UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MILLER, et al. | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. C-11-22 |
| | § | |
| CITGO Refining and Chemicals Company | § | |
| LP | § | |
| Defendant. | § | |

**ORDER DISMISSING CERTAIN PLAINTIFFS
WITH PREJUDICE**

On November 18, 2011, and November 30, 2011, the Court held evidentiary hearings to address Plaintiffs' alleged noncompliance with prior Orders of this Court.  This Order sets forth the rulings made at these evidentiary hearings.

**I.     JURISDICTION**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this suit is brought under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207 et seq.

**II.     FACTUAL AND PROCEDURAL BACKGROUND**

**A.     Events Necessitating Evidentiary Hearings**

In this civil action, Plaintiffs, current and former employees of Defendant CITGO Refining and Chemicals Company, LP ("Defendant" or "CITGO"), allege that CITGO improperly classified Plaintiffs as "non-exempt" employees in order to avoid paying them overtime wages.  Plaintiffs contend that this practice violated the provisions of the Fair Labor and Standard Act ("FLSA"), 29 U.S.C. § 207 et seq.  (D.E. 15.)

### 1.      Defendant CITGO's Discovery Requests

Defendant CITGO served Plaintiffs with interrogatories and requests for production in April of 2011.  On August 22, 2011, the Court held a telephone conference to address a dispute that had arisen concerning several discovery matters.  On the day of the telephone conference, the Court entered an Order ("First Order"), mandating that Plaintiffs comply with Defendant CITGO's discovery requests.  (See D.E. 17.)

### 2.      The Court's First Order

In its First Order, the Court entered a series of mandates with respect to several disputed interrogatories and requests for production.  (See id.)  What follows are excerpts from the First Order, including the text of the disputed interrogatories and requests for production themselves, and the Court's supplemental orders.

### a.      Interrogatory No. 16

**Interrogatory No. 16** states: "Identify, describe and specify all email addresses you used or accessed during your scheduled CITGO work hours or during work hours you worked for CITGO since January 1, 2008." (Id. at 6.)

The Court's instructions concerning Interrogatory No. 16 were as follows.  The Court ordered Plaintiffs to use their best efforts to provide CITGO with the following: (1) a summary of their personal efforts to retrieve the information requested; (2) an estimate of time spent during each scheduled workday using or accessing non-CITGO email accounts; and (3) a summary of their efforts to retrieve email information from their email providers by Monday, September 12, 2011.  (Id. at 6.)

Plaintiffs were also ordered to save and to print out requested information and to  provide that information to CITGO.  (Id.)  If such information was unavailable, Plaintiffs were to: (1)

state that the information was unavailable; (2) the amount of time it would take to retrieve the information; and (3) the cost of retrieving the information.  (Id.)

Plaintiffs were also ordered to provide Defendant with: (1) an estimate of the percentage of personal emails that had been deleted; and (2) the approximate date that such emails were deleted by Monday, September 12, 2011.  (Id.)

### b.      Request for Production No. 9

**Request for Production No. 9** states: "All documents prepared by you that you used, or that assist or have assisted you, in the operation of your console since January 1, 2008, including, but not limited to, trend charts, yield reports, logs, journals, and any other materials you review, prepare or exchange before you being [sic] or end shift." (D.E. 17 at 8-9.)

Concerning Request for Production No. 9, the Court ordered Plaintiffs to provide Defendant CITGO with all notes and/or documents created by Plaintiffs during scheduled work hours, relating to work for CITGO, by September 12, 2011.  (Id.)

### c.      Request for Production No. 41

**Request for Production No. 41** states: "All emails from a non-CITGO email address that you have sent during your scheduled CITGO work hours or during work hours you worked for CITGO since January 1, 2008." (Id. at 8.)

Concerning Request for Production No. 41, the Court ordered Plaintiffs to respond to Request for Production No. 41 by Monday, September 5, 2011.  (Id.)

### 3.      The Court's Order of November 3, 2011 ("Second Order")

On November 1, 2011, over two months later, the Court held a telephone conference to address Plaintiffs' noncompliance with the Court's First Order.  (D.E. 22 at 1.)  The Court subsequently entered the Second Order on November 3, 2011, reminding the Plaintiffs that they were under an obligation to preserve documents that might be responsive to requests for production, or that might lead to the production of relevant evidence.  (Id.)

The Court's Second Order also imposed several obligations upon Plaintiffs.  Specifically, Plaintiffs were ordered to produce either: (1) the emails that were responsive to Interrogatory No. 16 and/or Request for Production No. 41; or (2) a list of all of their respective email addresses, along with relevant accounts and passwords by November 8, 2011.  (D.E. at 2.)   The Court further stated that the Court would hold an evidentiary hearing on November 18, 2011.  (Id. at 4.)  Any Plaintiffs who had not preserved their notes and/or documents and who had not properly supplemented their responses were ordered to appear.  (See id. at 3-4.)  The Court stated that violations of the Court's First Order would lead to noncompliant Plaintiffs having their claims dismissed.  (Id. at 4.)

### B.    Evidentiary Hearings

What follows is a list of Plaintiffs that attended the evidentiary hearings on November 18, 2011 ("the First Hearing"), and November 30, 2011 ("the Second Hearing"), excerpts from Plaintiffs' testimony at these hearings, and the Courts findings concerning the Plaintiffs, if any.

### 1.    Rudy Ramirez ("Ramirez")

At the First Hearing, Ramirez conceded that he regularly took notes as he performed his work duties for Defendant CITGO.  (November 18, 2011, Hearing at 9:34.)   Ramirez also conceded that he had received the Court's First Order via email, and had reviewed it. (Id. at 9:34-35.)  With some equivocation, Ramirez acknowledged that the documents he prepares at work, relate to his work.  (Id. at 9:36.)  When asked whether he had begun preserving his work-related notes after the Court entered the First Order, Ramirez stated that he simply ceased taking notes at all.  (See id.)  Ramirez also admitted that he had not preserved his notes made prior to the entry of the Court's First Order.  (Id.)  When asked whether he remembered receiving the requests for production on April 13, 2011, Ramirez said that he remembered receiving them, but could not

remember when. (Id. at 9:38.)   Ramirez also admitted that, to the date of the hearing, he had

never produced any of his notes. (Id. at 9:44.)

Again, Ramirez represented that he stopped taking notes entirely after the entry of the

First Order. (Id. at 9:36.)  However, Defense counsel pointed to Ramirez's deposition testimony,

taken in October, 2011, that showed that Ramirez was still taking handwritten notes at that time.

(Id. at 10:23-31.)  The Court found that Ramirez had not preserved documents as he had been

ordered, and that Ramirez had not been truthful in his assertion that he had ceased taking notes

when the Court entered the First Order. (Id. at 10:35.)

### 2.      William Waggoner ("Waggoner")

At the First Hearing, Waggoner admitted that he took notes pertaining to his work. (Id. at

10:37.)   Waggoner further admitted that he took handwritten notes before entering the

information from those notes into the Enhanced Event Logging System ("EELS"). (See id. at

10:38.)  Waggoner further asserted that he had not been preserving the handwritten notes, but

would instead mark through items that he had placed on EELS and leave the notebook for the

employee who would relieve him. (Id. at 10:38.)  When asked, Waggoner stated that this was

still his practice at the time of the First Hearing. (Id. at 10:38-39.)

Waggoner stated that he remembered receiving a request for production some months

prior to the First Hearing. (Id. at 10:40.)  Waggoner further acknowledged that he had provided

supplemental responses to Defendant on October 11, 2011. (Id.)  Waggoner also conceded that,

in his response, he had formerly stated, "any notes that may be taken down on scratch paper [are]

thrown away at the end of the day." (Id.)  Waggoner averred that he would sometimes throw the

notes away at the end of his shift. (Id. at 10:41.)  Waggoner also admitted that he was still

engaging in that conduct as of the time of the First Hearing. (Id.)

Waggoner stated that he remembered receiving the Court's First Order to preserve records, and that he had received the First Order around August 22, 2011. (Id.) Waggoner stated that he understood that the First Order imposed an obligation to submit work-related notes by September 12, 2011. (See id. at 10:42.) Waggoner also admitted that the information on this scratch paper was related to his work for CITGO. (Id. at 10:48.)

### 3.  Greg Smith ("Smith")

At the First Hearing, Smith averred that he wrote down work-related information in the course of his employment for CITGO. (Id. at 10:50.) Smith also acknowledged that these notes were created during his work hours and related to his work at CITGO. (Id. at 10:51.) Smith contended, however, that everything in his handwritten notes is eventually transferred to EELS verbatim. (Id.) Smith also asserted that he no longer had these hand-written notes and did not understand that he was under an obligation to save them. (Id. at 10:53.)

### 4.  Diana Rudell ("Rudell")

At the First Hearing, Rudell acknowledged stated, "All hand-written notes that [inaudible] to pass-down information to my relief are thrown away after I leave because they are just notes on a scratchpad." (Id. at 11:09.) Rudell also acknowledged that these notes were created during scheduled work hours and related to her work for CITGO. (Id.) Rudell also acknowledged that the handwritten notes contained information that was not available on EELS. (Id.)

In addition, Rudell also acknowledged that she understood that she was under Court order to preserve work-related documents. (Id. at 11:10.) Rudell further admitted that she never made any attempt to copy and preserve the notes. (Id.)

### 5.    Chester Harrison ("Harrison")

At the First Hearing, Harrison asserted that he did not take hand-written notes in the course of his employment with CITGO.  (<u>Id.</u> at 11:15-16.)  Defense counsel reminded Harrison that he had provided written discovery responses in this case and that one of these responses had stated "Any handwritten notes for work would be left there at my console and in most probability would be thrown away.  I never kept any written pass-down notes."  (<u>Id.</u> at 11:16.)  At the hearing, Harrison testified that he had been referring in that response, to everyone's notes rather than his own. (<u>Id.</u>) Harrison subsequently reaffirmed that he had taken no handwritten notes in 2011, but that everything had been placed on EELS.  (<u>Id.</u> at 11:17.)

### 6.    Ronald Gaynor ("Gaynor")

At the First Hearing, Gaynor acknowledged that he had taken notes in the course of his employment with CITGO, and that these notes had been taken on a pad.  (<u>Id.</u> at 11:20.)  Gaynor also acknowledged that the notes he had taken on the pad were not on the console whenever he would return to work a subsequent shift.  (<u>Id.</u> at 11:21.)  Gaynor stated that he did not know what became of these notes.  (<u>Id.</u>)  Gaynor also acknowledged that he had taken no affirmative steps to preserve the notes, or to deliver them to Defendant CITGO.  (<u>Id.</u> at 11:22.)  When prompted by the Court, Gaynor insisted that his failure to preserve the handwritten notes was due to habit.  (<u>Id.</u> at 11:25.)  Gaynor also admitted that he understood that the notes he left at his console were thrown away.  (<u>Id.</u> at 11:26.)

### 7.    Ronald Stubbs ("Stubbs")

At the First Hearing, Stubbs acknowledged that he took notes at work.  (<u>Id.</u> at 11:29.)  He also stated that these notes were created during work hours and related to his work for CITGO.  (<u>Id.</u>)  Stubbs also acknowledged that he had received the First Order concerning preservation of

documents   (Id.)   Stubbs asserted that he had given his notes to Plaintiffs' counsel prior to the First Hearing.   (Id. at 11:31.)   However, Stubbs conceded that the notes that had been presented to counsel only covered dates from September 1, 2011, onward.   (Id. at 11:32.)   Stubbs further stated that notes made prior to the Court's First Order had been routinely left on the console at the end of his shift, and were discarded.   (Id.)   Stubbs stated that he only began preserving the handwritten notes when the Court entered the Court's First Order.   (Id.)

However, Stubbs conceded that he recalled stating that, since October, 2010, he had thrown or destroyed handwritten notes that he had made while working for CITGO.   (Id. at 11:34.)   Further, in his deposition, taken October 13, 2011, Stubbs had stated that his handwritten notes had been thrown away on a daily basis.   (See id. at 11:35.)   Moreover, in his written discovery responses submitted on October 6, 2011, read into the record by defense counsel, Stubbs stated that "I have no documents in my possession.   They are left on a pad physically on my console when I leave each day."   (Id. at 11:35-36.)   The Court found that Stubbs had not retained his notes as he had been ordered.   (See id. at 11:37-38.)

When prompted by defense counsel, Stubbs admitted that he did not know what had become of the notes that were written between the entry of the Court's First Order on August 22, 2011, and the date of the first entry on the pad that Stubbs had turned in.   (Id. at 11:45.)   Stubbs also conceded that he had not produced any of these notes as a response to the discovery requests he had received in April 2011.   (See id. at 11:46.)   Stubbs averred that he did not know whether the notepad that he had presented was complete.   (Id. at 11:47.)   The Court later took judicial notice that pages had been torn out of this notepad.   (Id. at 11:59.)

### 8.     Greg Salinas ("Salinas")

At the First Hearing, Salinas admitted that he took handwritten notes in the course of his work for CITGO.  (Id. at 11:49.)  Salinas also conceded that these notes are sometimes created during work hours and relate to his employment with CITGO.  (Id.)  These notes assisted Salinas in the operation of his console.  (Id.)  Salinas further acknowledged that he had done nothing to preserve his notes.  (Id.)  He also admitted having received the Court's First Order requiring him to preserve his notes.  (Id. at 11:49-50.)  In addition, Salinas acknowledged former deposition testimony where he had stated that the information written in his handwritten notes differed from that contained on the EELS system.  (Id. at 11:50.)  Salinas also admitted that he knew that the notes he compiled in the course of his work would not be on his console when he returned for a subsequent shift.  (Id. at 11:55.)

### 9.     Luis Galvan ("Galvan")

At the First Hearing, Galvan admitted taking notes while at work.  (Id. at 11:58.)  Further, Galvan acknowledged that these notes were created during work hours and related to his work for CITGO.  (Id.)  Galvan insisted however that he had preserved his notes, and that these notes were located in his backpack and his locker at work.  (Id. at 11:58-59.)  Galvan also averred that, while he was not sure when he began preserving his notes, he thought the notes might have been kept since April, 2011.  (Id. at 12:00.)  Galvan also admitted that much that was in his handwritten notes differed from the information that had been entered into EELS.  (Id.)

Galvan also stated that he had given his notebook to Plaintiffs' counsel the day before the First Hearing on November 18, 2011.  (See id. at 12:02.)  Galvan further acknowledged that some of the information in this notebook related to his work and had not been placed in the EELS system.  (Id. at 12:11.)  When asked why he had not given the document to Plaintiffs'

counsel until the day before trial, Galvan asserted that his failure to provide the documents was based on his estimation that they were not responsive to the Court's order.  (<u>Id.</u> at 12:12.)

### 10. Michael Weigel ("Weigel")

At the First Hearing, Weigel asserted that he kept notes while at work for CITGO.  (<u>Id.</u> at 12:14.)  Weigel also admitted that he did not preserve the notes but left them at his workstation. (<u>Id.</u> at 12:15.)  When asked whether he had received the Court's First Order requiring him to save his notes, Weigel stated that he had received a related email.  (<u>See id.</u>)  Weigel subsequently admitted that he had not saved his notes.  (<u>Id.</u>)  Weigel also admitted that there was information in the handwritten notes, relating to his work at CITGO that was not transferred to EELS.  (<u>Id.</u> at 12:15-16.)

### 11. Donald Hedrick ("Hedrick")

At the First Hearing, Hedrick asserted that he did not keep handwritten notes while working for CITGO.  (<u>Id.</u> at 12:20.)  Rather, all of his notes were kept on his computer.  (<u>Id.</u>) Defense counsel reminded Hedrick that, at his deposition, Hedrick admitted that he was aware that the person on the next shift would probably write over any notes Hedrick had taken.  (<u>Id.</u>) Hedrick also admitted that, since April of 2011, Hedrick had made no effort to print the notes that reflect his daily activity at CITGO.  (<u>Id.</u> at 12:21.)  Further, though Hedrick insisted that the notes that he took on his computer at work were probably backed up by CITGO, he did not know for certain that they were in fact backed up.  (<u>Id.</u>)

### 12. Jaime Requenez ("Requenez")

At the Second Hearing, Requenez admitted that he took notes while working for CITGO. (November 30, 2011, Hearing at 1:31.)  He also admitted that these notes would be the best reflection of the sort of work he did on a daily basis.  (<u>Id.</u> at 1:32.)  Requenez also stated that he

kept his notes in a folder.  (Id.)  Requenez denied having thrown his notes away in July of 2011, and rather insisted that he had preserved his notes from January, 2011, until the time of the Second Hearing.  (Id. at 1:34.)

When asked, Requenez stated that he remembered having his deposition taken on August 24, 2011.  (Id.)   Defense counsel reminded Requenez that he had stated in his deposition testimony that he would repeatedly winnow documents from this folder.  (See id.)  He also reminded Requenez that he had stated in his deposition that he had thrown out some of the notes that he kept in a binder about a month before the deposition.  (Id. at 1:35.)  Requenez further stated that he probably kept about two months worth of notes in this folder.  (Id.)  At the hearing he insisted that his statement in the deposition had been a mistake, and that after the deposition, he reviewed his folder and found that he had more than two months worth of material in it.  (Id. at 1:35-36.)

In addition, Requenez contended that he sent the notes to his counsel not long after the deposition.  (Id. at 1:36.)  Defense counsel asserted that on November 21, 2011, and November 29, 2011, he had received about 300 pages of notes from Requenez.  (See id.)  Plaintiffs' counsel averred that he had sent these items to defense counsel approximately two or three days after he himself had received them.  (Id. at 1:36-37.)  The notes were purportedly representative of dates running from February 8, 2011, to the date they were turned over the counsel.  (Id. at 1:37.)  Requenez also testified that in July of 2011, he had thrown away notes from dates prior to February 8, 2011.  (Id. at 1:38.)

When asked, Requenez stated that he remembered receiving CITGO's requests for production in April, 2011.  (Id. at 1:38.)  Requenez also admitted that he would type his own notes over the notes of the console supervisor who had preceded him.  (Id. at 1:40.)  When asked

whether, when he saved his notes, the previous supervisor's notes were eliminated, Requenez admitted that he did not know.  (Id.)  Requenez later conceded that he believed that, in saving his own notes, he was overwriting the notes of the supervisor who preceded him.  (Id. at 1:40-41.)

Requenez stated that he was aware of the Court' First Order, mandating the preservation of documents.  (Id.)  He also stated that he knew he had been under an obligation to present his documents to CITGO by September 12, 2011.  (See id. at 1:41-42.)  Moreover, he stated that he was aware that he had been under an obligation to provide copies of his personal emails and information concerning these emails to the Court in early September.  (Id. at 1:42-43.)  Requenez stated that he had provided information concerning his personal email accounts that he accessed from his work computer, though he could not remember when.  (Id. at 1:44.)

When asked about his email accounts, Requenez asserted that the only email account that he had at the time of deposition and onward was the gmail.com account.  (See id. at 1:48.)  Requenez averred that he had deleted some emails from his gmail.com account after the entry of the Court's Second Order.  (Id. 1:49.)  Requenez did this in spite of his knowledge of the contents of this Order.  (Id. at 1:49-50.)  The Court concluded that Requenez had not followed the Orders of the Court.  (Id. at 1:50-51.)  In response to the Court's order to, inter alia, estimate the amount of emails that had been deleted, Requenez had submitted only that such an estimation would be impossible to make.  (Id. at 1:51-52.)

### 13.   Robert Garcia ("Garcia")

At the Second Hearing, Garcia admitted that he had taken notes at work.  (Id. at 1:59.)  He also admitted that these notes reflect the work that he does during the day.  (Id.)   Garcia further estimated that only 50% of his notes are transferred to EELS.  (Id.)  Garcia also conceded that, prior to the deposition, Garcia he would throw his notes away at the end of his shift.  (Id. at

1:59-2:00, 2:07.)  His deposition was taken August 10, 2011.  (<u>Id.</u> at 2:00.)  Garcia asserted that, since the time of his deposition, he had preserved his notes.  (<u>Id.</u> at 2:01.)  He stated that these notes, taken in the one-month period prior to the Second Hearing, were presented to Plaintiffs' counsel on the morning of November 30, 2011.  (<u>Id.</u>)  Garcia subsequently stated, however, that the notes represented the period between the time of his deposition and the Second Hearing.  (<u>Id.</u> at 2:03-04.)  Any notes compiled by Garcia prior to his deposition had been thrown away.  (<u>Id.</u> at 2:07-08.)

Garcia also stated that he remembered receiving Defendant's requests for production in April of 2011.  (<u>Id.</u> at 2:05.)  Garcia admitted that his work notes were responsive to these requests for production.  (<u>Id.</u> at 2:06.)  With respect to the pass-down notes, Garcia stated that he would save the document, and then delete the notes of his predecessor.  (<u>Id.</u> at 2:07-08.)  Garcia averred that he could have printed out his pass-down notes.  (<u>Id.</u> at 2:08.)  When asked, Garcia conceded that these pass-down notes contained information relating to his work, and was unable to offer a reason as to why he had not produced them.  (<u>Id.</u> at 2:08-10.)

Garcia also conceded that, while he had provided a list of email contacts, he had not provided any other information required by the Court's First Order.  (<u>Id.</u> at 2:10-11.)  He provided no estimate as to the number of emails that had been deleted.  (<u>Id.</u> at 2:12.)  Garcia acknowledged his prior response to written interrogatories from June of 2011, in which he had stated that he could not estimate when he had stopped deleting his personal emails.  (<u>See</u> <u>id.</u> at 2:14.)

### 14.    Ciriaco Villareal ("Villareal")

At the Second Hearing, Villareal conceded that he had taken notes on a notepad at work. (<u>Id.</u> at 2:18-19.)  He further testified that he would leave these notes on the console and did not

know what happened to them afterwards.  (Id. at 2:19.)  Villareal had been deposed November 2, 2011.  (See id.)  Villareal acknowledged a statement he had formerly made in this deposition asserting that when the notepad was filled with information, it would be thrown away.  (Id. at 2:19-20.)  When prompted by the Court, he also stated that he had made no effort to locate the notes.  (Id. at 2:20.)

Villareal also asserted that he took no notes at work after the entry of the Court's First Order on August 22, 2011.  (Id. at 2:21.)  He conceded that he had received Defendant's request for production prior to the Second Hearing.  (Id. at 2:23.)

Villareal admitted that he had received the Court's First Order, which required him to provide information concerning the use of personal email accounts, and copies of the emails that he sent or read from those accounts while working for CITGO.  (Id. at 2:24.)  Villareal admitted that he had not submitted any of his emails by the September 5, 2011, deadline.  (Id. at 2:25.)  When asked about the email-related information that he was to provide by September 12, 2011, Villareal acknowledged that he had submitted such information after his deposition on November 2, 2011.  (Id.)

Villareal acknowledged that, on November 3, 2011, the Court entered an Order requiring him to send CITGO either his emails or the information necessary to access those emails.  (See id. at 2:25-26.)  Villareal testified that he had provided 46 emails from his aol.com account on November 8, 2011.  (See id. at 2:26.)  Villareal subsequently acknowledged that he had formerly answered an interrogatory and had stated that he had not accessed or used any person email while working for CITGO, since January 1, 2008.  (Id. at 2:35-36.)

In his interrogatory response, Villareal stated that it would be impossible to guess or even estimate how many emails had been deleted and when they had been deleted.  (Id. at 2:38-39.)

Villareal conceded that he had deleted personal emails from his aol.com account as late as the morning of his deposition November 2, 2011.  (See id. at 2:40-41.)   At the hearing, Villareal, who is apparently mayor of Mathis, Texas, asserted that he does no business as the mayor of Mathis through his email account.  (Id. at 2:41.)  However, Villareal subsequently admitted that the emails he had submitted on November 8, showed that he had sent and received several emails in which he had been acting in his capacity as mayor of the City of Mathis.  (Id. at 2:42.) Villareal again asserted that he had deleted no emails since the date of his deposition.  (Id.)

> **15.    Eduardo Martinez ("Martinez")**

At the Second Hearing, Martinez acknowledged having reviewed pass-down notes while working for CITGO.  (Id. at 2:44.)  Martinez also remembered responding to CITGO's document request by stating that important handwritten notes are stored on a terminal clipboard for all to have access to, and are unfortunately sometimes misplaced.  (Id.)  He also remembered stating that others that are not important go into the recycling bin.  (Id.)  Martinez admitted that these notes are notes he uses during his work for CITGO.  (Id.)

In addition, Martinez admitted that he had been aware that, since the entry of the Court's First Order, he had been under an obligation to preserve these notes.  (Id. at 2:44-45.)  Martinez also asserted that he invariably transferred the information in his notes to EELS.  (Id. at 2:46.) Martinez conceded that he had received CITGO's request for production in April of 2011.  (Id. at 2:48.)  Martinez also stated that he remembered having submitted a response to the discovery request around October 11, 2011.  (Id.)  Martinez admitted, however, that he did in fact take handwritten notes daily, and that he had done nothing to preserve these notes.  (See id. at 2:49.) Martinez further asserted that he had begin saving his notes about two or three weeks before the

hearing.  (Id. at 2:49-50.)  Martinez also stated that he realized that he had failed to comply with the Court's Order.  (Id. at 2:50.)

Martinez asserted that he remembered the Court's First Order, and that he had been obligated to produce information regarding his use of personal email accounts at work, and copies of the emails that he sent or read from those accounts while working for the company. (Id.)  He also stated that he remembered being instructed to provide an estimate of the percentage of emails that had been deleted, and the approximate date that such emails were deleted by September 12, 2011.  (See id.)  Martinez acknowledged that he had not submitted any of this information timely.  (See id. at 2:50-51.)

### 16.     David Bellows ("Bellows")

At the Second Hearing, Bellows admitted that he had taken handwritten notes while working for CITGO that related to his work for CITGO.  (Id. at 3:00-01.)  He also admitted that he had formerly said that he would leave notes on a pad at his console when he left for the day. (Id. at 3:01.)  Bellows stated that he believed the notes on this notepad were thrown away at some point.  (Id.)  Bellows also admitted that he knew that he was a under a Court Order, as of August 22, 2011, to preserve and produce his notes.  (See id.)  He admitted that he had not produced any documents by September 12, 2011.  (Id. at 3:01-02.)  The first time Bellows produced any notes was in his deposition that occurred on November 29, 2011.  (See id. at 3:02.) At the deposition, Bellows produced only two pages of notes.  (Id.)  Additionally, Bellows stated that he remembered receiving CITGO's request for production in April of 2011.  (See id. at 3:02-03.)  Finally, Bellows admitted that he had not transferred all of the information from his notes into EELS.  (Id. at 3:04.)

### 17.    Rudolfo Martinez ("Rudolfo")

At the Second Hearing, Rudolfo admitted that he "used to" take notes while working at CITGO.  (Id. at 3:08.)  He further averred that when he had received the directive to save his notes, he ceased taking such notes.  (Id.)  He conceded that when he had taken handwritten notes, not everything in those notes had been transferred to EELS.  (Id. at 3:09.)  Rudolfo also acknowledged his former response to interrogatory in which he stated that he kept handwritten notes on a legal pad.  (Id.)   Notes on this pad were made when Rudolfo did not have time to make an entry into EELS.  (Id.)  Further, he acknowledged that these notes would be discarded when someone had gotten to the last page of the legal pad.  (Id.)

Rudolfo admitted remembering that he had received a request for production from CITGO in April, 2011.  (Id. at 3:10.)  He also conceded that this request for production involved notes relating to his work for CITGO.  (Id.)  Rudolfo also admitted that he had taken notes between having received CITGO's request for production and the entry of the Court's First Order, and that these notes had been discarded.  (Id. at 3:12-13.)

Rudolfo acknowledged that he had provided a response to CITGO's discovery requests in October of 2011.  (Id. at 3:15.)  In that response, Rudolfo had stated that "Handwritten notes are on an eight-and-a-half legal pad.  These notes are simply notes that we jot down when he don't have time to type entries into our EELS.  These notepads are discarded once someone gets to the last page.  I don't know if anyone keeps these notes."  (Id.)  Defense counsel noted both that: (1) Rudolfo had used the present tense when making these statements; and (2) he had made no mention that he had ceased taking handwritten notes at that time (though over a month had elapsed since he had ceased keeping handwritten notes).  (Id. at 3:15-16.)  The Court found Rudolfo's testimony as to these matters was not credible.  (See id. at 3:17.)

Rudolfo admitted that he could have copied these notes and that he had chosen not to do so. (Id. at 3:18.) He further conceded that he remembered receiving the Court's First Order requiring him to provide information concerning the use of his personal email accounts while at work, and copies of the emails he sent or read from those accounts while at work. (Id.) He conceded that he had failed to produce any emails by September 5, 2011, and had not sent any additional information to CITGO by September 12, 2011. (See id. at 3:19.)

Rudolfo acknowledged that he had been ordered on November 3, 2011, to produce his personal emails, or the information necessary to retrieve those emails and had provided information concerning an aol.com account and a zebra-ware.com account on November 8, 2011. (Id. at 3:19-20.) When asked by defense counsel, Rudolfo asserted that he had in fact accessed his zebra-ware.com account at work. (Id. at 3:20.)

Rudolfo remembered providing discovery responses to CITGO in June of 2011, and listing only his CITGO email account at that time. (Id. at 3:21-22.) Rudolfo also acknowledged that, in his August 11, 2011, deposition, he had asserted that he did not have any personal email accounts. (See id. at 3:22-23.) Rudolfo subsequently admitted that he had accessed both the aol.com and the zebra-ware.com accounts while at work. (Id. at 3:26.) When asked by the Court, Rudolfo admitted that he was still deleting emails from his personal account at the time of the Second Hearing. (Id. at 3:28.)

### 18.    Steve Moore ("Moore")

At the Second Hearing, Moore admitted that was aware that, on August 22, 2011, he had been ordered to preserve his work notes from that date onward. (Id. at 3:31.) Moore also acknowledged having said in his deposition that he used a scratchpad at work to keep track of things that happened on his shift, that were not in the daily guidelines, and not the in any EELS

report.  (Id. at 3:32.)  He also admitted that he would often add detail to his handwritten notes that was not contained in the EELS.  (Id. at 3:33.)

Moore also admitted that, on November 16, 2011, he had produced copies of notes from a pad stating that he had been able to locate a legal pad that had been started at the console on September 1,  2011, and completed on November 15, 2011.  (See id. at 3:33-35.) Moore admitted that he was unsure whether this notebook was a complete record of his notes from this time period.  (Id. 3:37.)

Moore further conceded that this notepad did not contain all of his notes from the time of the entry of the Court's First Order, going forward.  (Id. at 3:35.)  In addition, Moore stated that he had made no effort to preserve the notes from the time he had received Defendant CITGO's discovery request to the time of the entry of the Court's First Order, and that he did not know what had become of them.  (Id. at 3:35-36.)   Moore admitted that he had submitted a response to CITGO's request for production of documents on October 11, 2011.  (Id. 3:42.)

Moore admitted that he remembered the Court's First Order in which he had been required to produce information concerning his use of personal emails at work and copies of those emails sent or read from those accounts.  (Id. 3:45.)  Moore further admitted that he could not testify, under oath, that he had met the September 5, 2011, deadline.  (Id.)  He also acknowledged that he had failed to meet the Court's September 12, 2011 deadline.  (Id. 3:45-46.)

Moore acknowledged that on November 8, 2011, after the entry of the Court's Second Order, he provided 10 emails from his account with hotmail.com.  (See id.)  Moore contended that no emails had been deleted from this hotmail.com account.  (Id. 3:46.)  Moore also conceded that, prior to his deposition, he had not made any attempt to compile any emails for production to

Defendant CITGO.  (<u>Id.</u> 3:47.)  Moore later admitted, again, that the information on the notepads is information necessary for the operation of his console.  (<u>Id.</u> at 4:03.)

      **C.**    **Findings**

At the conclusion of the Second Hearing, the Court made a series of findings.  The Court found that every Plaintiff who testified at the hearing, save Chester Harrison, had failed to participate in discovery, failed to properly supplement responses, and failed to preserve documents.  (<u>Id.</u> at 407-08.)

## III.    DISCUSSION

A district court may impose sanctions on parties found to have disobeyed the court's discovery orders.  <u>FDIC v. Conner</u>, 20 F.3d 1376, 1380 (5th Cir. 1994).  The Federal Rules of Civil Procedure provide:

> If a party . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders.  They may include . . . dismissing the action or proceeding in whole or in part.

Fed. R. Civ. P. 37(b)(2)(A).   In the Fifth Circuit, a Rule 37 dismissal is proper if the failure to comply with the court's order resulted "from willfulness or bad faith and is accompanied by a clear record of delay or contumacious conduct."  <u>Conner</u>, 20 F.3d at 1380 (internal quotations omitted).   Additionally, the violation of the discovery order must be attributable to the client rather than the attorney, and the violation of the order must substantially prejudice the opposing party.  <u>Id.</u>  Finally, dismissal is proper only if a lesser sanction would not have the desired effect.  <u>Id.</u> at 1381.  "Deliberate, repeated refusals to comply with discovery orders have been held to justify the use of this ultimate sanction" of dismissal with prejudice.  <u>Bonaventure v. Butler</u>, 593 F.2d 625, 625-26 (5th Cir. 1979).

The Court concludes that, with the exception of Chester Harrison, the named Plaintiffs willfully disregarded the Court's discovery orders in failing to preserve, and in destroying, their work-related notes.  In addition, many named Plaintiffs failed to preserve and to produce emails that they had read or sent while working for CITGO, in spite of this Court's express order.  Plaintiffs were aware of the Court's rulings, and nevertheless failed to conduct themselves in accordance with them.  This failure evidences a blatant disregard for the judicial process, and constitutes willful and contumacious conduct.

The Court also notes that the violations of the Court's discovery orders are accompanied by a record of delay.  Plaintiffs received requests for production and interrogatories in April of 2011, and by November 30, 2011, after two Orders requiring Plaintiffs to participate in the discovery process, Plaintiffs still had not provided their work-related notes.  Additionally, these violations are attributable to Plaintiffs rather than to their counsel.  Counsel routinely provided defense counsel with the information he had received from his clients.  Thus, this violation of the Court's Orders is fairly imputed to  Plaintiffs.

In addition, the Court concludes that Plaintiffs' violations of the Court's Order substantially prejudiced Defendant.  Plaintiffs destroyed, failed to preserve, and failed to produce their handwritten notes.  This case involves alleged violations of the FLSA.  The fundamental issues in this case are whether Plaintiffs were properly classified as supervisors, and whether they, in fact, performed supervisory functions while at work.  Much of the testimony indicates, and the Court concludes, that the notes Plaintiffs routinely destroyed or failed to preserve would have been the best evidence of their daily tasks.

Moreover, Plaintiffs failed to provide their personal emails and information concerning those emails in violation of the Court's First Order.  In its First Amended Answer, Defendant

contends that "Plaintiffs are barred [from receiving compensation] as to all hours during which Plaintiffs were engaged in activities that were preliminary or postliminary to their principal activities."   (D.E. 16 at 14.)    Further, "[w]hile Defendant denies that Plaintiffs worked uncompensated overtime, it pleads alternatively that their claims should be offset by personal time spent on the clock for which they were paid." (<u>Id.</u> at 15.)   The nature and amount of personal emails read while at work, or sent from work, would indicate the extent to which Plaintiffs engaged in personal activity while at work.   Thus, these emails go directly to two of Defendant's defenses.

The Court further notes that, in this case, trial has been set for March 5, 2012.   At the time of the Second Hearing on November 30, 2011, many Plaintiffs had still not produced their notes or their personal emails to Defendant CITGO.   The Court concludes that Plaintiffs' refusal to participate in the discovery process has substantially prejudiced Defendant CITGO's ability to prepare itself for trial.

Finally, the Court concludes that the conduct of the parties in the instant case indicates that a lesser sanction would not effectively deter Plaintiffs in this case.   The Court gave Plaintiffs several opportunities to remedy their failure to provide discovery, and had warned them of the possibility of dismissal in the Court's Second Order.   Despite this they still failed to strictly comply.   This indicates that lesser sanctions would have no deterrent effect.   Given that Plaintiffs' conduct satisfies the elements outlined by the court in <u>Conner</u>, the Court concludes that dismissal with prejudice is appropriate.

## IV.    CONCLUSION

As the foregoing analysis suggests, the claims of the named Plaintiffs are due to be dismissed pursuant to Federal Rule of Civil Procedure 37(b)(2)(A)(v).   Consequently, the claims

of Rudy Ramirez, William Waggoner, Greg Smith, Diana Rudell, Ronald Gaynor, Ronald Stubbs, Greg Salinas, Luis Galvan, Michael Weigel, Donald Hedrick, Jaime Requenez, Robert Garcia, Ciriaco Villareal, Eduardo Martinez, David Bellows, Rudolfo Martinez, and Steve Moore are DISMISSED WITH PREJUDICE.

SIGNED and ORDERED this 13th day of January, 2012.

_____
Janis Graham Jack
Senior United States District Judge