UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


| | | |
|---|---|---|
| STEVE MOORE, ET AL., | ) | CASE NO:  CA-C-11-022 |
| | ) | |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| vs. | ) | Corpus Christi, Texas |
| | ) | |
| CITGO REFINING AND CHEMICALS | ) | Friday, November 18, 2011 |
| COMPANY, LP, | ) | |
| | ) | ( 9:28 a.m. to 10:05 a.m.) |
| Defendant. | ) | (10:21 a.m. to 12:30 p.m.) |


EVIDENTIARY HEARING

BEFORE THE HONORABLE JANIS GRAHAM JACK,
SENIOR UNITED STATES DISTRICT JUDGE


Appearances:              See Next Page

Court Recorder:           Velma Gano

Clerk:                    Lori Cayce

Transcriber:              Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>


Plaintiffs:                       GREGG M. ROSENBERG, ESQ.
                                  Rosenberg Sprovach
                                  3555 Timmons Ln.
                                  Suite 610
                                  Houston, TX 77027


Defendant:                        MARK D. TEMPLE, ESQ.
                                  ALEXANDER NICHOLAS PYKE, ESQ.
                                  Jones Day
                                  717 Texas St.
                                  Suite 3300
                                  Houston, TX 77002


Senior Corporate Counsel:         ELBERT OCANAS, ESQ.
                                  JUDITH A. COLBERT, ESQ.
                                  CITGO Petroleum Corporation
                                  1293 Eldridge Parkway, N5020
                                  Houston, TX 77077

## INDEX

| DEFENDANT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| RUDY RAMIREZ | 9 | 31 | 39 | 50 |
| WILLIAM WAGGONER | 53 | 59 | 61 | 63 |
| GREGORY SMITH | 65 | 71/79 | 80 | -- |
| DIANA REDDELL | 83 | 86 | -- | -- |
| CHESTER HARRISON | 89 | -- | -- | -- |
| RONALD GANER | 94 | 96 | 98 | -- |
| RONALD STUBBS | 100 | 110 | 115 | -- |
| RICK SALINAS | 119 | 121 | -- | -- |
| LUIS GALVAN, II | 127 | 131 | 138 | -- |
| MIKE WEIGEL | 141 | 143 | 144 | -- |
| DONALD HEDRICK | 146 | 149 | 150/153 | 151/154 |

| PLAINTIFFS' EXHIBITS | MARKED/RECEIVED |
|---|---|
| 1 | 112 |
| 2 | 133 |

4

1    **Corpus Christi, Texas; Friday, November 18, 2011; 9:28 a.m.**

2                    **(Call to Order)**

3            **THE COURT:**  All right.  Now call the civil case,

4    please.  Sorry that took so long.  It should have been three

5    minutes.

6            **THE CLERK:**  The Court calls Civil Action C-11-22.

7    *Steve Moore, et al versus CITGO Refining and Chemicals Company.*

8    May I have appearances, please?

9            **MR. ROSENBERG:**  Gregg Rosenberg for the Moore

10   plaintiffs, all of them and especially those here today.

11           **THE COURT:**  Okay.

12           **MR. TEMPLE:**  Mark Temple for CITGO, your Honor.

13           **THE COURT:**  All right.

14           **MR. PYKE:**  Alex Pyke for CITGO.

15           **MR. OCANAS:**  Elbert Ocanas for CITGO.

16           **THE COURT:**  Thank you.  You can be seated.  Then, Mr.

17   Temple, you can proceed.

18           **MR. TEMPLE:**  Yes, your Honor.

19           **THE COURT:**  I'm giving you three hours and that's all

20   I've got.

21           **MR. TEMPLE:**  Okay, your Honor.

22           **THE COURT:**  So, that'll give you a time frame to work

23   with.  It would have been three hours and 20 minutes, but that

24   didn't work out.

25           **MR. TEMPLE:**  Okay.  Your Honor, could I call Rudy

5

1   Ramirez?

2        **THE COURT:**  Yes.  Mr. Ramirez, Rudy Ramirez, would

3   you come forward, please, sir?  And I think what I'll do is

4   just ask you all to stand and be administered the oath.

5        **THE CLERK:**  Please raise your right hands.

6   **(All Potential Witnesses; SWORN)**

7        **THE COURT:**  Mr. Rudy Ramirez?

8        **THE WITNESS:**  Yes, ma'am?

9        **THE COURT:**  Okay.  Starting with the gentleman in the

10  -- you can put your hands down -- in the light blue, would you

11  say your name?

12       **MR. MARTINEZ:**  Eduardo Martinez, Sr.

13       **THE COURT:**  Really loudly.

14       **MR. MARTINEZ:**  Eduardo Martinez, Sr.

15       **MR. BELLOWS:**  David Bellows.

16       **MR. REQUENEZ:**  Jaime Requenez.

17       **MS. REDDELL:**  Diana Reddell.

18       **MR. GALVAN:**  Luis Galvan.

19       **MR. HEDRICK:**  Donald Hedrick.

20       **MR. WAGGONER:**  William Waggoner.

21       **MR. GANER:**  Ronald Ganer.

22       **MR. VILLARREAL:**  Ciriaco Villarreal.

23       **MR. GARCIA:**  Robert Garcia.

24       **MR. SMITH:**  Gregory Smith.

25       **MR. STUBBS:**  Ronald Stubbs.

6

1              **MR. SALINAS:**  Rick Salinas.

2              **MR. MOORE:**  Steve Moore.

3              **MR. WEDGEL:**  Mike Wedgel.

4              **MR. OBERLANDER:**  Terry Oberlander.

5              **MR. HARRISON:**  Chester Harrison.

6              **THE COURT:**  All right.  Thank you.  The rest of you

7    all can -- you're under oath now, which means you cannot

8    discuss the case with anyone other than the lawyers involved in

9    the case, not even among yourselves.  I would usually -- I know

10   this is odd, but the thing is I don't necessarily -- have they

11   been sitting in on each other's depositions?

12             **MR. ROSENBERG:**  Yes, your Honor.

13             **THE COURT:**  All of them were there for every

14   deposition?

15             **MR. TEMPLE:**  No, your Honor.  A few have shown up for

16   some of the depositions, your Honor.

17             **THE COURT:**  Well, they're entitled to be here, but on

18   the other hand --

19             **MR. TEMPLE:**  Your Honor, I would ask that the rule be

20   invoked for purposes of this hearing because the individual

21   nature of each sanctions issue is at issue and one testimony

22   should not relate to another.

23             **THE COURT:**  It shouldn't.  So, I think I will ask you

24   all to stand up, to wait outside if you could and not discuss

25   the case with anyone other than the lawyers.

1          **MR. ROSENBERG:**  May I be heard for one moment?

2          **THE COURT:**  Yes.

3          **MR. ROSENBERG:**  We have one issue.  There's -- the

4    Court had released the subpoenas that were served.  There's one

5    gentleman here, I think -- yeah, responded to the subpoena who

6    shouldn't be here.  I sent an e-mail to Mr. Temple yesterday

7    releasing him, but he's here and I just wanted --

8          **THE COURT:**  Okay.  Who's he?

9          **MR. ROSENBERG:**  Mr. -- the gentleman back there --

10   Ober --

11         **MR. OBERLANDER:**  Oberlander?

12         **MR. ROSENBERG:**  Yeah.

13         **THE COURT:**  Goodbye.

14         **MR. OBERLANDER:**  Thank you.

15         **MR. ROSENBERG:**  I'm sorry.

16         **THE COURT:**  No problem.  Anyone else?

17         **MR. ROSENBERG:**  No, everyone else is here.  Everyone

18   else is here in response to the Court's order.  If the Court's

19   ruled on everybody leaving, we're --

20         **THE COURT:**  I'm okay with that because I think it is

21   an individual thing.

22         **MR. ROSENBERG:**  You know, honestly, your Honor, I'm

23   not, but I'm going to respect the Court's ruling.  If that's

24   the Court's ruling, they all go.

25         **THE COURT:**  If this were an issue about the wages and

1    what have you, I would agree with you about the heart of the

2    suit, but this is an individual sanction matter and I'd prefer

3    that they didn't learn from each other's questions and answers.

4              **MR. ROSENBERG:**  Like I said, if that's the Court's

5    ruling, they go.  I would have liked the opportunity to address

6    the Court before this started on where I saw the issues and

7    some of the issues involved.  But if the Court's not -- doesn't

8    want to hear it, that's fine, we can --

9              **THE COURT:**  I think I got the issues.

10             **MR. ROSENBERG:**  Okay.

11             **THE COURT:**  So, I want -- if everybody will leave,

12   Mr. Ramirez?

13             **THE WITNESS:**  Yes, ma'am.

14             **THE COURT:**  Take the stand.

15             **MR. ROSENBERG:**  I'm just going to tell them to go to

16   that area down there and then I'll go out and call them as --

17             **THE COURT:**  Yeah.  You can go visit with anybody any

18   time you want.  They can always talk to you about anything.

19             **MR. ROSENBERG:**  Right.  But I'm not going to delay it

20   here and I just want them -- I don't want them to go get coffee

21   or anything.  I just want them to be right there.

22             **THE COURT:**  Okay.

23             **MR. ROSENBERG:**  So, we've got one on the stand.

24             **THE COURT:**  You may be seated.  Thank you.  You may

25   proceed.

Ramirez - Direct / By Mr. Temple                    9

1          **MR. TEMPLE:**  And your Honor, as a housekeeping

2   matter, I did want to clarify the record.  Given where we were

3   the other day, we had represented to the Court that no

4   plaintiffs had produced any of these work notes.  We did

5   receive, I think now two days ago work notes from Steve Moore.

6   So, we do now have one set of work notes that we received right

7   before the hearing the other day.

8          **THE COURT:**  Fine.  Thank you.

9          **MR. TEMPLE:**  I wanted to clarify that.  Your Honor,

10  would you like for us to question the witness from the table or

11  from the lectern?

12         **THE COURT:**  You always go from the podium.  Thank

13  you.

14       **RUDY RAMIREZ, DEFENDANT'S WITNESS, PREVIOUSLY SWORN**

15                    **DIRECT EXAMINATION**

16  **BY MR. TEMPLE:**

17  Q    Mr. Ramirez, do you remember having your deposition taken

18  in this case?

19  A    Yes, sir.

20  Q    And do you remember in that deposition we asked the

21  question of you whether or not you take work notes during your

22  shift while working at CITGO?

23  A    I believe I remember that, yes, sir.

24  Q    And sir --

25         **THE COURT:**  Why don't you -- you know what?  If you

1    don't mind, just put that on the overhead projector.  This is

2    not the usual kind of hearing.

3              **MR. TEMPLE:**  Okay.  It's a lot easier, your Honor.

4              **THE COURT:**  And he doesn't -- he should have it in

5    front of him, anyway.

6              **MR. TEMPLE:**  And your Honor, this one, unfortunately

7    because it's an excerpt, is not -- it's not numbered on the

8    left hand side like the others but -- the other pages are.

9    **BY MR. TEMPLE:**

10   Q    Mr. Ramirez, do you remember giving testimony in this case

11   that you do take work notes with regard to your daily

12   activities while working at CITGO?

13   A    Yes, sir.

14   Q    And, sir, isn't it true that those work notes are the best

15   reflection of what you're doing every minute of the day while

16   working at the company?

17   A    No, sir.

18   Q    That is not true?

19   A    No, sir.

20   Q    Do you remember testifying that during the time that you

21   take the notes that you do try to take the notes of the

22   activities that you're conducting?

23   A    I believe so, yes.

24   Q    And do you remember that these notes, you would agree, do

25   actually go to the issue of whether or not they're created

1  during your scheduled work hours relating to your work

2  activity?

3  A    They're done while I'm at work, yes.

4  Q    And, sir, have you reviewed the Court's August 22nd order

5  with regard to the production of your work notes?

6  A    Yes, sir.

7  Q    And were you -- did you understand that you were under an

8  order to preserve those work notes from August 22nd forward?

9  A    I believe the request was to preserve the notes that were

10 pertaining to my job duties, yes.

11 Q    Is it your testimony that those notes do not pertain to

12 your job duties?

13 A    Not all of them, no, sir.

14 Q    Okay.  Where did you get the idea that those notes -- or

15 the preservation order only related to the notes that pertained

16 to your job duties?

17 A    I believe that's the way I read it.  It was given to us in

18 an e-mail, I believe.

19 Q    The order specifically says, sir, that plaintiffs are to

20 provide the defendant with all notes and/or documents created

21 by plaintiffs during scheduled work hours relating to work for

22 CITGO by September 12th, 2011.  Do you understand that?

23 A    Relating to work, yes.

24 Q    Yes, sir.  And those notes do actually relate to your

25 work, correct?

1  A    Like I said, some of them do.

2  Q    I'm sorry?

3  A    Some of them do.

4       **THE COURT:**  What notes would you be making on the job

5  that don't relate to your work?

6       **THE WITNESS:**  Somebody might call and leave an

7  (indiscernible) and -- to call them back.  I might write down

8  an extension number to call someone back.  My boss might call.

9       **THE COURT:**  Well, doesn't that relate to work?

10       **THE WITNESS:**  Well, that would relate to work but not

11  to my job function.

12       **THE COURT:**  Okay.  I didn't think the order said

13  anything about job function, did it?

14       **MR. TEMPLE:**  I didn't, your Honor.

15       **THE WITNESS:**  Okay.

16  **BY MR. TEMPLE:**

17  Q    Sir, you would agree that those notes do actually relate

18  to your work at CITGO and they're taken during your CITGO work

19  hours?

20  A    Yes, sir.  Some of them do.

21  Q    Okay.  And, sir, have you taken any steps to preserve

22  those notes and produce those to the defendant CITGO?

23  A    After the e-mail was put out on August 22nd, I just quit

24  writing notes and just transferred everything into my

25  electronic EELs.  My -- they call it EELs, Electronic Event

Ramirez - Direct / By Mr. Temple                    13

1    Log, at work.

2    Q    What did you do, sir, with regard to the notes that you'd

3    already taken that would be responsive to the Court's order

4    prior to August 22nd?

5    A    Prior to August 22nd, we don't save the notes.  They're

6    given; it's passed down; they're left on the desk and after I

7    leave I really don't know.  We have four guys -- five guys --

8    rotating the shift all the time.

9    Q    Sir, after receiving the August 22nd order, were there

10   still notes that related to your prior work that were in

11   existence?

12   A    Not that I know of.

13   Q    Did you look?

14   A    Yes.  I sit at the desk every day.

15   Q    And upon receipt of that order, did you look for those

16   notes that you had previously been taking at work?

17   A    Yes.  I think that's what you just asked me, right?

18   Q    Do you know what happened to the notes that you'd

19   previously been taking at work?

20   A    No, sir.  I have no idea.  We work a four-on, four-off

21   shift.  So, I'm gone for four days at a time.

22   Q    And, sir, do you remember receiving requests for

23   production of documents from defendants in this case on or

24   about April the 13th?

25   A    Possibly.  Can you refresh my memory?  I'm not exactly

1    sure what you're asking for.

2    Q    And, sir, if you'll look at the bottom here, request for

3    production number 9, it specifically asks you to produce all

4    documents prepared by you that you use or used or that assists

5    or have assisted you in the operation of your console since

6    January 1, 2008, including but not limited to trend charts,

7    yield reports, logs, journals, and any other materials you

8    review, prepare or exchange before you begin or end a shift.

9    A    I see that, yes, sir.

10   Q    And, sir, do you remember receiving these actual requests

11   for production on or around October -- I'm sorry, April the

12   13th, 2011?

13   A    I'm not positive on the date, but I remember seeing it,

14   yes, sir.

15   Q    And, sir, you would agree with me that the notes that

16   we're talking about would be responsive to that particular

17   request?

18   A    Yes, sir.  And they're all retained at work.  The company

19   has all of the electronic log.  Everything gets backed up at

20   the company by the company.

21   Q    Upon receiving that request, sir, did you take any steps

22   to preserve those notes that specifically relate to your work

23   functions at CITGO?

24   A    The company preserves the notes.

25   Q    Sir, did you take any steps --

1  A    No, sir, I can't --

2  Q    -- to preserve those notes?

3  A    That's the company's property, the computers.

4          **THE COURT:**  So, all your notes are on a company

5  computer?

6          **THE WITNESS:**  Yes, ma'am.

7          **THE COURT:**  You never take any notes that are not on

8  a computer?

9          **THE WITNESS:**  No, ma'am, not that pertain to my work,

10  no.

11          **THE COURT:**  Well, what do -- do you ever take notes

12  at work not on the computer?

13          **THE WITNESS:**  Not really.  Just doodling.

14          **THE COURT:**  Okay.

15  **BY MR. TEMPLE:**

16  Q    Sir, I'm going to hand you the second page.  It's your

17  supplemental response.  Your answer was, "Any notes that I may

18  take are kept at my console and left there when I leave at the

19  end of the day."

20  A    Yes, sir.  You asked me that.

21  Q    Which notes are you talking about there?

22  A    The extensions, the people to call back; any minor notes

23  like that.  Have nothing to do with my work, but they have to

24  do with other console operators.

25  Q    Notes that have to do what you're doing for CITGO,

Ramirez - Direct / By Mr. Temple                    16

1   correct?

2   A    Sure.  And they're left at the console.  I do not --

3   Q    Okay.  So, you did keep paper notes prior to the Court's

4   order, correct?

5   A    I did or I didn't?

6   Q    You did.

7   A    Before the order, yes.  You asked me that before.

8   Q    Yes.  And what did you do to preserve those paper notes

9   after receiving defendant's request for production of documents

10  in this case on or about April 13th, 2011?

11  A    I believe I answered that already.  I leave them at the

12  console.  That's the company's property.  I'm not allowed to

13  take --

14           THE COURT:  Okay.  You told me that you didn't make

15  any notes that weren't on a computer.  Now you're saying you

16  had paper notes.

17           THE WITNESS:  Before -- didn't he say before the

18  order?  I'm misunderstanding, because before --

19           THE COURT:  Any time before or after the order, do

20  you make paper notes?

21           THE WITNESS:  Yes, ma'am.

22           THE COURT:  Where are they?

23           THE WITNESS:  They're left at the console, at my

24  desk.

25           THE COURT:  So, you don't know what happens to them?

1          THE WITNESS:  No, ma'am.  I turn them over to the guy

2    that I relieve and after I leave work, I'm gone for 12 hours

3    and then on my days off I'm gone for 48 hours.

4          THE COURT:  Okay.  Do you have a copier at your

5    workplace?

6          THE WITNESS:  There's one in the outside office.

7          THE COURT:  Okay.  Did you never -- you never

8    understood you were supposed to preserve those and give them as

9    a response to discovery?

10         THE WITNESS:  I was under the impression that we were

11   to preserve them, not to discard them.  And my understanding is

12   everything that I use at work belongs to the company.  I'm not

13   allowed to take anything -- personal files off the computer, or

14   anything like that.

15         THE COURT:  So, you have paper notes that relate to

16   your work and computer notes that are in the CITGO computer?

17         THE WITNESS:  They're basically the same thing, yes,

18   ma'am.  As I'm writing down as people are calling me, I'll

19   write down some notes and then I transfer it into the

20   electronic EELs log and that's maintained strictly by the

21   company.  And they back it up forever I assume.

22         THE COURT:  So, every -- why would you take them on a

23   paper note and then transfer them?  Why don't you just take

24   them on the computer directly?

25         THE WITNESS:  The way our job is, sometimes it's kind

1    of hard to be on the phone, on the computer.  I have six,

2    eight, ten computer screens in front of me at one time, at all

3    times.  And I don't have a lunch hour.  I don't have breaks.

4    Sometimes things come in quick and to make sure I get -- I

5    remember them -- I'll write them down.

6            **THE COURT:**  So, you write it down instead of put it

7    in the computer?

8            **THE WITNESS:**  Write them down first, yes, ma'am, and

9    then transfer it to the electronic log.

10           **THE COURT:**  Word for word, exactly?

11           **THE WITNESS:**  Yes, ma'am, pretty much.

12   **BY MR. TEMPLE:**

13   Q    Sir, do you remember we talked about this in your

14   deposition -- this very issue?  And do you remember the

15   testimony that those notes are not exactly transferred into the

16   EEL system.  Do you remember that?  That's what you told us?

17           **THE COURT:**  Do you have that in front of him?

18           **THE WITNESS:**  Not anymore, but it's not -- there's

19   nothing on here.

20   **BY MR. TEMPLE:**

21   Q    I'll just -- we'll put it up, but I'll ask you a question,

22   sir.  Is it your testimony that what you keep on those notes

23   are the verbatim copy of what is -- that you put into the EEL

24   system?

25   A    It's impossible for me to say that it's verbatim.

1  Q    It's your testimony, isn't it, that it's not verbatim.

2  You don't copy everything from your notes into the system, do

3  you?

4  A    Word for word, exactly, no.

5  Q    Okay.  And so, there are things that are contained in

6  those notes that will not be in the EEL system, correct?

7  A    Like I said, word for word, there's going to be words

8  missing, yes.  There's no way I can transfer exactly.  I'm not

9  a -- I can't do --

10         **THE COURT:**  Why?

11         **THE WITNESS:**  -- things like that.

12         **THE COURT:**  Why?

13         **THE WITNESS:**  I mean, you're asking me exactly word

14  for word, a and the, every word that I write?  No, because I

15  sometimes write notes in shorthand --

16         **THE COURT:**  Well, I guess that's the point of

17  discovery.  You're supposed to have saved it.  You're supposed

18  to have been saving it so the attorneys can decide whether

19  everything's going into the EEL system or not.  It's not up to

20  you to decide.  It's -- I issued the orders and they issued the

21  requests and I expect them to be followed.

22         **THE WITNESS:**  Yes, ma'am.

23         **THE COURT:**  If there's no reason to leave those notes

24  for the next shift, unless they had signified something, if

25  it's all in the computer, you would say to the next shift,

Ramirez - Direct / By Mr. Temple                    20

1    "Check my last eight hours in the computer."  Those have to

2    have some significance, those notes, or you wouldn't be leaving

3    them for the next party.  You'd be tossing them in the garbage.

4          So, I don't buy that argument and that's not a good

5    argument.

6    **BY MR. TEMPLE:**

7    Q    Sir, we talked in your deposition about your knowledge of

8    what would happen with those notes.  Are you telling us that

9    you knew when you left those notes there somewhere on the unit

10   that you knew those notes would be discarded?

11   A    I have no idea what happens after I leave.  I don't know

12   for sure, no.

13   Q    But you also took no steps to preserve those notes,

14   correct?

15   A    I did not discard them, so I did not save them personally,

16   but no, I did not discard any notes.

17   Q    Did you have any reason to believe they would not be

18   discarded?

19   A    No, sir, because everybody I believe got the same e-mail I

20   did.

21         **THE COURT:**  Did you get a copy of these documents

22   word for word or just a summary from your attorney?

23         **THE WITNESS:**  That I'm not sure.  I don't know what's

24   the original and what's the --

25         **THE COURT:**  Show him -- has he seen the actual

 1   request for production?

 2            **MR. TEMPLE:**  That's what I just had on the screen,

 3   your Honor.

 4            **THE COURT:**  Right.  But, I mean, the whole thing?

 5            **MR. TEMPLE:**  Yes, your Honor.  It's on the screen

 6   again.  It's request for production number 9.

 7            **THE COURT:**  Have you seen that?

 8            **THE WITNESS:**  This is the original?

 9            **THE COURT:**  Yes.

10            **THE WITNESS:**  Yes, ma'am.  I believe this is the one

11   that I've seen.

12            **THE COURT:**  Okay.

13   **BY MR. TEMPLE:**

14   Q    And the notes we just talked about would be responsive to

15   that request.  Is that right, sir?  As you read it?

16   A    Like I said, when I -- the way I interpret it, assisting

17   me with my job, that has specific meaning to me, things that I

18   would transfer to EELs.

19   Q    That's your understanding?

20   A    Yes, sir.

21   Q    Sir, are you aware that Steve Moore has produced some of

22   his notes in this case?

23   A    No, sir, I'm not.

24   Q    Is it your testimony that you could not take those notes

25   that you take every day off the unit?

Ramirez - Direct / By Mr. Temple                    22

1    A    My understanding is that's CITGO property, yes.

2    Q    So, it's your belief that those notes that you take -- not

3    the EELs -- but those notes that you take, you cannot take them

4    off the unit?

5    A    I would have no reason to take them.

6    Q    Is it your testimony you're prohibited from taking those

7    off the unit, sir?

8    A    Like I said, I believe they're CITGO's property and

9    they're used to pass -- to have information there, scratch pad,

10   it's basically just a scratch pad.  I mean, I have no reason to

11   take it, preserve it.

12   Q    And you could have taken it home with you, couldn't you?

13   A    For what?

14   Q    To respond to the Court's order or our request for

15   production.  You could have done that without suffering any

16   penalty from CITGO.  Isn't that true?

17   A    We were preserving them at the console.

18          **MR. TEMPLE:**  Objection, non-responsive, your Honor.

19          **THE COURT:**  Just listen -- listen to the question,

20   please, and answer it exactly as best you can.

21   **BY MR. TEMPLE:**

22   Q    Sir, you could have taken those notes with you at the end

23   of the day, couldn't you?

24   A    I suppose I could have.

25   Q    And at no time after receiving defendant's request for

1    production of documents did you ever take those notes off the

2    unit?

3    A     After the August 22nd?

4    Q     No, after receiving the original request back in April.

5    A     No, sir.

6    Q     And to today, you've never produced any notes in this

7    case; those particular notes we're talking about or any notes

8    that have ever, in any way, related to the operation of your

9    unit, have you?

10   A     No, sir, I have not turned in anything.

11   Q     Do you remember testifying in your deposition and you

12   specifically said that most of the time after you do a shift

13   change you throw your notes away?

14   A     Yes.  You asked me about shift change and I told you I'd

15   take highlights from the electronic log and write down what we

16   did for four days and I'll read it off.  Instead of reading it

17   off the computer, I'll pass my notes on to the guy, just

18   hitting the highlights what's already in the EELs, yes.

19   Q     But do you remember telling us that after -- most of the

20   time -- after you do a shift change, you throw your notes away,

21   the very notes that that we're talking about right now?

22   A     Those specific notes that I was talking about at shift

23   change, yes.  I do throw them away because they're highlights

24   off of what's already logged into the EELs.

25   Q     Okay.  And so those notes also reflect your work at CITGO,

1  correct?

2  A    Yes, they're copies of what's in EELs already.

3  Q    And you throw those notes away after your shift?

4  A    I pass them to the relief guy and if he throws them away,

5  yes, I guess he does.

6           **THE COURT:**  Do you have his deposition?

7           **MR. TEMPLE:**  Yeah, we will, your Honor.  I'm going to

8  pull the deposition testimony.

9  **BY MR. TEMPLE:**

10  Q    Sir, do you remember when your deposition was taken

11  October 31st, 2011?

12  A    Yes, I remember.

13  Q    And do you remember the question I specifically asked and

14  we were talking about these very notes and it says, "And at the

15  end," starting at line 4, "And at the end of your shift, what

16  happens with those notes that you're taking?"

17           And you answered, "Most of the time after we do a

18  shift change I throw them away."

19  A    Yes, sir.  That's what I said.

20           **THE COURT:**  Well, why are you telling me something

21  different now?  You told me you left them for the next shift?

22           **THE WITNESS:**  Sometimes I leave them on the desk;

23  sometimes, if it's highlights off the EELs -- it's hard to

24  understand if you don't understand our job.  We log things into

25  EELs --

1            THE COURT:  I think what's hard to understand are

2    these requests for you.  I don't understand why you can't

3    answer one way the same way every time you're under oath.  And

4    why we're getting different answers to these questions.

5            THE WITNESS:  Because we're talking about different

6    kinds of notes.  That's where I did --

7            THE COURT:  If you're throwing notes away, they

8    should be preserved for discovery for this case.

9            THE WITNESS:  Okay.

10           THE COURT:  And that has been since last April.  Have

11   you saved any of those notes?

12           THE WITNESS:  Not in my personal property, no.  I

13   don't take them home and save them.  They're on the computer.

14           THE COURT:  You toss them or leave them; one or the

15   other?

16           THE WITNESS:  Both.

17           THE COURT:  Okay.  Well, I said you do one or the

18   other.

19           THE WITNESS:  Well, there's both.  There's some that

20   aren't pertaining to my work; like I said, messages and stuff

21   that I don't feel is relevant to my work that get tossed, but -

22   -

23           THE COURT:  It doesn't matter what you think is

24   relevant.  It matters what I have ordered you to do.  Now, I am

25   this close just to dismissing your case because you have not

 1    followed what this Court has ordered, repeatedly.

 2            THE WITNESS:  Sorry.  I guess I misunderstood the

 3    order.

 4            THE COURT:  There's no misunderstanding about it.

 5    You're to preserve these records and give them to your attorney

 6    for production to the other attorney.

 7            THE WITNESS:  Yes, ma'am.

 8            THE COURT:  That's as clear as it can be.  And you

 9    don't make the decision as to whether or not these are relevant

10    to this litigation.  I make that decision.

11            THE WITNESS:  And so anything --

12            THE COURT:  And it can never be made if you keep

13    throwing these things away.

14            THE WITNESS:  Okay.  So, anything we write down from

15    now on needs to be turned over to the lawyer, take it home and

16    turn it in, or --?

17            THE COURT:  You address that to your attorney.  I

18    have told you what the order of the Court is and if you still

19    have to question it, I don't think you belong here anymore.

20            Go ahead.

21    BY MR. TEMPLE:

22    Q    Sir, at any time prior to throwing away those notes that

23    you take, do you have to get any permission from any member of

24    CITGO management?

25    A    Before I throw them away?

Ramirez - Direct / By Mr. Temple                    27

1  Q    Before you throw them away, do you have to get permission

2  from anyone?

3  A    No.

4  Q    You thought you can throw them away because they're your

5  notes, correct?

6  A    Because I've transferred the important information to EELs

7  and I throw away what's not relevant, yes.

8  Q    The information you determined was important --

9  A    Yes.

10 Q    -- and the information you determined was not relevant.

11 A    Yes.

12 Q    Okay.

13        THE COURT:  How long have you had that request for

14 production that was shown earlier?

15        THE WITNESS:  I don't remember when we got it.  I'm

16 not sure.  It's been a while since we got the original.

17        THE COURT:  Well, a month?  Two months?  Six months?

18 Any indication?

19        THE WITNESS:  Several months.  At least two or three

20 months.

21        THE COURT:  Two or three months?

22        THE WITNESS:  Yes, ma'am.

23        THE COURT:  Could it have been longer than that?

24        THE WITNESS:  It could have been.

25        MR. ROSENBERG:  I'll stipulate.  I think counsel said

1    -- I thought I heard him say April, right around there.

2            **THE COURT:**  Well, I don't want you stipulating.  I

3    want to know when he got the documents.

4            **MR. ROSENBERG:**  The documents --

5            **THE COURT:**  I think that may be part of the problem.

6    And if it's two or three months, that's not so hot.

7            Okay.  Go ahead.

8    **BY MR. TEMPLE:**

9    Q    So, do you have any recollection as to when --

10           **THE COURT:**  This is November, if memory serves.

11   Okay.

12   **BY MR. TEMPLE:**

13   Q    Sir, the notes that existed that we talked about that

14   pertain to your operations that were kept by you -- well, let

15   me go back.  Sir, at what point in time did you reasonably

16   anticipate that you were going to file this lawsuit?

17   A    Repeat the question?

18   Q    Yes, sir.  At what point in time did you reasonably

19   anticipate that you would be involved in this litigation?

20   A    I'm not sure on the date when the original order -- when

21   we talked to Mr. Rosenberg.  It's been six months, eight

22   months, maybe a year.  I'm not sure.

23   Q    It was sometime shortly before it was filed?  The lawsuit

24   was filed?

25   A    Sure.

1  Q    And at that time you knew that these notes pertained to

2  the jobs -- the actual tasks that you're performing on a daily

3  basis, correct?

4  A    Ask again?

5  Q    These notes haven't changed.  The function of the notes

6  haven't changed from that point in time up until the time you

7  received the Court's preservation order, have they?

8  A    I guess not.

9  Q    Sir, what has happened with the notes that were in

10 existence that pertained to your job duties from the time that

11 you reasonably anticipated you'd file this lawsuit or at least

12 from the time this lawsuit was filed up until the time that you

13 received this Court's order in August?

14 A    What happened to them?  Is that what you're asking?

15 Q    Yes.  That eight-month period of time, thereabout eight

16 month period of time, those notes that we're talking about,

17 what happened to those notes?

18         THE COURT:  Just a moment.  Yes, sir?

19         MR. ROSENBERG:  Your Honor, I'm going to object to

20 the scope of time frame is outside the boundaries of what's

21 required for this order.  He's asking for before the lawsuit

22 was filed.

23         THE COURT:  I think he's talking about -- well, when

24 did you file the lawsuit?

25         MR. ROSENBERG:  January something of --

1          **THE COURT:**  Okay.  And the request for production was

2   served in April.

3          **MR. TEMPLE:**  It was in April.

4          **THE COURT:**  So, April to now --

5          **MR. ROSENBERG:**  Right.  He's asking before that.  I

6   thought I heard the question --

7          **THE COURT:**  Okay.  I assumed that we're talking about

8   April 'til now.

9          **MR. TEMPLE:**  Fair enough, your Honor.

10  **BY MR. TEMPLE:**

11  Q   And, sir, at any point in time you could have copied any

12  of these notes at CITGO, correct?  You had access to a copy

13  machine?

14  A   I have access to a copy machine, yes.

15         **MR. TEMPLE:**  Your Honor, I have no further questions

16  of this witness.

17         **THE COURT:**  Thank you.

18         **MR. ROSENBERG:**  May I?

19         **THE COURT:**  Yes, sir.

20         **MR. ROSENBERG:**  Can we put the request back on the

21  board where I can hand him one for here?

22         **THE COURT:**  Have you got one?

23         **MR. ROSENBERG:**  Yeah, but -- I got the -- yeah, I

24  don't have it in the request for production.  He had it right

25  there.  I just want to put that back on the board.

1          **MR. TEMPLE:**  I'm happy to share whatever request he

2     needs, your Honor.

3          **MR. ROSENBERG:**  If it's been up there, I just wanted

4     to use it.

5          **THE COURT:**  That's fine.

6          **MR. ROSENBERG:**  Let me -- may I proceed just before I

7     get that, your Honor?

8          **THE COURT:**  Sure.

9          **MR. ROSENBERG:**  Okay.

10                         **CROSS EXAMINATION**

11    **BY MR. ROSENBERG:**

12    Q    Let me ask you -- oh, it's right here.  Do you understand

13    the seriousness and the magnitude of the Court's order?

14    A    Yes, sir, I do.

15    Q    Do you respect the Court's order?

16    A    Yes, sir.

17    Q    Okay.  With regard to the request for production, we've

18    heard a lot about different types of notes.  And I want to know

19    whether or not you are confused as to what was responsive to

20    the request?

21    A    Yes, sir.  I believe I was a little confused.

22    Q    All right.  Tell the Court what the source of your

23    confusion was?

24    A    The way I read it was it was things that were used to help

25    -- to assist me in my job.

Ramirez - Cross / By Mr. Rosenberg                    32

1  Q    Okay.

2  A    There's a lot of different notes and scratch notes that I

3  take throughout the day.

4  Q    Okay.  Now, if you look at the request, it says, "All

5  documents prepared by you that assist or have assisted you in

6  the operation of your console."  Do you see that there?

7  A    Yes, sir, the first sentence.

8  Q    Are the notes that you passed down to others, are those

9  the notes that you -- that assist you in the operation of the

10 console?

11 A    No, sir.

12 Q    Okay.  What other purpose -- when you're passing notes to

13 somebody else, what are you doing -- what are you trying to

14 convey --?

15         **THE COURT:**  I think that that's in the alternative;

16 that you use or used or that assist.  It's not just that

17 assist.

18         **MR. ROSENBERG:**  And that's the point.  And that's --

19 I see -- you know what, your Honor?  I see it now and I didn't

20 see it then and if it's on anybody, it's on me.

21         **THE COURT:**  Well, except we've been going over this

22 for months, months.  I have been doing discovery conferences

23 with you all on the phone for months about this same issue.

24         **MR. ROSENBERG:**  I understand that.

25         **THE COURT:**  And I don't know why we're here again

1   today with the same thing.

2           **MR. ROSENBERG:**  Well, may I respond and --

3           **THE COURT:**  Yes, sir.

4           **MR. ROSENBERG:**  -- share with the Court why I believe

5   we're here?  I believe we're here because during these

6   depositions, notes -- the topic of notes -- came out and all of

7   a sudden that rabbit trail as to things that were not requested

8   originally.  What, candidly, your Honor, if the request for

9   production would have said, "All notes of any sort that are

10  kept," I would have -- I would have objected as being vague and

11  over broad.  When I saw the qualifier, if you will, the

12  (indiscernible) "that assists you in the job operation," and

13  these guys are reporting back that, you know, there are notes

14  all over the place we pass down to communicate, I made a

15  determination as to what was responsive and what's not.

16          So, if there's been a misinterpretation in the way

17  these clients have been counseled, because --

18          **THE COURT:**  Have you seen any of the notes?  Have you

19  seen any of the notes from your client?

20          **MR. ROSENBERG:**  Yes, and quite frankly, the ones when

21  Mr. Moore was here testifying, they're not responsive to that.

22  And that's what we produced the other day.  And the Court can

23  examine them.

24          **THE COURT:**  Have you seen any besides Mr. Moore's?

25          **MR. ROSENBERG:**  Yes.

1        **THE COURT:**  Whose?

2        **MR. ROSENBERG:**  Can I just --

3        **THE COURT:**  Yes.

4        **MR. ROSENBERG:**  Requenez and Delmond.  And I will

5   tell you there's --

6        **THE COURT:**  Okay.  So, you made a determination that

7   those three were not responsive.  You've not made a

8   determination that all the other notes are not responsive.

9        **MR. ROSENBERG:**  I didn't make -- I'm sorry, your

10  Honor.  I did not make a determination.  I counseled the

11  clients as to what would be and what wouldn't be responsive.

12  And I will tell you, now having these notes, that were

13  safeguarded at all times at the -- they're not responsive.

14       And that's the issue.  And your Honor, I can't

15  apologize to the Court enough if there's been any

16  misunderstanding on my part.  But there certainly was a

17  misunderstanding on the clients' part, because I know how these

18  people were counseled.

19       **THE COURT:**  Well, I appreciate that and I don't want

20  to get into your attorney/client privilege, either.  But the

21  problem is if you haven't seen all these notes, you don't know

22  whether they're responsive or not.  Therein lies the problem.

23       **MR. ROSENBERG:**  But the problem also is that these --

24  first of all, after the Court issued its order of whatever date

25  it was -- August 22nd -- there has been nothing that has been

Ramirez - Cross / By Mr. Rosenberg                              35

1  destroyed.  My clients tell me that -- well, it's my

2  understanding that the purpose of these notes are to

3  communicate and they go out of -- and you'll see when you see

4  the notes of Mr. Moore -- there's a legal pad of 30 pages, for

5  example.  And I'll provide it to the Court.  Of those 30 pages,

6  one-eighth, if that, are Mr. Moore's.  Most of them are other

7  people unrelated to the lawsuit, which is why I actually

8  subpoenaed some of the people who could have, you know, shared

9  in that light.  And, well, and that's the issue.

10             And, you know, if CITGO would have had a box, you

11 know, dump your notes in here at the end of the day, this

12 wouldn't have happened.  But what we would have seen would be a

13 pile of information that wasn't relevant.

14             Now, I'm certainly not going to make that

15 determination.  You make the relevant determination -- you make

16 the determination as to relevance.  But as far as responding to

17 the request, that's where this thing stands.

18             **THE COURT:**  Okay.

19             **MR. ROSENBERG:**  There isn't any way I want to --

20             **THE COURT:**  Okay.  Do you have any questions for this

21 gentleman?

22             **MR. ROSENBERG:**  Yeah.

23             **THE COURT:**  Go ahead.

24             **MR. ROSENBERG:**  All right.

25 //

Ramirez - Cross / By Mr. Rosenberg                    36

1    **BY MR. ROSENBERG:**

2    Q    Has anything by you been destroyed or not preserved since

3    the Court issued this order of August 22nd?

4    A    No, sir.

5         **MR. ROSENBERG:**  Okay.

6         **THE COURT:**  So, you have the notes now from August

7    22nd on?

8         **THE WITNESS:**  No, sir -- I mean, no ma'am.  I don't

9    keep any notes any more.  I transfer everything into EELs as

10   soon -- I have my EELs open all the time and I'm typing in,

11   even if it doesn't make a whole lot of sense, I just put it all

12   in the log.

13        **THE COURT:**  I thought you said you couldn't do that.

14   You told me earlier that you couldn't directly put it into the

15   computer; that you had to take it down on the paper and then

16   put it in the computer.

17        **THE WITNESS:**  It's a lot more difficult now, but I

18   make myself do it for not having to hold onto the notes and

19   save and not knowing where to do -- what to do with them and

20   copy them, so I just transfer everything in the computer.

21        **THE COURT:**  I thought you said that was an

22   impossibility with six computer screens in front of you, that

23   you always took notes.  You just told me that.

24        **THE WITNESS:**  I just said it was very difficult.

25        **THE COURT:**  No, you didn't.  Let's hear what he said

37

```
 1  earlier, Ms. Gano.

 2          COURT RECORDER:  Yes, your Honor.

 3      (Record from 9:41:33 a.m. to 9:42:38 a.m. was played back)

 4          THE COURT:  Okay.  And why didn't you tell me then

 5  you stopped doing the notes?

 6          THE WITNESS:  I thought I had.

 7          THE COURT:  No, you didn't.

 8          THE WITNESS:  Okay.  Well, I'm sorry.  After the

 9  August letter where we had to retain everything --

10          THE COURT:  I'm having a real problem with his

11  credibility.  I think I'm just going to dismiss his suit

12  altogether.

13          MR. ROSENBERG:  Your Honor, I would urge you not to

14  do it, but my recollection is that he did say earlier in Mr.

15  Temple's examination.  I could have sworn I heard it, but -- I

16  just can speak to what I heard.

17          THE COURT:  Well.

18          MR. TEMPLE:  Your Honor, if I might respond?  I mean,

19  we've served numerous discovery requests.  At no time has he

20  taken this position that he stopped doing his job in a certain

21  way after he received the Court's order.  It just doesn't --

22          THE COURT:  He didn't tell me that earlier, did he?

23          MR. TEMPLE:  No, your Honor.

24          THE COURT:  I don't believe him, actually.  Now, you

25  want to go back through this and see if you --
```

1        **MR. ROSENBERG:**  Well, if I have to, yes --

2        **THE COURT:**  Yes, you do.

3        **MR. ROSENBERG:**  Okay.  Then if he represented to the

4  Court that he stopped doing it earlier on at some point --

5        **THE COURT:**  Yeah.

6        **MR. ROSENBERG:**  Okay.  I don't know how that

7  operates, but I'm happy to do it.

8        **THE COURT:**  Well, you can just listen to the replay.

9        **MR. ROSENBERG:**  Okay.

10       **THE COURT:**  And tell me when you hear it.

11       **COURT RECORDER:**  Starting at the beginning?

12       **THE COURT:**  Just start at the beginning and play it.

13  We can take a break while she's doing that, okay?

14       **COURT RECORDER:**  So, off the record and then replay?

15     **(A recess was taken from 10:05 a.m. to 10:21 a.m.; parties**

16  **present)**

17       **THE COURT:**  Did you find it?

18       **MR. ROSENBERG:**  Yes, your Honor.

19       **THE COURT:**  Okay.  Would you play it back?

20       **COURT RECORDER:**  Yes, your Honor.

21     **(Record from 9:36:29 a.m. to 9:36:53 a.m. was played back)**

22       **MR. ROSENBERG:**  That was it.  I mean unless the Court

23  wants any more.

24       **THE COURT:**  No.  Go ahead.

25       **MR. ROSENBERG:**  Pass the witness.

1      **MR. TEMPLE:**  Just a few follow-up.

2      **THE COURT:**  Go ahead.

3                    **REDIRECT EXAMINATION**

4   BY MR. TEMPLE:

5   Q    Mr. Ramirez, do you remember providing the supplemental

6   response to the request for production of documents in this

7   case to that very Request for Production Number 9 on or about

8   October the 11th, 2011 on top of the screen here?

9   A    Yes, sir.

10  Q    And could you read the response that you provided to CITGO

11  in this case on or about October the 11th, 2011 that was after

12  the Court's August 22nd order?

13  A         "Any notes I may take are kept in my console and left

14            there when I leave at the end of day -- end of the

15            day."

16  Q    Okay.  Sir, what notes are you talking about there if you

17  changed your practice as of August 22nd?  This is dated as of

18  10-11-2011.

19  A    The notes pertaining to my job.

20  Q    Okay.  The notes that you stopped taking as of

21  August 22nd?  Because this is, again, dated October the 11th

22  and it appears you're still representing that you're taking

23  notes and that's what you're doing with the notes at the end of

24  the day.

25  A    I believe that's when I answered, August or October

1   the 11th; but it was referring to all notes that were taken

2   before, any notes that I had taken from the time the lawsuit

3   started.

4   Q    And where did you provide that so CITGO would understand

5   that's what you were really trying to say here?

6   A    I didn't.  That was just a one-sentence answer.

7   Q    Any notes that I may take.  And so you at no time in any

8   discovery responses had indicated to CITGO that you had stopped

9   your practice as of August 22nd, correct?

10  A    Until you just asked me, no, sir.

11  Q    In fact, to the contrary.  In your discovery responses

12  you're indicating the present tense, any notes you may take.

13  You're talking about still taking notes as of October the 11th,

14  2011, correct?

15  A    I think I said any notes that I may take, yes, sir.

16  Q    Okay.  And, sir, in your deposition we went over this

17  issue as well.  And your deposition was taken after the Court's

18  August 22nd order.  Do you remember that?

19  A    Yes, I do.

20  Q    The very same issue was covered, and this is as of October

21  the 31st, 2011.  I asked you:

22          "When you're operating your console duty throughout

23          the day do you keep any kind of notes or records or

24          scratch sheet or anything to help you remember what's

25          happening and later?"

Ramirez - Redirect / By Mr. Temple                    41

1           And what was your answer?

2    A    Sometimes.

3    Q    Okay.  Did you mean sometimes prior to August the 22nd or

4    did you mean sometimes presently because you were still working

5    for the company as of October the 31st?

6    A    I meant sometimes before I had changed my practice in

7    August.

8           THE COURT:  Why didn't you say that?

9           THE WITNESS:  It wasn't date specific.  I didn't

10   really...

11          THE COURT:  Oh, for goodness sake.

12   BY MR. TEMPLE:

13   Q    You didn't clarify your response at the time; did you,

14   sir?

15   A    No, sir.

16   Q    And we go on.  And it says:  "Later go back and, you know,

17   if you need to trigger" --

18          THE COURT:  But the question is when you're operating

19   your console, one would assume that it meant now and before and

20   in the future.  Why would you think it meant before

21   August 24th?

22          THE WITNESS:  I just thought we were talking about

23   from the time that we started to present.  I mean that was

24   being general --

25          THE COURT:  Well, then you should have answered it

Ramirez - Redirect / By Mr. Temple                          42

1    that way.

2    **BY MR. TEMPLE:**

3    Q    Sir, do you remember you were under oath when you gave

4    this deposition testimony?

5    A    Yes, I do -- or I did.

6    Q    And you never stated anything like that did you?

7    A    No, sir.  There was no timeframe.

8    Q    And it goes on, and we're talking about in the present

9    tense.  Because at the time we took this deposition, as you are

10   today, you were working for CITGO, correct?

11   A    Yes, sir.

12   Q    The question is asked:

13            "Later go back, and if you know, if you need a

14            trigger, figure out you know what happened earlier in

15            the day."

16            And it's part of a broken question.

17            And your answer was:  "Sometimes," talking about the

18   taking of the notes, correct?

19   A    I believe that's what we're talking about, yes, sir.

20   Q    And then I asked:

21            "When you're kind of juggling all these things."

22            And you nodded yes.

23            Do you remember nodding yes?

24   A    If it says so, yes, sir.  I guess I did.

25   Q    And you were nodding yes about the present notes that you

1   were taking at the time we took your deposition; weren't you,

2   sir?

3   A    I was nodding to your question that says when you're

4   juggling all these things.

5   Q    And we were talking about the taking of your notes as

6   you're juggling --

7   A    Yes.

8   Q    -- these things; weren't we, sir?

9   A    Yes, sir.

10  Q    And so at least at the time that we took your deposition

11  you were telling us under oath that you were taking notes in

12  the operation of your console at CITGO weren't you?

13  A    I was testifying that I had taken notes before, yes.

14  Q    But sir --

15          **MR. TEMPLE:**  Objection.  Non-responsive, your Honor.

16  **BY MR. TEMPLE:**

17  Q    That's not my question.  Sir, at the time that we took

18  your deposition you were specifically telling us about the fact

19  that you were taking notes in the present tense, correct?

20  You've made no clarifications whatsoever that you only were

21  taking notes and that you stopped as of August 22nd.

22  A    Right.  There was no clarification.

23  Q    And then we go on and there's no clarification as to --

24  there's no statement on your side with regard to what you

25  really meant, but we go on talking about the present:

Ramirez - Redirect / By Mr. Temple                    44

1              "Okay.  Is it that some people they keep a spiral.

2              Do you keep any kind of notebook or is it just a

3              piece of paper or what do you keep -- or what do you

4              kind of" -- and interrupted.

5              "Most of the time I just get a piece of paper."

6              What were you talking about there?

7    A    I don't see it on there, but I'm probably talking about

8    notes that have been taken.

9    Q    I'm sorry.  I'll go further down.  Excuse me.  "Most of

10   the time I just get a piece of paper."

11   A    Okay.

12   Q    Were you not referring to the piece of paper that you get

13   to take notes at CITGO?

14   A    Yes.

15   Q    And that was as of the time that you were still working as

16   of October 31st, 2011, correct?

17   A    Like I said, there was no timeframe.  But, yes, sir.

18   Notes --

19   Q    But you were telling us that as of that time you were

20   taking notes at CITGO in the operation of your job, correct?

21   A    I had taken notes, yes.

22   Q    And then we go on:

23              "And just as you're going about your daily activities

24              you're just kind of writing down, probably in

25              shorthand format, what is going on, not what's going

Ramirez - Redirect / By Mr. Temple                45

1          on prior to August the 22nd, but what is going on and

2          what it is that you are doing."

3          And what was your answer?

4          A     Pretty much.

5   Q    And were you talking about pretty much meaning prior to

6   August the 22nd or pretty much presently at the time we took

7   your deposition on October the 31st?

8   A    Like I said, there was no timeframe, so just notes that I

9   had taken before.

10  Q    Did you mean notes that you had taken prior to

11  August 22nd?  Is that what you're telling us that that's what

12  you meant?

13  A    That's what I was referring to, but I just answered

14  "pretty much."  I think I was getting kind of frustrated with

15  the questions over and over, the same questions, so I was

16  answering pretty short.

17          THE COURT:  This is your lawsuit.  You haven't seen

18  all the questions yet, by the way.

19          THE WITNESS:  Yes, ma'am.

20          MR. TEMPLE:  And we go on, your Honor.

21          THE COURT:  On the other hand, you may never have to

22  worry about another question.

23  BY MR. TEMPLE:

24  Q    The next question, the next page:

25          "Okay.  And then it sounds like you -- as a matter of

Ramirez - Redirect / By Mr. Temple                    46

1            course, that's what you do as you're kind of keeping

2            a record of what's going on just to kind of help you

3            remember what's going on during your shift."

4       Do you remember that question?

5       A    Somewhat, yes, sir.

6  Q    And what was your answer?

7  A    When it gets busy there's a lot things going on.  If

8  someone calls and asks for something, asks me to do something,

9  asks me to look at something, yeah, I'll write it down so I can

10 remember to do it.

11      **THE COURT:**  Now, why at that time did you not tell

12 him about your new practice of never writing anything down?

13      **THE WITNESS:**  Because he didn't ask for a timeframe

14 if I had changed anything to now, or it was a pretty general

15 question.

16      **THE COURT:**  All right.  That's not going to fly.

17 It's just not going to fly.  You know, depositions are to get

18 at the truth.  If the answers have changed that you're not --

19 you told him that you would write something down -- where is in

20 the future -- you didn't say this is limited only to what I

21 do -- did before August 22nd or 24th.  You left the impression

22 and clear with your answer that this is something that's

23 ongoing.

24           Would you not agree with that?

25      **THE WITNESS:**  It looks that way, yes, ma'am.

1           **THE COURT:**  Well, how else could it be interpreted?

2    **BY MR. TEMPLE:**

3    Q    We went on.  And the question was asked:

4         "Sure, okay."  I'm at Line 9.

5              "And that is something you keep on your shift every

6              day," meaning you keep it at the end of the day.

7              And you said "No."

8              And the question was asked:  "Okay.  How often do you

9              find yourself taking notes or keeping notes about

10             what is going on?"

11             What was your answer?

12             A    On the day shift pretty often, but on night

13             shift not very often.

14   Q    And what timeframe were you really referring to at that

15   point in time, sir?

16   A    My question -- I mean my answer is going to be the same,

17   just referring to before the August 22nd.  And it's always the

18   same.  It's busy on days but not so busy on nights.

19   Q    At the time you gave your deposition that's not what you

20   said.  You did not clarify it and you didn't provide any

21   statement with regard to what you really meant by this

22   testimony did you?

23   A    Right.

24   Q    Why not?

25   A    You didn't ask.

Ramirez - Redirect / By Mr. Temple                    48

1   Q    And it goes on and we ask:

2            "Okay.  How often do you find yourself taking notes?"

3            And you said:  "On day shift pretty often, night

4            shift --

5            "Question:  Just it's slower?

6            "Right.

7            "Is there a big variance or any variance between the

8            operation of console during the day versus night?

9            "Sometimes."

10            And then we go on and talk about the notes.

11            On the next page, sir, Page 4, starting at Line 19:

12            "Fair enough.  What do you -- do you translate

13            everything that you put in your notes into the EELS

14            that you then pass on to someone else, or how do the

15            EELS work?

16            "Not all of it, some of it" was your answer, correct?

17   A    Yes, sir.

18   Q    Versus you're sorry.  You answered what?  "Some of the

19   information I do."

20            **MR. ROSENBERG:**  It is not on the thing.

21            **MR. TEMPLE:**  I'm sorry.  Excuse me.

22   **BY MR. TEMPLE:**

23   Q    What was your answer after seeking clarification with

24   regard to how much you were translating?  The bottom, Line 25.

25   A    Some of the information I do.

Ramirez - Redirect / By Mr. Temple                    49

1   Q    And then I asked the question:

2            "How do you determine that is, I guess, EELS worthy,

3            what you put in the EELS and what's not?"

4            And what was your answer:

5            A    Just my personal opinion what I think is

6            important that they need to know.

7   Q    And we go down to Line 16:

8            "Okay.  Even though some of those things might not

9            have been important for you at the time, they may not

10           rise to the level of what would be included in the

11           EELS."

12           And we're talking about what's in your notes.  And

13           what was your answer?

14  A    Yes.

15  Q    "Even though at the time they still might pertain to

16           your daily job functions, what have you been asked to

17           do, for example?"

18           And you answered "Yes," correct?

19  A    Yes.

20           MR. TEMPLE:  Your Honor, I have no further questions

21  for this witness.

22           THE COURT:  Thank you.

23           MR. ROSENBERG:  Going back to that -- may I?

24           THE COURT:  Yes.

25           MR. ROSENBERG:  Going back to that last question --

1          **THE COURT:**  Please get at the podium.  That's where

2   the microphones are.

3                        **RECROSS EXAMINATION**

4   **BY MR. ROSENBERG:**

5   Q    Going back to that last question about what the EELS were

6   for and the notes were for, wasn't your testimony up there that

7   it was for the operation of somebody else's console?  I thought

8   I saw that in the --

9          **MR. ROSENBERG:**  Could you put the deposition back for

10  me, please?

11         **THE COURT:**  Do you have a copy of the deposition?

12         **MR. ROSENBERG:**  I don't have a copy.  These are our

13  excerpts.  I just have them up there.  I just thought it would

14  be easier to see that here.

15  **BY MR. ROSENBERG:**

16  Q    Here.  Do you see that Line 6:

17         "Okay, so the EELS as we talked about earlier today

18         is really more of a pass-on for the next person so

19         they can go back and look at things that might be

20         important?

21         "Yes, sir.

22         "For the operation of their console."

23         Do you see the answer is "yes"?

24         **THE COURT:**  Is their console different than his

25  console?

1          **MR. ROSENBERG:**  I'd have to ask --

2          **THE COURT:**  Do you all work in the same consoles?

3          **THE WITNESS:**  Not all of us.  No, ma'am.

4          **THE COURT:**  Well, when you leave messages for the

5   next shift aren't they working at your console?

6          **THE WITNESS:**  Yes, ma'am.

7          **THE COURT:**  Okay.  So why would they -- never mind.

8   This is ridiculous.  It's ridiculous.

9          **MR. ROSENBERG:**  Well, your Honor, I apologize.  I

10  don't think it is.  I think that there is a genuine

11  misunderstanding of the scope of the discovery, of the scope of

12  the question.  And had it been asked the way I tried to do it

13  now I would have made the objection.

14         **THE COURT:**  Well, you should have said -- he should

15  have said every day let's go back to August 1st.  How do you do

16  this?  August 23rd, October 31st, how do you do this?  This is

17  ridiculous.

18         **MR. ROSENBERG:**  No, your Honor.

19         **THE COURT:**  No one could be expected to say that and

20  ask the questions like that.

21         **MR. ROSENBERG:**  No, your Honor, I don't mean that.

22  What I do mean was when it's -- when the request for production

23  is framed narrowly that assists them in the operation of their

24  console, it's a responsive document.  And that's why I didn't

25  object to it.  And that was --

52

1          THE COURT:  But if it assists the next person in the

2    operation of the same console, one would assume it assisted him

3    as well.

4          MR. ROSENBERG:  This isn't --

5          THE COURT:  It was something he needed to know.  So

6    I'm not going to argue with you about it anymore.  I just know

7    that he has not preserved those documents as he was ordered to

8    do and there's a problem.  And today he comes up with a brand

9    new explanation that he stopped making those notes when he was

10   really, really sure he was supposed to save those notes.  Now,

11   I find that extraordinary and not truthful.

12          Is this the line I'm going to get from all the rest

13   of them?

14          MR. ROSENBERG:  Similar.  I mean --

15          THE COURT:  I bet.  Okay.  Are we finished with this

16   witness?

17          MR. TEMPLE:  We are, your Honor.

18          THE COURT:  Okay.  Thank you.  You may stand down.

19          Are you finished?

20          MR. ROSENBERG:  Yes, your Honor.

21          THE COURT:  You can stand down.  Call your next

22   witness.

23      **(Witness steps down)**

24          MR. TEMPLE:  Your Honor, I'd like to call William

25   Waggoner.

1          **MR. ROSENBERG:**  Your Honor, would you like for us to

2    request the relief as to each Plaintiff between the Plaintiffs

3    or at the end?

4          **THE COURT:**  At the end.

5       **(Pause)**

6          Would you take the stand please, sir, up here?  Up

7    here.  Thank you.

8          **THE WITNESS:**  Oh.

9          **THE COURT:**  This is home to me.  I know it's not home

10   to you.

11         **THE WITNESS:**  No, ma'am.

12         **THE COURT:**  You may proceed.

13     **WILLIAM WAGGONER, DEFENDANT'S WITNESS, PREVIOUSLY SWORN**

14                        **DIRECT EXAMINATION**

15   **BY MR. TEMPLE:**

16   Q    Mr. Waggoner, will you please state your name for the

17   record?

18   A    William Franklin Waggoner, Jr.

19   Q    And sir, it's true is it not that you take notes

20   pertaining to your daily activities at work, correct?

21   A    Sometimes, yes.

22   Q    And these are notes that you create during the scheduled

23   work hours relating to your work for CITGO, correct?

24   A    I take down telephone numbers.  And if somebody calls me

25   and tells me we're going to do this, and then I'll issue orders

1  on it later.

2  Q    Okay.  Is it -- so do your notes that you take during your

3  work hours relate to your work at CITGO?

4  A    Telephone numbers, basically.  Everything else is put in

5  the EELS or is put on the computer or...

6  Q    Is it your testimony under oath here today, sir, that the

7  only thing you keep separate notes of are telephone numbers?

8  Is that what you're saying?

9  A    That's basically all that I write down.

10        **MR. TEMPLE:**  Objection, your Honor.

11  **BY MR. TEMPLE:**

12  Q    That's not what I'm asking you.  I'm not asking you if

13  it's basically.  I asked a very direct question.

14        Are you telling this Court that the only thing you

15  put on those notes are telephone numbers, that's it?

16  A    Those are -- there are some numbers but...

17  Q    I'm sorry, there are some what?

18  A    There are some numbers that I put down.

19  Q    And there are those numbers.  Those numbers relate to your

20  daily activities at CITGO don't they?

21  A    Those numbers get entered into a electronic event log book

22  on the computer.

23        **THE COURT:**  So you take notes and then you put them

24  in the computer?

25        **THE WITNESS:**  Correct.

1          **THE COURT:**  Word for word?

2          **THE WITNESS:**  As best as I can.

3          **THE COURT:**  What do you do with those notes when

4    you're done with them?

5          **THE WITNESS:**  After I scratch off whatever I have

6    done with it, then I sometimes put them in a recycle bin.  If

7    there's something that I didn't finish, I hand it to my relief

8    when he walks in.

9          **THE COURT:**  Is that your policy today?

10         **THE WITNESS:**  Yes, ma'am.

11         **THE COURT:**  Okay.  You're still doing that?

12         **THE WITNESS:**  Yes, ma'am.

13         **THE COURT:**  Okay.

14   **BY MR. TEMPLE:**

15   Q    Sir, do you remember answering some written discovery

16   requests in this case, specifically a request for production

17   that asked about notes or documents you used or in any way

18   accessed during your work day?  It's Number 9, sir, on the

19   screen.

20         **(Pause)**

21         Sir, do you remember receiving that request in April

22   of 2011?

23   A    I remember -- I don't remember the exact date.

24   Q    Okay.  Sir, do you remember --

25         **THE COURT:**  Do you remember if it was months ago,

1   weeks ago or --

2          **THE WITNESS:**  It seemed like it was months ago.

3          **THE COURT:**  Okay.  Thank you, sir.

4   **BY MR. TEMPLE:**

5   Q    And, sir, do you remember providing a supplemental

6   response on or about October the 11th, 2011 here on the top of

7   the screen?

8          **THE COURT:**  When was that?  What was the date on

9   that?

10         **MR. TEMPLE:**  October -- it looks like the supplement

11  was October the 11th of 2011.

12         **THE COURT:**  Thank you.

13         **THE WITNESS:**  Okay.

14  **BY MR. TEMPLE:**

15  Q    And, sir, what supplemental response did you provide as of

16  that date?  What did you represent to CITGO as of that date you

17  were doing with these notes?

18  A    Some of them I'd just leave on the console.

19  Q    And, sir, could you please read your response?

20  A    "All documents" --

21  Q    I'm sorry.  It starts with "any notes."  That's your

22  response.

23  A    Okay.  "Any notes that may be taken down on scratch paper

24  which is thrown away at the end of the day."

25  Q    Okay.  And that's you that throws them away at the end of

1   the day, correct?

2   A     Sometimes, yes.

3   Q     And that -- you've been doing that before and after

4   receiving this Court's August 22nd, 2011 order, correct?

5   A     Say that again.

6   Q     You've been --

7           **THE COURT:**  You are still doing that.

8           **THE WITNESS:**  Yes.

9           **THE COURT:**  Okay.  Is that clear enough?

10          **MR. TEMPLE:**  Thank you, your Honor.

11          **THE COURT:**  How do you spell your name again, please?

12          **THE WITNESS:**  William Franklin Waggoner,

13  W-a-g-g-o-n-e-r, Jr.

14          **THE COURT:**  Thank you.

15  **BY MR. TEMPLE:**

16  Q     And, sir, do you remember receiving the Court's order that

17  you were specifically ordered to preserve and produce certain

18  records?

19  A     Yes, sir.

20  Q     Do you remember seeing that order on or about August 22nd,

21  2011?

22  A     Again, I don't remember the exact date but somewhere

23  around there, yes.

24  Q     And at that time, sir, you were ordered to provide

25  Defendant with all the notes and/or the documents created by

Waggoner - Direct / By Mr. Temple                    58

1    the Plaintiffs during scheduled work hours relating to work for

2    CITGO by September 12th, 2011.

3                Do you remember that?

4    A    Okay.

5    Q    Is that -- did you understand you were under that order?

6    A    Yes.

7    Q    And did you do that?

8    A    To the best of my ability, yes.

9    Q    Today have you provided any notes to CITGO?

10   A    Can I explain that?  I mean that's -- or is this just a

11   "yes" and "no"?

12   Q    I'd like to know your explanation as to how you complied

13   with the Court's order.

14   A    As I said, we have an Audix at work; we have an answer

15   machine.  Most of my business is done over the telephone.  I'm

16   in the pipeline department.  They call me and say, "Can you

17   switch this tank to this tank," and I'll say "okay."  Sometimes

18   I'll jot that down on a piece of paper, and he'll say "I'll

19   send you written orders of exactly what I want done here

20   shortly."  And I will do that and then I will mark it off the

21   paper as in a scratch, or I will answer a phone call and write

22   down the phone number because I can't remember all the phone

23   numbers all the time.

24               So when I listen to the Audix I write down the phone

25   number and then I'll return somebody's call.  I scratch that

1   off.  And if I call somebody and they say, "Switch this or

2   this," I enter it into the electronic event deal on the

3   computer or I change a tank on the computer, and then that

4   piece of note thing I had is null and void because I entered

5   the information somewhere else.

6           THE COURT:  Okay.  But why are you not saving those

7   pieces of paper?  That's the question.

8           THE WITNESS:  I wasn't -- I didn't know that

9   something like that -- I thought something like if I had a

10  order from somebody that I needed to maintain that information.

11          THE COURT:  Anything you write down at work you're

12  supposed to be saving.

13          THE WITNESS:  Okay.

14          THE COURT:  Well, I don't need to tell you again.  I

15  issued that order pretty clearly in August.

16          MR. TEMPLE:  So, your Honor, I have no other

17  questions for this witness.

18          THE COURT:  Mr. Rosenberg.

19                        CROSS EXAMINATION

20  BY MR. ROSENBERG:

21  Q   Mr. Waggoner, I want to take you back to the original

22  request for production.

23          You're familiar with Request for Production Number 9

24  aren't you?  Read over it again.

25  A       "All documents prepared by you that are use" --

Waggoner - Cross / By Mr. Rosenberg                     60

1          **THE COURT:**  You don't have to read it out loud.

2    That's okay.

3          **THE WITNESS:**  Okay.

4      **(Pause)**

5          Okay.

6    **BY MR. ROSENBERG:**

7    Q    Do you believe that any of the notes that you discarded

8    are responsive to this request, Number 9?

9    A    No, sir.

10         **THE COURT:**  Well, why did you then supplement your

11   response in October saying that you threw those notes away that

12   were responsive if you didn't think they were relevant?

13         **THE WITNESS:**  As I say, it's --

14         **THE COURT:**  I'm just saying why did you respond

15   specifically to that request that you threw that stuff away if

16   you didn't think it was responsive to that --

17         **THE WITNESS:**  I didn't think that that was.  I didn't

18   understand what we were supposed to be maintaining.  I tried to

19   save emails.  I had been putting all emails in folders.  Any

20   paper work that I get from the work that tells me to do

21   something, I've been trying to save that work.  But I thought

22   writing down a phone number and scratching it off a list

23   because --

24         **THE COURT:**  Okay.  Where are those papers?

25         **THE WITNESS:**  They're probably in a recycle bin, and

1    they're in the company's possession once I put it in the

2    recycle bin.

3            **THE COURT:**  I see.

4            **THE WITNESS:**  I don't know what they do with them.

5            **THE COURT:**  All right.  Go ahead.  Anything else?

6            **MR. ROSENBERG:**  Pass the witness.

7            **THE COURT:**  Thank you.

8            **MR. TEMPLE:**  Just a few questions, your Honor.

9            **THE COURT:**  Really.

10                         **REDIRECT EXAMINATION**

11   **BY MR. TEMPLE:**

12   Q    Sir, those phone numbers that you write down, those

13   numbers directly relate to tasks and activities that you're

14   performing throughout the day; do they not?

15   A    That's a difficult question.  Somebody may have a question

16   as to a vessel and when it's going to come in, and I'll say "I

17   don't know.  You'll have to call the harbor master."

18   Q    But you're writing down the phone numbers that relate to

19   your job and the tasks that you're performing; because if they

20   didn't, you wouldn't be writing them down.  Isn't that right?

21   A    Sir, I get 500 or 600 phone calls a day.  I'm not sure --

22   I can't remember all those phone numbers.  I have to write them

23   down somewhere sometimes.

24           **THE COURT:**  I understand that, Mr. Waggoner but do

25   you -- you write down orders you said.

1          THE WITNESS:  If somebody calls me on the phone and

2    says pump this tank to this tank, I write it on our pass-down

3    sheet.

4          THE COURT:  Okay.

5          THE WITNESS:  A lot of times.  Once I do that, once I

6    start doing that and I enter it in EELS, I will erase it with a

7    pencil off of that paper.  That paper may change 500 or 600

8    times a day because of all the phone calls.

9          THE COURT:  So where is that paper?

10         THE WITNESS:  That is our pass-down paper.  They have

11   a copy of it.  And it changes -- it may change a hundred times

12   a day easily.  I mean it's -- we write on it with a pencil, and

13   a vessel comes to the dock.  And it finishes, it leaves.  I

14   erase that vessel and write the next vessel in.  And there is

15   just a --

16         THE COURT:  So you have a pass-down sheet that has

17   things that you've erased.

18         THE WITNESS:  Correct.  But that is -- if not, I

19   would have --

20         THE COURT:  So they don't have a copy of your

21   erasures.

22         THE WITNESS:  We have a copy at the end of the shift

23   that we hand to the next person that is the most accurate --

24         THE COURT:  But it's got stuff erased on it and

25   written over.

Waggoner - Redirect / By Mr. Temple                          63

1          **THE WITNESS:**  Yes, ma'am.

2          **THE COURT:**  Okay.

3    **BY MR. TEMPLE:**

4    Q    Sir, with regard to your supplemental response when you

5    said any notes that may be taken down are on scratch paper,

6    that's different; those are different notes that relate to

7    phone numbers, correct?

8    A    Basically, yes.

9    Q    Okay.  And that scratch paper you discard.

10   A    After I call the people back I pass it on to my relief.

11   Q    And all those phone numbers on those scratch papers

12   specifically relate to things that you're doing throughout the

13   day, who you're calling, what you're doing, correct?

14   A    People that have called me.

15   Q    Right.  In the operation of the performance of your job,

16   correct?

17   A    Yes.

18          **MR. TEMPLE:**  Your Honor, I have no further questions.

19          **THE COURT:**  Thank you.

20                    **RECROSS EXAMINATION**

21   **BY MR. ROSENBERG:**

22   Q    Your supervisors know you're writing these notes in pencil

23   and erasing them?

24   A    Yes, sir.

25   Q    Is that accepted practice?

 1   A    Yes, sir.

 2   Q    Did they ever -- have you ever been called to memorialize

 3   these notes in pen or something nondestructive?

 4   A    No, sir.

 5   Q    Okay.

 6            MR. ROSENBERG:  Pass the witness.

 7            THE COURT:  So today you're still throwing away your

 8   scratch paper.

 9            THE WITNESS:  Yes, ma'am.

10            THE COURT:  Nobody told you to save it?

11            THE WITNESS:  We write on the pass-down paper a lot

12   of this information and --

13            THE COURT:  Okay.  Okay, but --

14            THE WITNESS:  -- some of it on scratch paper is

15   thrown away or it gets passed to my relief at the end of the

16   day.

17            THE COURT:  Okay.  Thank you.  You're excused.

18        (Witness excused)

19            Next?

20            MR. TEMPLE:  Your Honor, I'd like to call Greg Smith

21   to the stand, please.

22            MR. ROSENBERG:  Yeah, go get...

23        (Pause)

24            THE COURT:  This seat right over here please, sir.

25            THE WITNESS:  Yes, ma'am.

Smith - Direct / By Mr. Temple                    65

1        **GREGORY SMITH, DEFENDANT'S WITNESS, PREVIOUSLY SWORN**

2                    **DIRECT EXAMINATION**

3    **BY MR. TEMPLE:**

4    Q    Sir, could you please state the name for the record --

5    your name?

6    A    Gregory Guy Smith.

7    Q    Mr. Smith, do you remember having your deposition taken in

8    this case?

9    A    Yes.

10   Q    And do you remember during that deposition being asked a

11   specific question about whether or not you take notes at work?

12   A    Yes.

13   Q    And do you take notes at work, sir?

14   A    I don't take notes, per se.  I write down things that I

15   need to remember to put into the EELS.

16   Q    Do you remember testifying that you take notes on a pad

17   each day?

18   A    Not each day.

19   Q    How frequently do you take those notes, sir?

20   A    Probably on nights once.

21            **THE COURT:**  I'm sorry.  Say that again.

22            **THE WITNESS:**  Probably on nights once.  On nights.

23            **THE COURT:**  Okay.

24   //

25   //

1    **BY MR. TEMPLE:**

2    Q    So on each shift you're taking notes at least once during

3    that shift, correct?

4    A    Yes.  On the pad, right.

5    Q    Yes, sir.  And those notes relate to your job duties at

6    CITGO, correct?

7    A    They're related to EELS entries, yes.

8    Q    Those notes, sir, those are notes that you create during

9    your scheduled work hours and relate to your work, correct?

10   A    Yes.

11   Q    And some of those notes do not get transposed into EELS;

12   isn't that correct?

13   A    That's not correct.

14   Q    Is it your testimony that every single thing that you

15   write down in those notes verbatim is put into EELS by you?

16   A    Yes.

17   Q    Has that always been your practice?

18   A    Yes.

19              THE COURT:  Well, where are those notes?

20              THE WITNESS:  They're on a scratch pad sitting at the

21   console.

22              THE COURT:  Why are they not here?

23              THE WITNESS:  They've been put in the EELS for

24   permanent record.

25              THE COURT:  I understand that.  But why did you not

Smith - Direct / By Mr. Temple                    67

1   bring those notes for handing over to the other side?

2          THE WITNESS:  They're not always there when I come

3   back to work.

4          THE COURT:  Well, why do you not save them in

5   response to this requests for production?

6          THE WITNESS:  Because I figured that they were put in

7   the EELS for a permanent record where they could be retrieved.

8          THE COURT:  Okay.  The deal is that's not up to you

9   to decide.  When I issued the order in August that you're to

10  save those notes and hand them to your lawyer as part of a

11  production, that's what that meant.

12         THE WITNESS:  I was under the impression that they

13  were supposed to be pass-down notes, the notes to pass down to

14  my --

15         THE COURT:  Who told you that?

16         THE WITNESS:  That was just me.

17         THE COURT:  Why would you think that?

18         THE WITNESS:  Because on the order it was saying

19  notes related to my job as far as handwritten notes like if I

20  write something down and I refer to it when I'm making relief,

21  to pass that on to my relief.

22         THE COURT:  Well, if you put it in EELS it relates to

23  your job doesn't it?

24         THE WITNESS:  Yes.

25         THE COURT:  So where are those notes is what I'm

1   asking?

2              THE WITNESS:  I don't have them.

3              THE COURT:  Okay.  You didn't know that the order

4   meant for you to save those?

5              THE WITNESS:  No, ma'am.

6              THE COURT:  Okay.  That's what discovery is all

7   about.  It's not for you to make the decision.  When I issue

8   the order save the notes, I expect that to be done.

9              THE WITNESS:  Yes, ma'am.

10             THE COURT:  And now it may be too late for you to

11  continue this suit because you have not followed the order of

12  the Court.  You don't make the decision as to whether these are

13  the exact same words that go into EELS.  CITGO is entitled to

14  find out if you put something else on the notes.  It's not your

15  decision.

16  **BY MR. TEMPLE:**

17  Q    Sir, do you remember providing some interrogatory

18  responses in this case?  Specifically Interrogatory Number 8

19  asked you to state and describe all the operational upsets,

20  shut downs, start ups, turn arounds and/or similar event that

21  you have worked in any manner since January the 1st, 2008.

22             And in your supplemental response you stated:

23             "I am currently in the process of reviewing my EELS

24             report and I will supplement the request for

25             information as soon as I have finished."

1          Have you provided any of that information?

2   A    No, sir.

3   Q    Why not?

4   A    Could you move that up a little bit?

5   Q    This is not actually the particular interrogatory.  My

6   question is directed at you.

7          Have you at any time supplemented that interrogatory

8   response that you said that you would supplement from the EELS

9   report?

10  A    No.

11         **THE COURT:**  Wait a minute.  Go ahead.

12         **MR. ROSENBERG:**  My objection is to scope.  He's

13  talking and he's questioning the witness about something that's

14  not part of the Court's order for today.  It's a different --

15  it's a different interrogatory.  This Court's order I thought

16  was for Request for Production Number 9 today.

17         **MR. TEMPLE:**  I understood the Court's order was

18  Plaintiffs' failure to properly supplement their discovery

19  responses.  This is related to that issue.

20         **THE COURT:**  Yes.

21         **MR. TEMPLE:**  Sir --

22         **THE COURT:**  Can you show him his response?

23         **MR. TEMPLE:**  Sure.

24         **THE COURT:**  If you've got it.

25         **MR. TEMPLE:**  I think we do.

1      **(Pause)**

2    **BY MR. TEMPLE:**

3    Q     The specific interrogatory is Number 8:

4            "State and describe all operational upsets, shut

5            downs, start ups, turn arounds and/or any similar

6            event that you have worked on in any manner since

7            January 1, 2008."

8            The answer you provided on October the 10th, 2011

9            was:

10           "I am currently in the process of reviewing my EELS

11           report and will supplement the requested information

12           as soon as I finish."

13           Is that correct?

14   A     Yes.  But the turnaround I was not a part of that out in

15   the field.  I was still on shift and on rotation.

16   Q     Okay.  Sir, as of this date have you provided this

17   information?

18   A     No.

19   Q     Why not?

20   A     I was not actively working on the turnaround out in the

21   field.

22   Q     And, sir, you had the EELS report and you could have

23   provided this information, correct?  You just haven't done it

24   yet.

25   A     No, I haven't.

1   Q    Did you understand that you are under a court order to

2   provide supplemental discovery responses?

3   A    Yes.

4           **MR. TEMPLE:**  Pass the witness, your Honor.

5                        **CROSS EXAMINATION**

6   **BY MR. ROSENBERG:**

7   Q    With regard to the interrogatory issue, revealing the EELS

8   do you have access to that EELS anywhere else but at work?

9   A    No, I don't.

10  Q    Okay.  On the shift times that you work do you have the

11  ability to take time off, review the EELS to answer the

12  request?

13  A    No.

14  Q    What would you have to do to do that?

15  A    I would have to do it on personal time off after hours at

16  work.  I'd have to come back to the job to do that.

17  Q    Okay.

18          **THE COURT:**  Why have you not done that?

19          **THE WITNESS:**  Ma'am?

20          **THE COURT:**  Why have you not done that?

21          **THE WITNESS:**  I have been on vacation for most of

22  last month-and-a-half.

23          **THE COURT:**  For the last month-and-a-half?

24          **THE WITNESS:**  Most of the time I have.  I've only

25  worked --

1          **THE COURT:**  Have you been out of town the whole time?

2          **THE WITNESS:**  No, not the whole time.

3          **THE COURT:**  Why didn't you go down there on your

4    vacation time?  This is your lawsuit isn't it?

5          **THE WITNESS:**  Yes, ma'am.

6          **THE COURT:**  Why didn't you go down on your personal

7    time and get it done?

8          **THE WITNESS:**  It was I was thinking it was referring

9    to me working on the turn around.  I did not work on the turn

10   around.

11         **THE COURT:**  Where does it say working on the turn

12   around?

13         **THE WITNESS:**  Well, it says part of the 2010 turn

14   around.  That's what I saw on the -- maybe I misread it.

15         **THE COURT:**  So you wanted to work on your case only

16   when you're getting paid on work at CITGO to do that?  You

17   didn't want to use your personal time to go down and get this

18   information?  That was two questions.

19         You didn't want to use your personal time to go down

20   and get this information?

21         **THE WITNESS:**  Not while I was at work.  I couldn't do

22   that.  Oh, you mean when I was on my --

23         **THE COURT:**  Yes.

24         **THE WITNESS:**  On my time.

25         **THE COURT:**  Yeah.

Smith - Cross / By Mr. Rosenberg                    73

1              THE WITNESS:  No, I didn't go down there.  I didn't.

2              THE COURT:  You didn't want to.

3              THE WITNESS:  I just didn't.

4              THE COURT:  Okay.  So you wanted to do it on your

5    CITGO time?

6              THE WITNESS:  No, ma'am.  It was an over --

7              THE COURT:  Well, when were you going to do it?

8              THE WITNESS:  It was an oversight on my part.

9              THE COURT:  Well, those are the kind of oversights

10   that lead to your case being dismissed.

11         Okay, go ahead.

12   BY MR. ROSENBERG:

13   Q    With regard to the -- let me ask you.

14         Explain what your understanding of a "pass-down note"

15   is.

16   A    My understanding of a pass-down note is if I was to write

17   something on the piece of paper or note that I would pass it on

18   to the other person.  But that's done in the EELS, and that's

19   where the pass-down is made on the EELS.  I never referred to

20   anything written on any piece of paper or anything.  Everything

21   is coming directly off of the computer.

22   Q    All right.  What about the pieces of paper -- what about

23   anything that gets handed down after your shift?

24   A    There's nothing handed down.  Not on paper.

25   Q    All right.  So when you're referring to pass-down notes,

Smith - Cross / By Mr. Rosenberg                                        74

1  are you referring to tangible paper or electronic entry?

2  A     Electronic entry.

3              **MR. ROSENBERG:**  Okay.

4              **THE COURT:**  Why does everybody have a different

5  answer for this, just out of curiosity?

6              **MR. ROSENBERG:**  Well, because there's eight different

7  consoles.

8              **THE COURT:**  Okay.

9              **MR. ROSENBERG:**  Maybe not eight, maybe seven; but

10  they're different -- they're different --

11              **THE WITNESS:**  Nine.

12              **MR. ROSENBERG:**  There you go.

13              **THE COURT:**  And every console is operated

14  differently?

15              **MR. ROSENBERG:**  The judge asked you the question.

16              **THE WITNESS:**  Yes, ma'am.

17              **THE COURT:**  So are you aware that some consoles they

18  hand down -- their pass-down notes are handwritten?

19              **THE WITNESS:**  I'm not aware of that, ma'am.

20              **THE COURT:**  You never heard of that.

21              **THE WITNESS:**  No, ma'am.

22              **MR. ROSENBERG:**  What -- counsel, I'm sorry.

23              **MR. TEMPLE:**  Your Honor, I'm sorry.  I've just been

24  informed that outside of the courtroom apparently Plaintiffs

25  are talking to some that have left the stand.  I don't know

1  what the subject of it is, but I just want to make the Court

2  aware.

3          **THE COURT:**  Why is that happening?

4          **MR. ROSENBERG:**  Well, he said they're talking, but

5  they're not talking about the testimony.  They've been

6  instructed not to.  I'll go back there and admonish them again.

7          **THE COURT:**  Nope.  I think I'll bring them in now.

8  Do you know who was talking to whom?

9          **MR. TEMPLE:**  I just received a note that when the

10  gentleman just walked out, when Elbert walked out, someone

11  yelled, "Steve, they have a spy" and they immediately

12  scattered.  And then they disbanded.  I don't know, your Honor.

13  I just wanted to make the Court aware.

14          **THE COURT:**  Mr. Waggoner said --

15          **MR. TEMPLE:**  Someone around Rudy yelled, "Steve, they

16  have a spy" and then they scattered.

17          **THE COURT:**  Who heard that?

18          **MR. TEMPLE:**  Elbert.  He just walked out.  I think he

19  stepped out to the restroom.  He'll be right back in.

20          **THE COURT:**  Well, your clients have some big

21  problems, Mr. Rosenberg; I mean big problems.  And this is not

22  the only one.  Discussing the case like that is not good.  I'd

23  call them back in but I don't expect Mr. Ramirez to give me a

24  straight answer anyway.

25          Who is Steve?

1          **MR. ROSENBERG:**  Moore.  That's the only Steve I think

2    I have.

3          **THE COURT:**  All right.  Let's get Steve in.

4          Would you stand down, please, for a minute?

5      **(Witness steps down)**

6          Did you hear -- Mr. Smith, did you hear Mr. Ramirez

7    or any of those remarks made out there?

8          **MR. SMITH:**  No, ma'am.  I think I was already in

9    here.

10          **THE COURT:**  Not when Ramirez walked out.

11          **MR. SMITH:**  No.  When Mr. Waggoner walked out he told

12   me I was next and I passed him up and came in.

13          **THE COURT:**  Okay.  But you didn't hear Mr. Ramirez or

14   anybody else make remarks?

15          **MR. SMITH:**  No, ma'am.

16          **THE COURT:**  Okay.

17          **MR. SMITH:**  Do I stand here?

18          **THE COURT:**  Oh, you can sit -- just sit in the jury

19   box if that's okay with you.

20          You go out with him.

21      **(Pause)**

22          Your name, sir?

23          **MR. OCANAS:**  Elbert Ocanas, your Honor.

24          **THE COURT:**  Did you make a comment to one of the

25   other people out there?

77

1          **MR. TEMPLE:**  Your Honor, this is the gentleman

2    that --

3          **THE COURT:**  Oh, that's right.

4          **MR. TEMPLE:**  -- that reported it to me.  He's from --

5          **THE COURT:**  Sorry.  What did you hear?

6          **MR. TEMPLE:**  He's a CITGO lawyer, your Honor.

7          **MR. OCANAS:**  When I stepped outside there was a group

8    gathered around the first witness and somebody yelled, "Steve,

9    they have a spy," and they all scattered.

10          **THE COURT:**  And are you Steve?

11          **MR. MOORE:**  I am.

12          **THE COURT:**  Come forward.

13          **MR. MOORE:**  Sure.

14          **THE COURT:**  Is your father Elbert Ocanas, too?

15          **MR. SPEAKER:**  Yes, your Honor.

16          **THE COURT:**  That I know?

17          **MR. SPEAKER:**  Yes, your Honor.

18          **THE COURT:**  Oh, he has a son your age?

19          **MR. SPEAKER:**  Believe it or not.

20          **THE COURT:**  This can't be happening.  Okay, come

21    forward.

22          So what was it that you and Mr. Ramirez were talking

23    about out there?

24          **MR. MOORE:**  I was just asking him -- because he came

25    out and it was an hour or so into it.  And I just basically

1   told him that, you know, you were taking up our time, just

2   messing around with him.

3         THE COURT:  Well, who yelled out "Steve, you had a

4   spy?"

5         MR. MOORE:  I'm not sure who did that, ma'am.  I

6   think it was somebody over in the back and it was -- and I went

7   over and I sat back down to him.  And I think he pointed to

8   this gentleman right here, (indicating), and said that they're

9   taking notes or something but...

10        THE COURT:  Who's taking notes?

11        MR. MOORE:  That he was taking; he was typing on his

12   cell phone or something.  But it was -- we specifically talked

13   to anything about what happened in this room at all.  It was

14   just -- it was just, like I said, I was just making light of

15   the fact that he had been in here for an hour.

16        THE COURT:  Mr. Ocanas?

17        MR. OCANAS:  Your Honor, I didn't hear any

18   conversations.  I was 30 yards away from them.  I just happened

19   to notice the witness, and that's the only thing that I heard.

20   The second witness asked me if he could leave, and I said, "I

21   don't know; you need to ask your counsel."

22        THE COURT:  Okay.

23        You can go back outside.

24        MR. MOORE:  Thank you.

25        **(Pause)**

1          **THE COURT:**  Take the stand again.

2      **(Pause)**

3          Go ahead.

4          **MR. ROSENBERG:**  Yes, ma'am.

5                    **CROSS EXAMINATION (CONTINUED)**

6  BY MR. ROSENBERG:

7  Q    I think I was asking you to explain "pass down," the

8  inherence of pass-down sheets to the Court.

9  A    I don't have pass-down sheets.

10 Q    Okay.

11 A    I make pass down pertaining to electronic entries on our

12 computer.

13 Q    Okay.  The tangible notes that we're talking about, the

14 tangible pieces of paper --

15 A    Yes, sir.

16 Q    -- what do they consist of?

17 A    This doodling; I couldn't even tell you what another

18 person wrote down and what they meant by what they wrote.  Far

19 as me writing anything, it's just numbers so I can remember and

20 not have to call the guys outside and ask them again to repeat

21 what they'd already told me.

22 Q    Okay.  So, people would call you on the phone and you'd

23 write a number down?

24 A    Call me on the radio or the phone.

25 Q    Okay.  On these doodle -- on these pads or paper, however

```
                  Smith - Redirect / By Mr. Temple                80
```

1   they are -- well, first of all, are they pads?

2   A    Sometimes, yes.

3   Q    Okay.  Are you the only one that writes on those pads?

4   A    No, sir.

5   Q    Who else?  Who else would?

6   A    The other console operators.

7   Q    Okay.  So, is it as much -- in your opinion, is it as much

8   theirs as anyone else's?

9   A    Yes.

10            **MR. ROSENBERG:**  Okay.

11            Pass the witness.

12            **THE COURT:**  Go ahead.

13            **MR. TEMPLE:**  Just a few questions, your Honor.

14                       **REDIRECT EXAMINATION**

15   **BY MR. TEMPLE:**

16   Q    Sir, are you aware that CITGO served these EELs reports on

17   plaintiffs as of August the 29th, the ones that you've

18   indicated that you couldn't complete the --

19   A    Could you repeat that?

20   Q    Yes.  Are you aware that the EELs reports that you've

21   referenced earlier were served on plaintiffs on or about August

22   the 29th?

23   A    Served on them?

24   Q    That they were sent to you, sent to your counsel.

25   A    No.

Smith - Redirect / By Mr. Temple                        81

1   Q     Have you sent --

2   A     That the EELs were sent to my counsel --

3   Q     Yes, sir.

4   A     -- was I aware of that?

5   Q     Yes, sir.

6   A     No; not to my knowledge.

7   Q     Have you sent -- seen any EELs since August the 29th?

8   A     At work?  Yes, I've seen EELs at work.

9   Q     Have you received any EELs from your counsel since August

10  the 29th?

11  A     I don't recall receiving any.

12  Q     Question was asked during your deposition, talking about

13  the notes:

14              "What are done with those?  So, those notes are

15              separate and apart from what you put in the EELs,

16              correct?"

17              And what was your answer?  Starting on line 15.

18  A           "The notes are a reminder for me what information I

19              need to put in the EELs as far as pump numbers or

20              level numbers just so I won't forget."

21  Q           "QUESTION:  So, it's not the actual text of the EELs;

22              it's just a reminder for yourself."

23              "ANSWER:"

24              What do you say there?

25  A           "Right."

1              The text in the EELs is more than just the numbers.

2    It's a description of what's going on pertaining to that

3    equipment number or levels.

4    Q    Right.  And your notes contain information that wasn't in

5    the EELs, correct?

6    A    The notes have information that aren't in the EELs?

7    Q    Yes, sir.

8    A    No.

9              **MR. TEMPLE:**  Okay.  Pass the witness.

10             **MR. ROSENBERG:**  Pass the witness.

11             **THE COURT:**  Thank you.  You may stand down.

12         **(Witness stepped down)**

13             Call your next witness.

14             **MR. TEMPLE:**  Your Honor, we'd like to call Diana

15   Reddell.

16             **MR. ROSENBERG:**  Go get Diana.

17         **(Pause)**

18             Your Honor, can the witness be excused?  He was just

19   coming off the shift that worked all night.

20             **THE COURT:**  That's up to the defense.

21             **MR. TEMPLE:**  Yes.  I have no problem with that.

22             **THE COURT:**  Okay.

23             **MR. ROSENBERG:**  May I tell the others who have come

24   off shift to go?  I don't know who's testified that's just gone

25   off shift.  I can't figure that out right now.

1          **THE COURT:**  I want Mr. Ramirez to stay.  Mr. Waggoner

2    and Mr. Smith may go.

3          **MR. ROSENBERG:**  Okay.

4          You can tell Bill to leave, but Mr. Ramirez to stay.

5    If he wants.  No, he has to stay, but Waggoner can leave.

6          **THE WITNESS:**  Right.

7          **MR. ROSENBERG:**  And you can leave.

8          **THE WITNESS:**  Thank you.

9        **(Pause; voices and whispers off the record)**

10       **DIANA REDDELL, DEFENDANT'S WITNESS, PREVIOUSLY SWORN**

11                  **DIRECT EXAMINATION**

12   BY MR. TEMPLE:

13   Q   Ms. Reddell, do you remember submitting responses to

14   CITGO's request for production in this case?

15   A   Yes, I do.

16   Q   And do you remember those responses specifically asking

17   you about work notes?

18   A   Yes.

19   Q   And do you remember in response to those work notes, the

20   question about work notes, you specifically said:

21          "All handwritten notes that used to pass down

22          information to my relief are thrown away after I

23          leave, because they are just notes on a scratch pad.

24          Their own notes are permanently documents in the

25          company log known as EELs."

1            Do you see that?

2    A    No.  Where is that?

3    Q    It's at the very top.  I'm sorry.

4    A    Oh.

5        **(Pause)**

6            Yes.

7    Q    Okay.  And the notes that you're talking about that are

8    thrown away, those are notes that you create during the

9    scheduled work hours relating to your work for CITGO, correct?

10   A    Yes.

11   Q    And there is information in those notes that is not

12   contained in the EELs.  In other words, the EELs are not

13   exactly what's in the notes.  Correct?

14   A    Correct.

15   Q    Do you remember being informed on or about August 22nd

16   that you were under a court order to preserve your notes?

17   A    Yes.

18   Q    In the meantime, have you tried to preserve your notes?

19   A    I don't preserve them as far as, like, copy them and keep

20   them.  I just didn't throw them away.

21           **THE COURT:**  Where are they?

22           **THE WITNESS:**  Excuse me?

23           **THE COURT:**  Where are they?

24           **THE WITNESS:**  I don't know.  I normally just leave

25   them on the console for the next person to continue, you know,

1  putting their notes on there.  And usually, when I come back on

2  my four days, they're gone.

3          THE COURT:  So, what did it mean to you to preserve

4  the notes?

5          THE WITNESS:  I guess I thought you meant mainly like

6  the EELs or any procedures that I have to initial, like the

7  official documents that we use.

8          THE COURT:  How did you get that impression?

9          THE WITNESS:  I guess because most of the -- the

10 scratch pad that I normally just put little notes on or doodle

11 are transferred to the EELs, and I thought that was the way

12 it's preserved, by transferring the information.  I didn't

13 really think that they were, like, the doodle pad or scratch

14 pad that I use with just random information was, I guess, the

15 official document that I needed to maintain.

16         THE COURT:  So, you made that decision yourself?

17         THE WITNESS:  Yes, ma'am.

18         THE COURT:  Did you hear what Mr. Ramirez said when

19 he went out after he testified?

20         THE WITNESS:  No, ma'am.  He was on the other end of

21 the hallway.

22         THE COURT:  And who was talking to him?

23         THE WITNESS:  I think it was Steve.  Steve Moore.

24         THE COURT:  Did you hear anything they said?

25         THE WITNESS:  No, ma'am.

1          **THE COURT:**  Okay.

2          Go ahead.

3          **MR. TEMPLE:**  No further questions, your Honor.

4                          **CROSS EXAMINATION**

5    **BY MR. ROSENBERG:**

6    Q    What is the best way of preserving the integrity of the

7    handwritten notes?

8    A    To transfer them onto the EELs, which is the official log.

9          **THE COURT:**  How does that preserve the handwritten

10   notes?  I don't understand what you're saying.

11         **MR. ROSENBERG:**  My question was "preserve the

12   integrity."

13         **THE COURT:**  Well, how does that preserve the

14   handwritten notes?  Did we talk about that?  Did anybody say

15   anything about EELs?  Did we just talk about notes?

16         **MR. ROSENBERG:**  We've -- we're talk --

17         **THE COURT:**  What does it say?  Well, didn't we talk

18   about this on the phone and I wrote it in an order?  Preserve

19   your notes.

20         **MR. ROSENBERG:**  Your Honor, yes, you did say that,

21   but it was in response -- it was secondary to the request that

22   assisted the plaintiffs in the operation of the console.  And

23   the plaintiffs' position is that all that's on EELs.  I

24   understand the Court disagrees with me, but that's our --

25         **THE COURT:**  Okay.

Reddell - Cross / By Mr. Rosenberg                    87

1          **MR. ROSENBERG:**  -- response.

2          **THE COURT:**  I'm not saying that.  I understood that

3    not everything you wrote down went into EELs; you sort of

4    summarized it on the EELs.

5          **THE WITNESS:**  Correct.  Because some of what I put

6    down is just doodling or just random --

7          **THE COURT:**  I'm not talking about doodles.  I'm

8    talking about the things you wrote down in your job.  You

9    didn't put every single word in the EELs?

10         **THE WITNESS:**  Probably not every single word, no,

11   ma'am.

12         **THE COURT:**  Okay.  That's the issue, is that you're

13   not entitled to decide whether it's relevant or not, and the

14   defendant is entitled to decide what you wrote down versus what

15   you put in EELs.  They're entitled to compare it.

16         **THE WITNESS:**  Yes, ma'am.

17         **THE COURT:**  And you have made that impossible.

18   Because you knew that your notes are never there when you come

19   back after the four days off, right?

20         **THE WITNESS:**  Right.

21         **THE COURT:**  Sorry?

22         **THE WITNESS:**  Correct.

23         **THE COURT:**  Okay.  So, you knew you weren't

24   preserving your notes by leaving them there, correct?

25         **THE WITNESS:**  Correct.

1          **MR. ROSENBERG:**  May I?

2          **THE COURT:**  Go ahead.

3    **BY MR. ROSENBERG:**

4    Q    Do the supervisors know that these -- of this practice of

5    handing down scratch pad notes?

6          **MR. TEMPLE:**  Objection.  Calls for speculation.

7          **THE COURT:**  It what?

8          **MR. TEMPLE:**  Objection.  Calls for speculation of

9    what the supervisors may or may not know.

10         **THE COURT:**  Sustained.

11   **BY MR. ROSENBERG:**

12   Q    Do you know if the supervisors ever see you passing down

13   notes or taking notes, hand down notes?

14   A    No, sir.

15   Q    You don't know whether they see it or not?

16   A    We usually make relief about the same time that the

17   supervisor does, so he's not in the room while we're doing

18   that.

19         **MR. ROSENBERG:**  Okay.

20         Pass the witness.

21         **MR. TEMPLE:**  No further questions, your Honor.

22         **THE COURT:**  Thank you.  You may stand down.

23     **(Witness stepped down)**

24         **MR. TEMPLE:**  Your Honor, we'd like to call Chester

25   Harrison.

1      **(Pause)**

2           **MR. ROSENBERG:**  Up there.

3      **CHESTER HARRISON, DEFENDANT'S WITNESS, PREVIOUSLY SWORN**

4                         **DIRECT EXAMINATION**

5    **BY MR. TEMPLE:**

6    Q    Mr. Harrison, you take notes during your work at CITGO, do

7    you not?

8    A    I use the EELs.  It's electronic.

9    Q    Is it your testimony that you never take any handwritten

10   notes?  Is that what you're telling us?

11   A    I've tried to not take any handwritten notes at all.  It's

12   just easier to keep track of everything on EELs.

13           **MR. TEMPLE:**  Objection.  Nonresponsive.

14   **BY MR. TEMPLE:**

15   Q    Sir, are you telling us that you have never taken any

16   handwritten notes?

17   A    No.

18   Q    And have you taken handwritten notes in the last six

19   months?

20   A    Not that I recall.

21   Q    Do you remember providing written discovery responses in

22   this case?

23   A    Yes.

24   Q    And do you remember you were asked a specific question

25   about notes?

Harrison - Direct / By Mr. Temple                          90

1   A    Yes.

2   Q    And documents?  And at the bottom of the page here, you

3   specifically said:

4           "Any handwritten notes for work would be left there

5           at my console and in most probability would be thrown

6           away.  I've never kept any handwritten pass-down

7           notes."

8           Do you see that?

9   A    Yes.

10  Q    Okay.  Were you not talking about notes that you kept

11  while at work?

12  A    I was referring to everyone's notes.  That was a general

13  question.

14  Q    The question was directed at you, sir.

15  A    I answered as a general question as directed at the board.

16  Q    You didn't understand this request for production was

17  directed at you?

18  A    Yes; and I produced everything that I had, which was not

19  much.

20  Q    But my question, sir, is --

21  A    Now --

22  Q    -- you have, in fact, kept notes, have you not?

23  A    Over what time period?

24  Q    How about 2011?

25  A    No.

Harrison - Direct / By Mr. Temple                    91

1   Q    How about since August 22nd, 2011?

2   A    No.

3   Q    It's your testimony you've kept no notes whatsoever.

4   A    No.  I don't keep anything except in EELs.

5   Q    And --

6        **THE COURT:**  Well, not "keeping."  Have you made any

7   notes in all of 2011?

8        **THE WITNESS:**  Made any?

9        **THE COURT:**  Yeah.

10       **THE WITNESS:**  Electronic or --

11       **THE COURT:**  Handwritten notes.

12       **THE WITNESS:**  -- handwritten?

13       **THE COURT:**  Handwritten.

14       **THE WITNESS:**  No.

15       **THE COURT:**  You're positive?

16       **THE WITNESS:**  I may have written something down, like

17  if I did a calculation, write a number down or something like

18  that, before I put it on the board.  But, no, I haven't keepen

19  any handwritten notes of what I was doing.

20       **THE COURT:**  I know you haven't kept them.  I just

21  want to know if you've made them.

22       **THE WITNESS:**  No, I haven't made any handwritten

23  notes of what I did at the time.  I've gotten to the point now

24  where I go ahead and I put it in EELs.  If I have a question on

25  what I did, I go back and look on PIE, and then I enter it into

Harrison - Direct / By Mr. Temple                    92

1    EELs.

2              **THE COURT:**  So, you haven't made any handwritten

3    notes at work in all of 2011.

4              **THE WITNESS:**  No.

5              **THE COURT:**  Sorry?

6              **THE WITNESS:**  No, ma'am.

7              **THE COURT:**  Okay.

8    **BY MR. TEMPLE:**

9    Q    And your response with -- your explanation with regard to

10   the supplemental answer is that was directed at the board and

11   not you?

12   A    Yes.

13             **MR. TEMPLE:**  No more questions, your Honor.

14             **THE COURT:**  Thank you.

15             **MR. ROSENBERG:**  Pass the witness, your Honor.

16             **THE COURT:**  You may stand down, sir.

17        **(Witness stepped down)**

18             **THE COURT:**  Did you have any e-mail problems with any

19   of these people, or is that all taken care of?

20             **MR. TEMPLE:**  Well, we got some.  We've gotten some e-

21   mail account information, your Honor.  My office is now going

22   through trying to access all of the e-mails.  We still don't

23   have, but I've told opposing counsel that we would accept, the

24   explanations with regard to an estimate of what was deleted and

25   when.  We still have not received that.  But we've talked about

93

1    that issue.

2           **MR. ROSENBERG:**  In fairness, we just did that the

3    other day.  And we --

4           **THE COURT:**  Oh, you can go.  Thank you.

5           **THE WITNESS:**  I'm sorry.  I didn't want to interrupt.

6           **THE COURT:**  No; appreciate that.

7           Who is the next witness, and he can send him in?

8           **MR. ROSENBERG:**  Yeah.  Well --

9           **MR. TEMPLE:**  The next witness is Ronald Ganer.

10          **MR. ROSENBERG:**  And can this witness -- can he leave?

11          **MR. TEMPLE:**  I have no further use for this witness,

12   your Honor.

13          **THE COURT:**  Yes, sir.

14          **MR. ROSENBERG:**  So, you can take off.

15          **THE COURT:**  I'm sorry; what was his name again?

16          **MR. ROSENBERG:**  This was Randy -- Chester Harrison.

17          **THE COURT:**  Chester Harrison.  Thank you.

18          **MR. ROSENBERG:**  He goes by -- and you might see it as

19   "Randy," but --

20       **(Pause)**

21          **MR. ROSENBERG:**  Right there.

22          **COURT RECORDER:**  Would you come forward, please, and

23   take a seat.

24   //

25   //

1          **RONALD GANER, DEFENDANT'S WITNESS, PREVIOUSLY SWORN**

2                         **DIRECT EXAMINATION**

3   **BY MR. TEMPLE:**

4   Q    Mr. Ganer, you take notes in the operation of your

5   console, do you not?

6                **COURT RECORDER:**  His name?

7                **MR. TEMPLE:**  Oh, I'm sorry.

8   **BY MR. TEMPLE:**

9   Q    Mr. Ganer, would you please state your name for the

10  record?

11  A    My name is Ronald Ganer.

12  Q    Thank you, sir.

13       You take notes during the operation of your console

14  while at CITGO, do you not?

15  A    Rarely, but occasionally I do.

16  Q    And do you remember giving deposition testimony on this

17  particular issue, and when you were asked about the notes you

18  take, you said that you take notes on a pad?  Correct?

19  A    Yes.

20  Q    And at that point in time you didn't say anything about

21  "rarely," did you?

22  A    I'm not -- I don't recall exactly what I said, sir.

23  Q    The question was asked:

24            "Do you keep any notes" -- I'm sorry.

25            "Do you keep any notes during your shifts, written

Ganer - Direct / By Mr. Temple                    95

1              notes about what you were doing on your console,

2              personal notes?"

3              Or, I'm sorry.  The answer was that you stated -- you

4      had a question:

5              "Personal notes"?

6              And the question was asked, starting at line three:

7              "Personal notes about the console, not personal notes

8              about things going on in your life."

9              And what is the answer you provided at line five?

10    A      "I may have a pad that I write things down on so I

11            can remember them."

12    Q    And, then, go on further down.  The question was asked:

13            "When you come back on your next shift, are those

14            notes typically still there?"

15            And what did you say?

16    A      "No."

17    Q    The question was:

18            "But you don't know what happened to them."

19            And what did you answer?

20    A      "No."

21    Q    Okay.  Sir, on these notes that we're talking about, have

22    you taken any steps to preserve those notes, whether it be copy

23    them while you're out there on the unit, or provide them in

24    this case to CITGO?

25    A    No.

1      **MR. TEMPLE:**  No further questions, your Honor.

2                    **CROSS EXAMINATION**

3    **BY MR. ROSENBERG:**

4    Q    Are you familiar with the EELs system, sir?

5    A    Yes.

6    Q    Can you explain to the Court -- first of all, which

7    console do you work on?

8    A    I work the west plant, mixed distillate hydrotreater,

9    ultra-low-sulfur diesel, and SRU console.

10   Q    Okay.  What is the EELs system?

11   A    The EELs system is our electronic event log.

12   Q    Okay.  What is recorded in the EELs system?

13   A    Generally, any event or -- any kind of operational event

14   that takes place; if we receive a delivery of some type of

15   product, or if we are -- virtually anything that goes on, on

16   the unit, during the day.

17   Q    Is there a spot for -- I'm sorry.  Is there a spot on EELs

18   for notes?

19   A    Yes, there is.

20   Q    And what's the purpose of that?

21   A    That, the purpose of that, is that if we have anything

22   unusual, like we've taken a control valve out of service or

23   something of that nature, we can write it in the notes section.

24   Q    Okay.  With regard to what notes are used to assist you in

25   the operating of your console on a daily basis, are those on

1    the handwritten notes, on EELs, or both?

2    A    They'd be on both.

3    Q    Okay.  Now, with regard to the ones that are on the --

4    explain to the Court why there would be handwritten notes that

5    you use to assist you in the operation of your console.

6    A    At various times I'd get a phone call from maybe one of

7    the analyzer techs or someone, you know, somewhere in the

8    plant, and I might jot down their extension number so I can

9    call them back.  I might be busy and I've been called on the

10   radio and told there's an oxygen truck or something like that;

11   I might write "O2 truck" down there and something like that,

12   and just so I can remember, okay, I've got an O2 truck, and

13   then I'll enter it in EELs.

14   Q    And then what, sir?

15   A    I will enter the O2 truck in the EELs.

16   Q    Okay.  So, what's the purpose of transferring the material

17   in the written notes to EELs?

18   A    Well, that's where the document is.  The EELs is the

19   document.  I mean, that's -- to me, the EELs is the legal

20   document, sir.  The notes are just -- it's just a notepad

21   that's there.  I wouldn't consider it a legal document.  That's

22   you-all's opinion, or that's the Court's opinion, sir.

23   Q    Okay.

24            **THE COURT:**  Is it your decision to determine what's a

25   legal document?

1          **THE WITNESS:**  No.  No, ma'am.

2          **THE COURT:**  Well, then, why did you make that

3   determination and not save your written notes?

4          **THE WITNESS:**  Your Honor, I'd have to say that out of

5   habit of leaving the notes on the console daily for -- you

6   know, on that console for about 11 years, that's been my habit.

7   And that is why I didn't make an effort to save the maybe half

8   a dozen written notes I've made since August.

9          **THE COURT:**  Okay.

10         **MR. ROSENBERG:**  Pass the witness.

11                      **REDIRECT EXAMINATION**

12  **BY MR. TEMPLE:**

13  Q    And, sir, you answered the request for production number

14  nine that specifically asked for these notes, correct, in

15  providing the supplemental responses?  Asked for notes that

16  were used or assisted you in the operation of your console?

17  A    Yes.

18  Q    And your supplemental answer that you provided was

19  specifically, you said:

20         "Any note that I compose at work is either left on

21         the half oval desk behind the console or left on the

22         console itself."

23         Do you remember that?

24  A    Yes.

25  Q    And those would be the notes that we're talking about,

Ganer - Redirect / By Mr. Temple                    99

1    correct?

2    A    Yes.

3    Q    Separate and aside from the EELs, correct?

4    A    Yes.

5    Q    And, then, you --

6            THE COURT:  And those handwritten notes, if you leave

7    them on the console, you know they're not there when you come

8    back to work?

9            THE WITNESS:  Your Honor, most of the time they are

10   not there.

11           THE COURT:  Okay.

12   BY MR. TEMPLE:

13   Q    And we asked you about that in your deposition here.  We

14   said:

15               "Do you think you would find them if you searched for

16               them around your console, or do you think they got

17               thrown away?"

18               You said:

19               "No, they got thrown away.  I throw away any notes

20               that people leave."

21               Do you remember that testimony?

22   A    Yes, sir.

23   Q    And that was truthful testimony, correct?

24   A    Yes.

25           MR. TEMPLE:  Pass the witness, your Honor.

1          MR. ROSENBERG:  No questions.

2          THE COURT:  Thank you, sir.  You may stand down.

3      **(Witness stepped down)**

4          MR. ROSENBERG:  Your Honor --

5          MR. TEMPLE:  Your Honor, we'd like to call Ronald

6  Stubbs.

7          MR. ROSENBERG:  Before we do that, your Honor, can I

8  have a, please, a five-minute break?  I've got a --

9          THE COURT:  Yes, sir.

10         MR. ROSENBERG:  Thank you.

11     **(Off the record from 11:27 a.m. until 11:28 a.m.)**

12         MR. TEMPLE:  Your Honor, while he's outside, could I

13 grab a cup of water outside?

14         THE COURT:  Yes, sir.

15         MR. TEMPLE:  Thank you.

16     **(Pause; off the record from 11:28 a.m. until 11:29 a.m.)**

17      **RONALD STUBBS, DEFENDANT'S WITNESS, PREVIOUSLY SWORN**

18                     **DIRECT EXAMINATION**

19 BY MR. TEMPLE:

20 Q    Would you please state your name for the record?

21 A    Ronald Stubbs.

22 Q    And, Mr. Stubbs, you take notes during your work at CITGO,

23 do you not?

24 A    Occasionally.

25 Q    And, sir, those notes are notes that you create during

1    your scheduled work hours relating to your work for CITGO,

2    correct?

3    A    Yes.

4    Q    And, sir, do you remember seeing the Court's August 22nd

5    order with regard to the preservation and production of those

6    notes?

7    A    Yes.

8    Q    And as of today, you still have not produced any of those

9    notes, have you?

10   A    Yes, we have.

11   Q    What notes have you produced?

12   A    The ones that you refer to as "pass-down" notes.

13             **THE COURT:**  As what?

14             **THE WITNESS:**  Since -- I think the first one that

15   came in our possession was September 1st.

16   **BY MR. TEMPLE:**

17   Q    And do you remember talking about notes that are left

18   physically on a pad of paper on your console when you leave

19   each day?

20   A    Not each day.  But that's typically where they leave them.

21   Q    Okay.  And what happened to those notes that you keep

22   relating to your work?

23   A    They're in our possession.

24   Q    You said you've produced them in this case and you've

25   given them to your lawyer?

1  A    Yes.

2  Q    When did you provide them to your lawyer?

3  A    Steve Moore gave them to Gregg.

4          **THE COURT:**  Pardon?

5      **(No audible response)**

6          **THE COURT:**  Pardon?  What did you say?

7          **THE WITNESS:**  Steve Moore, that works on the same

8  console as I do, gave them to Gregg.

9          **THE COURT:**  To who?

10          **THE WITNESS:**  Our lawyer, Gregg.

11          **THE COURT:**  Okay.

12  **BY MR. TEMPLE:**

13  Q    You're saying that those are your notes, the notes that

14  Steve Moore produced?

15  A    Those are not my official notes, no.  Those are notes that

16  are left on the desk that all console people use.

17  Q    No, I am asking, sir, about the notes that you testified

18  earlier that you keep with regard to your console.  Where are

19  those notes?

20  A    They're in Gregg's possession.

21  Q    When did you provide them -- and those are separate and

22  apart from the ones that you mentioned about Steve.

23  A    Steve Moore took possession of those notes and gave those

24  to Gregg.

25  Q    Your notes.

1   A    No.  I don't have "my" notes.

2   Q    Where are your notes?

3   A    Gregg has them.

4   Q    When did you provide them to your counsel?

5   A    Steve Moore gave them to him, I think a couple of weeks

6   ago.

7   Q    And how far do your notes go back that have been provided

8   to your counsel?

9   A    The first pass-down note that we saw was September 1st.

10  Q    Of this year.

11  A    Yes.

12          THE COURT:  What happened to the other notes from

13  August -- last April forward?

14          THE WITNESS:  The ones before the order?  Typically,

15  before we got the order to retain those notes, we would leave

16  them on the desk for our fellow console supervisor to look at,

17  and they would discard them when they were through with them.

18  BY MR. TEMPLE:

19  Q    You knew they would be discarded, correct?

20  A    Before; but once we got the notice to retain those, we

21  started retaining them.

22  Q    Do you remember --

23          THE COURT:  When did you get that notice?

24          THE WITNESS:  Ma'am?

25          THE COURT:  When did you get that notice?

1          THE WITNESS:  When did we get that notice?

2          THE COURT:  Yes.

3          THE WITNESS:  I think it was on the 22nd of August.

4          THE COURT:  Okay.  So, you knew what that meant; your

5    handwritten notes.

6          THE WITNESS:  Yes; and we retained those notes.

7          THE COURT:  Okay.  And who is "we"?

8          THE WITNESS:  Steve Moore and I.

9          THE COURT:  Just your notes and Steve Moore's notes?

10         THE WITNESS:  I think there is a misconception going

11   on.  We don't have individual notes.  We have a tablet and --

12         THE COURT:  Well, several people have said they have

13   scrap pads, scratch pads, that they write on.  So, that's no

14   misconception.

15         THE WITNESS:  Right.  But the scratch pads are --

16         THE COURT:  And they're not -- they have notes

17   separate and apart from what they put in EELs and notes

18   separate and apart from the pass-down notes.

19         THE WITNESS:  Right; well, what people are referring

20   to --

21         THE COURT:  So, there is no misconception.  Maybe

22   it's yours.

23         So, you don't write anything down on a scratch pad

24   while you're at work?

25         THE WITNESS:  Yes.  But it is a community scratch

Stubbs - Direct / By Mr. Temple                     105

1   pad.

2           THE COURT:  Okay.

3           THE WITNESS:  I don't have individual pass-down

4   notes.

5           THE COURT:  Okay.

6   BY MR. TEMPLE:

7   Q    Do you remember testifying that you write handwritten

8   notes, pass-down notes?

9   A    Occasionally.  Sometimes I don't.  Sometimes I do verbal

10  pass down.

11  Q    But you do write them, correct, sir?

12  A    Occasionally.

13  Q    Okay.  And what have you done to save those notes?

14  A    We retain those notes.  Those --

15          THE COURT:  Who is "we"?

16          THE WITNESS:  We have a tablet that we write on, and

17  we just flip the page and write on the next page until it

18  becomes full.

19          THE COURT:  Okay.  Who is "we"?  That's what I'm

20  still trying to figure out.

21          THE WITNESS:  The people on the crude coker console.

22          THE COURT:  Which console?

23          THE WITNESS:  Crude coker.

24          THE COURT:  Out of -- and that's one out of nine

25  consoles?

1          **THE WITNESS:**  Yes.

2          **THE COURT:**  Okay.  You don't know what happened to

3     the other pass-down notes in the other consoles.

4          **THE WITNESS:**  No, ma'am.

5          **THE COURT:**  Okay.

6     **BY MR. TEMPLE:**

7     Q    Sir, do you remember being asked the questions

8     specifically in the case, starting at line 17:

9               "Since October of 2010, have you thrown away or

10              destroyed any handwritten notes that you've kept

11              while working for CITGO?"

12              And what was your response, starting at line 20?

13    A    Uh -- I might have said yes.

14    Q    And then you said:

15              "No, we -- those have been thrown away."

16              Starting at line 22.

17              Because you asked about handwritten notes the

18    question was, "Yeah," and your answer was what?

19    A         "Since" -- "Since we got the order on August 22nd to

20              retain those notes, we have."

21    Q    Sir, your deposition was taken on October the 13th.  Isn't

22    that right?

23    A    That's correct.

24    Q    And on October 13th, you told us, when we asked about

25    handwritten notes like the pass-down notes, you were clear as

Stubbs - Direct / By Mr. Temple                    107

1    to what we were talking about, and the answer you provided is:

2            "No.  Those have been thrown away, typically daily,

3            you know."

4    A    I interpreted that question as:  What do you normally do

5    with those notes?  And typically we do.  But since we got the

6    notice, on August 22nd, we have retained every note.

7            **THE COURT:**  Why didn't you say that?

8            **THE WITNESS:**  I really don't know, ma'am.

9            **THE COURT:**  This is not supposed to be a time of

10   changing answers.  Discovery is expensive; and you're supposed

11   to answer right the first time.

12           **THE WITNESS:**  Yes, ma'am.

13   **BY MR. TEMPLE:**

14   Q    Do you remember answering the written discovery requests?

15   With regard to that particular request, it was number nine.  On

16   or about October the 6th, you said what?

17           "I have no documents in my possession.  They are left

18           on a pad physically on my console when I leave each

19           day."

20           Correct?

21   A    I do not have the documents in my possession.  Steve Moore

22   took it upon himself to be the guardian of those documents.

23   Q    Well, why didn't you tell us that Steve Moore took it upon

24   himself to be the guardian of those documents that you didn't

25   produce?

1   A    Because you asked me if I have possession.  I do not.

2   Q    Sir, you had the ability to obtain those from Mr. Moore,

3   did you not?

4   A    When I'm asked a direct question, I answer it with a

5   direct answer.

6            **MR. TEMPLE:**  Yes.

7            **THE COURT:**  That doesn't sound very direct to me.

8   That's a problem.

9            Go ahead.

10  **BY MR. TEMPLE:**

11  Q    Sir, you had the ability to go to Mr. Moore and ask for

12  the notes that contained your work activities, correct?

13  A    Yes, if I had a reason to.

14  Q    And you did have a reason to, because as of August 22nd

15  there was a court order requiring that you preserve and produce

16  those notes.  You understand that, correct?

17  A    Right.  Yes.

18  Q    And you never did that.  You never produced them.

19  A    I never produced them?

20  Q    Correct.  You gave them to Mr. Moore and let Mr. Moore

21  take care of it.

22  A    He is -- he wanted to assume responsibility for them, so I

23  let him have them.

24  Q    And at any point in time you could have gotten them back

25  or you could have simply made copies, correct?

1  A    If I needed to.  But I never had the reason, a reason to

2  get possession of them.

3          **THE COURT:**  You don't think my order was enough?

4          **THE WITNESS:**  Ma'am, there is only one copy of the

5  notes.  To have multiple copies would just be confusing.

6          **THE COURT:**  Really.  You didn't think it was

7  worthwhile in your deposition to mention that?

8          **THE WITNESS:**  What was that, ma'am?

9          **THE COURT:**  You didn't think it was worthwhile in

10  your deposition to mention that?

11         **THE WITNESS:**  I knew that the court order was to

12  retain those notes, and those notes were being retained.

13         **THE COURT:**  Actually, you were ordered to retain your

14  notes.  And you didn't do that.

15         **THE WITNESS:**  Ma'am, the way pass-down notes work is

16  someone writes some information on it.  And it's not for me;

17  it's for the person that's coming in.  For me to take those

18  away, I would be failing to pass on that information.

19         **THE COURT:**  Well, do you have access to a copy

20  machine at work?

21         **THE WITNESS:**  Yes, ma'am, we have a copy machine.

22         **THE COURT:**  You know, this is your lawsuit, and when

23  I order you to do something, I expect it to be done.  If you

24  don't want to continue the lawsuit, that's your option.

25         **MR. TEMPLE:**  No further questions of this witness,

Stubbs - Cross / By Mr. Rosenberg                    110

1   your Honor.

2          **MR. ROSENBERG:**  Your Honor, I'd like to mark an

3   exhibit.

4       **(Pause)**

5          **MR. ROSENBERG:**  May I approach?

6          **MR. TEMPLE:**  Could I see it, Gregg?

7          **MR. ROSENBERG:**  Yeah.  It's the original of what

8   Steve sent the other day.  Okay?

9          **THE COURT:**  No; just put it on the overhead document.

10         **MR. ROSENBERG:**  Okay.  All right.  Perfect.

11      **(Pause)**

12         **MR. ROSENBERG:**  How -- I don't even know how this

13  works.

14         **THE COURT:**  Well, what happens is it shows on yours

15  and it shows on his.

16         **MR. ROSENBERG:**  Oh, but it's not on --

17         **THE COURT:**  It's not been admitted, so it doesn't

18  show to everybody else.

19         **MR. ROSENBERG:**  I apologize.  Okay.  Oh, so, he sees

20  it.  Okay.

21                        **CROSS EXAMINATION**

22  **BY MR. ROSENBERG:**

23  Q   Can you identify -- do you see that, what's on Exhibit

24  Number 1 there?

25  A   Yes, sir.

Stubbs - Cross / By Mr. Rosenberg                              111

1   Q    Can you identify what this is?

2   A    It's a typical pass-down note.

3   Q    All right.  Can you identify the date of that?

4   A    Nine one eleven.

5   Q    Okay.  I'm going to flip through it and show you the

6   last -- the last page.

7            Do you see that there?

8   A    Yes.

9   Q    All right.  Can you identify this as -- well, what do you

10  identify this as?

11  A    As a pass-down note.

12  Q    All right.  Do you know by looking at the first and last

13  page when this pass-down note ended?

14  A    It started on September 1st, and I did not see the date on

15  the last.

16  Q    Well, there isn't a date.  There's not a date at the end,

17  but can -- are these the pass-down notes?

18  A    Yes.

19  Q    They contain your notes in --

20  A    Yes.

21          **MR. ROSENBERG:**  All right.

22          We'll offer --

23          **THE COURT:**  Have you handed those to the --

24          **MR. ROSENBERG:**  Yes.  Yes.

25          **THE COURT:**  -- plaintiff -- to the defendant?

1          **MR. ROSENBERG:**  Yes.

2          **THE COURT:**  When?

3          **MR. ROSENBERG:**  When I finished the other day, two or

4     three days ago, when the pad finished.  And you'll hear that

5     from Moore's testimony.

6          **THE COURT:**  Do you have those?

7          **MR. TEMPLE:**  We just got them two days ago, your

8     Honor.

9          **THE COURT:**  Okay.

10         **MR. ROSENBERG:**  So, we'll offer Plaintiff Exhibit

11    Number 1.

12         **THE COURT:**  Any objection?

13         **MR. TEMPLE:**  No, your Honor.

14         **THE COURT:**  Plaintiffs' Exhibit 1 is admitted for

15    purposes of this hearing.

16       **(Plaintiffs' Exhibit Number 1 was received in evidence)**

17    **BY MR. ROSENBERG:**

18    Q    Can you tell us whose notes are on the first page here,

19    whose handwriting?

20    A    That looks like my handwriting.

21    Q    Okay.  Now let's go to the second page.

22         Whose handwriting?

23    A    That looks like my handwriting.

24    Q    Third page.

25    A    I think that's John Holforth (phonetic).

1   Q    Another co-worker, but not a plaintiff in the case?

2   A    Yes.

3   Q    Okay.  And, then, look -- this handwriting right here?

4   A    I think that's Terry Oberlander's handwriting.

5   Q    Another co-worker not a plaintiff in the case?

6   A    Yes.

7   Q    How about this page here?

8   A    That typically looks like Mike Bayham's (phonetic)

9   handwriting.

10  Q    Another co-worker not a plaintiff in the case.

11  A    Yes.

12  Q    All right.  Now, if we go through this, you'll see some --

13  for example, here you have -- I don't know if it comes up on

14  the screen -- blue pen ink right there?

15  A    Yes.

16  Q    And, then, there is information right there?

17  A    Uh-huh.

18  Q    Are those the same people or different people making that

19  reporting?

20  A    It looks like different people.

21  Q    Okay.  What about this page right here?

22  A    It looks like Steve Moore's on the top, and, then, the

23  middle looks like mine.

24  Q    Okay.  Well, something like this, "600 Elizabeth, Sixth

25  and Third," is that just a doodle or --

Stubbs - Cross / By Mr. Rosenberg                114

1   A     It's a doodle.

2   Q     And that happens from time to time?

3   A     Very often.

4   Q     In conjunction with stuff that says "coker," that would be

5   business related, correct?

6   A     Yes.

7   Q     Okay.  Now, and this page has a tear-out involved in it.

8   I don't know if you see it there.  Do you see it --

9   A     Yes.

10  Q     -- torn out?  Do you know what that would be?

11  A     Typically, people will tear stuff off and write a phone

12  number on it or --

13  Q     Okay.

14          THE COURT:  So, we don't know where that is?

15          THE WITNESS:  No.  I don't know who did that.

16  BY MR. ROSENBERG:

17  Q     But what I'm getting at, is this -- is this pad shared by

18  people who are plaintiffs and non-plaintiffs in this case?

19  A     Yes.

20  Q     And it gets filled up until the end, correct?

21  A     Correct.

22  Q     Okay.  Where is it left?

23  A     What was the question?

24  Q     Where is it left?

25  A     Where is it left?

Stubbs - Redirect / By Mr. Temple                    115

1    Q    Yeah.  Where -- where -- if I --

2    A    It's left on the table until they fill it up, and then

3    Steve Moore took possession of it.

4    Q    Okay.  Now, is any of this information transferred into --

5    the stuff that you write -- was only the stuff I'm interested

6    in -- transferred into EELs, as well?

7    A    One hundred percent of it.

8         **MR. ROSENBERG:**  Okay.

9              I'll pass the witness, your Honor.

10        **(Pause)**

11                    **REDIRECT EXAMINATION**

12   **BY MR. TEMPLE:**

13   Q    It's your testimony that you always transfer every single

14   bit of information that are contained on Plaintiffs' Exhibit 1

15   into EELs.  Every bit.  Verbatim.  Is that what you're telling

16   us?

17   A    In my case, yes; because I actually take this information

18   from EELs and put it on the paper to give to my relief.

19   Q    Okay.

20        **THE COURT:**  I thought there were some demonstrative

21   drawings on there.

22        **THE WITNESS:**  Ma'am?

23        **THE COURT:**  Aren't there some demonstrative drawings

24   on there?

25        **THE WITNESS:**  Like I said, some people do doodles on

Stubbs - Redirect / By Mr. Temple                    116

1  it.  I have no idea what that would be.  It's just people

2  expressing themselves.

3  **BY MR. TEMPLE:**

4  Q    You don't know what any of this is with regard to anyone

5  else's handwriting, right?

6  A    What was the question again?

7  Q    You don't know what any of these demonstrative drawings

8  the Court's referring to are, do you?

9  A    Some of them look sort of like maybe a tower, and the

10  other one might be a draw of the tower.  I mean, there is no

11  way of knowing for sure.

12  Q    And those aren't in EELs, are they?

13  A    The EELs?  No.

14  Q    And this pad starts on nine -- on September the 1st.  What

15  about from the time the Court issued the order, August the

16  22nd, up until September 1st?  Where are your notes relating to

17  that time period?

18  A    I would not know.

19  Q    I'm sorry?

20  A    I would not know.

21  Q    Did you take any effort to preserve them?

22  A    From the date that I got the order to preserve them, if

23  there were some notes on the table, I preserved them.

24  Q    What date did you get that order, sir?

25          THE COURT:  Well -- I'm sorry.  Well, back in April

EXCEPTIONAL REPORTING SERVICES, INC

1    you were notified that these documents were part of your

2    discovery.

3              THE WITNESS:  Yes.

4              THE COURT:  So, in April did you gather what you had

5    and give them to your lawyer?

6              THE WITNESS:  I did not.

7              THE COURT:  Why?

8              THE WITNESS:  I didn't know I was under orders to

9    retain those.

10             THE COURT:  Well, you were first requested to provide

11   these in April of 2011.  Did you provide what you had in April

12   of 2011?

13             THE WITNESS:  No.

14             THE COURT:  Okay.

15   BY MR. TEMPLE:

16   Q    Sir, at any point in time you could have copied any of the

17   notes that you were keeping on the shift or on the unit,

18   correct?

19   A    I could have, but that's not typically what we do.

20   Q    But a copier was available at any point in time.  You

21   could have gotten up from your console and simply made a copy

22   of what it was that you had taken note of that day.  Isn't that

23   right?

24   A    I could.  But this information is already in EELs.

25             THE COURT:  Well, you just said the drawings weren't.

Stubbs - Redirect / By Mr. Temple                    118

1   And they look work-related, actually, to me.

2           **THE WITNESS:**  Right.  Well, the information in the

3   drawings are -- I don't know what those are.

4           **THE COURT:**  Well, one of them said "78," like a

5   measurement; it was a drawing that was written out.

6   **BY MR. TEMPLE:**

7   Q    And, sir, are you sure, as we sit here today, that this

8   pad is complete, that no pages have been torn out from

9   beginning to end?  You don't know that, do you?

10  A    I did not check the pad to see if anything was torn out.

11  No.

12  Q    Well, and you don't know.

13  A    No.

14  Q    You don't know whether this pad is complete, do you?  You

15  can't under oath tell the Court that this pad is complete from

16  September the 1st onward, can you?

17  A    The only thing I know is what was left in that pad.

18  Whether someone tore it out, I have no idea.

19  Q    And as we sit here today, you can't testify that it is, in

20  fact, complete and nothing was torn out, can you, because it's

21  one of the pads that you can tear out from the top, right?

22  A    The only thing I can testify to is that we retained

23  everything we could.

24          **MR. TEMPLE:**  Pass the witness, your Honor.

25          **MR. ROSENBERG:**  No further questions, your Honor.

1          **THE COURT:**  Thank you.  You may stand down.

2      **(Witness stepped down)**

3          **MR. ROSENBERG:**  Can this witness be excused?

4          **THE COURT:**  Yes.

5          Who do you want to call next?

6          **MR. TEMPLE:**  Mr. Rick Salinas, your Honor.

7          **MR. SPEAKER:**  Okay.

8      **(Pause)**

9          **MR. TEMPLE:**  Yes, you may be seated.  Thank you.

10     **RICK G. SALINAS, DEFENDANT'S WITNESS, PREVIOUSLY SWORN**

11                     **DIRECT EXAMINATION**

12    BY MR. TEMPLE:

13    Q    Would you please state your name for the record, sir?

14    A    Rick G. Salinas.

15    Q    And, sir, you take notes during your work at CITGO, do you

16    not?

17    A    Sometimes.

18    Q    And those notes are notes that you create during the

19    scheduled work hours that relate to that work, correct?

20    A    Not necessarily.  Sometimes they do; sometimes they don't.

21    Q    But sometimes they do, correct?

22    A    Yeah, sometimes there are scratch pads, is what we call

23    them.

24    Q    And do you remember in our deposition you told us that you

25    prepared notes that assist you in the running of your console?

1   A    Yes, sir.

2   Q    And you stand by that testimony, correct?

3   A    Yes, sir.

4   Q    Have you done anything to save those notes?

5   A    No, sir.

6   Q    Do you remember getting the Court's August 22nd order

7   specifically directing you to save those notes?

8   A    Yes, sir.

9   Q    Did you comply with the Court's order?

10  A    I was not in the understanding that those scratch pads

11  were being considered for that.  I was thinking that it was

12  the -- our electronic event log, which is the computer where we

13  log all our information in.

14  Q    Okay.  But do you remember this issue was discussed in

15  your deposition and we talked about the difference between the

16  information contained in the electronic event log and the

17  information in your notes?  Do you remember that?

18  A    Yes, sir.

19  Q    And you specifically told us there is information that you

20  have in your notes that you keep that relate to your work that

21  is not contained in the electronic event log, the EELs,

22  correct?

23  A    Yes.

24           MR. TEMPLE:  No further questions, your Honor.

25           THE COURT:  Thank you.

1          Anything further?

2          **MR. ROSENBERG:**  Yes.

3                          **CROSS EXAMINATION**

4    **BY MR. ROSENBERG:**

5    Q    Is any of the information that is not transferred into

6    EELs, is any of that information information you would deem

7    that assists you in the operating of your console?

8          **THE COURT:**  I thought he just said that it was work

9    related.

10         **MR. ROSENBERG:**  Work related and assists in operating

11   a console are two different things.

12         **THE COURT:**  I know, but is there something in the

13   request for production that says only assisting?

14         **MR. ROSENBERG:**  Yes.  That was the whole -- that was

15   my whole point.

16         **THE COURT:**  No, it was disjunctive.

17         **MR. ROSENBERG:**  Well, that was my point.  I didn't

18   read it that way.

19         **THE COURT:**  Well, when it says this or this or this,

20   that's disjunctive.

21         **(Pause)**

22         **MR. ROSENBERG:**  With all due respect to the Court, I

23   didn't read it that way and that's how I counseled the

24   Plaintiffs.  All documents --

25         **THE COURT:**  Does it not say or or or?

Salinas - Cross / By Mr. Rosenberg                    122

1          **MR. ROSENBERG:**  Not before the comma it doesn't.  It

2    says:

3               "All documents prepared by you that you use or used

4               or that assisted you or have assisted you in the

5               operating of the console since January 1st, 2008."

6          And that's the -- that's the -- how I interpreted it.

7          **THE COURT:**  It's disjunctive.  Surely you know the

8    difference, as an attorney --

9          **MR. ROSENBERG:**  And I --

10         **THE COURT:**  -- between conjunctive and disjunctive.

11         **MR. ROSENBERG:**  And quite honestly I'm embarrassed

12   because I was a minor in English and I just didn't see it that

13   way, because if it was that way I would have objected to it.

14   And that was the point of this whole --

15         **THE COURT:**  Well, that's the way it is and there was

16   no objection and he already said these are notes that he used

17   in work.

18         Is that right?

19         **MR. ROSENBERG:**  But --

20         **THE COURT:**  Sir?

21         **THE WITNESS:**  Some of the notes, yes, and some of

22   not.

23         **THE COURT:**  Well, what would you make the notes for

24   if they weren't work related?

25         **THE WITNESS:**  Well, sometimes, ma'am, when we're in

Salinas - Cross / By Mr. Rosenberg                    123

1    there and we're busy, we're answering phones, we're answering

2    the radio, and we'll be called on something outside, we'll put

3    it on that note because we don't have time to stop what we're

4    doing to log everything into the electric event log.

5              **THE COURT:**  I understand.  Where --

6              **THE WITNESS:**  Things are happening, things are

7    happening, so sometimes they'll call about something, let's say

8    it's 9:30, I put 9:30, so then when I have time to go into my

9    electric log book I will log in 9:30 we did this particular

10   item.  But sometimes if somebody calls for somebody that's not

11   even there I might even put somebody's phone number there.

12   They called for Rick Salinas and I'll put what time and that

13   guy might not be there.  So sometimes it's a scratch sheet,

14   it's not used in the operation of our unit.  We use it to

15   remind ourselves -- for instance, if there's a maintenance man

16   working on five instruments outside, I can't remember the tag

17   numbers for all five of them.  I will write them down so then

18   when I go into the electronic event log I will write all those

19   five instruments that were worked on.

20             **THE COURT:**  Okay, go ahead.

21   **BY MR. ROSENBERG:**

22   Q    Did --

23             **THE COURT:**  This is such a simple thing.  I ordered

24   keep the notes.  Some of the people brought the notes, one

25   person apparently, Steve Moore brought notes.  He understood it

Salinas - Cross / By Mr. Rosenberg                124

1    was notes eventually.  And apparently the last gentleman knew

2    it was notes, though he didn't save his notes.  And now some of

3    the people are saying they didn't know they were supposed to

4    bring in their handwritten notes, they thought the company had

5    them in EELs.  No matter how many times I said handwritten

6    notes, handwritten notes, it just didn't happen.

7              **MR. ROSENBERG:**  Because the qualifier, your Honor,

8    was -- when the Court issued its Order, which we took very

9    seriously, it related to the --

10             **THE COURT:**  Well, how come Steve Moore kept his notes

11   and these other people didn't?

12             **MR. ROSENBERG:**  Because after August -- after

13   August 22nd I told them that everything needs to be kept.

14             **THE COURT:**  Then how come he didn't do it?  How come

15   this gentleman, Mr. Salinas, didn't do it?

16             **THE WITNESS:**  Ma'am, some boards keep notes and some

17   don't.

18             **THE COURT:**  Well, you said in your deposition you

19   kept notes.

20             **THE WITNESS:**  Sometimes I work a whole four-day block

21   and I won't have no notes.

22             **THE COURT:**  Okay, all I'm saying is you took notes in

23   2011, did you not?

24             **THE WITNESS:**  Yes, ma'am.

25             **THE COURT:**  Written notes?

1            THE WITNESS:  Yes, ma'am, I have.

2            THE COURT:  And you have since April of 2011?

3            THE WITNESS:  Yes, ma'am.

4            THE COURT:  And you have since August the 22nd of

5    2011?

6            THE WITNESS:  Yes, ma'am.

7            THE COURT:  Where are they?

8            THE WITNESS:  They're left on a tablet and the next

9    guy comes in, he flips it over and he does his --

10           THE COURT:  When you come back to work a few days

11   later those notes are gone, is that right?

12           THE WITNESS:  Yes, ma'am.

13           THE COURT:  Okay, so you knew they would not be

14   preserved?

15           THE WITNESS:  I've never thrown any away.  We've

16   never -- we don't have a place where --

17           THE COURT:  I understand, but you knew they would not

18   be preserved because when you come back they're not there?

19           THE WITNESS:  Yes, sometimes they are, sometimes they

20   aren't, yes, ma'am.

21           THE COURT:  I think that about says it all,

22   Mr. Rosenberg.

23           MR. ROSENBERG:  Your Honor, I --

24           THE COURT:  This is very frustrating.

25           MR. ROSENBERG:  The last thing I want to do is

1    frustrate this Court or any Court.

2              **THE COURT:**  I can imagine.

3              **MR. ROSENBERG:**  But when we talk about preservation

4    and the clients are reporting back that they preserve this

5    information that assist in the operating of the console --

6              **THE COURT:**  Some are and some aren't.  That's just

7    the way it is.

8              **MR. ROSENBERG:**  Everything's going to EELs.  There

9    hasn't -- the testimony's been consistent the only thing --

10             **THE COURT:**  No, it has not, Mr. Rosenberg.  It has

11   not been consistent.  And it's not up to you or your clients to

12   determine what went into EELs.  The Defendants, once again, are

13   entitled to see those written notes to see if those notes went

14   into EELs.  The drawing that clearly was work related that had

15   a 78-foot measurement was work related and didn't go into EELs.

16             **MR. ROSENBERG:**  That wasn't my client.

17             **THE COURT:**  I'm just saying that all the notes did

18   not go into EELs.  And the Defendants are entitled to see what

19   went in and what did not go in.  I can't -- we've gone over

20   this and over this and over this and your clients refuse to

21   bring in the handwritten notes.  They refuse to save them.  And

22   even what you brought had a piece torn out of it on one of the

23   pages.

24             **MR. ROSENBERG:**  But -- I guess my point --

25             **THE COURT:**  I'm just -- I don't know how -- I'm not

1    arguing with you anymore.  The Order of the Court was clear.

2    Your clients have not followed it.  And so far I only have one

3    that did, and that's Chester Harrison.  He said categorically

4    he had no handwritten notes ever, and he did.

5            Next person?

6        **(Witness excused)**

7        **(Pause)**

8            Who do you want next?

9        **MR. TEMPLE:**  Luis Galvan, your Honor.

10       **(Pause)**

11           **THE COURT:**  I think that was admitted.

12           **MR. TEMPLE:**  I think it was.

13           **THE COURT:**  May I see it?

14           **MR. TEMPLE:**  Of course.

15           **THE COURT:**  Thank you.

16       **(Pause)**

17       **LUIS GALVAN, II, DEFENDANT'S WITNESS, PREVIOUSLY SWORN)**

18                       **DIRECT EXAMINATION**

19   **BY MR. TEMPLE:**

20   Q    Would you please state your name for the record?

21   A    Luis R. Galvan, II.

22   Q    Mr. Galvan, you take notes during your work at CITGO, do

23   you not?

24   A    I do.

25   Q    And those notes are notes that you create during scheduled

Galvan - Direct / By Mr. Temple                    128

1   work hours relating to your work for CITGO, correct?

2   A    For personal reference, yes.

3   Q    Notes that relate to your work, correct?

4   A    Yes.

5   Q    And you have not produced any of those notes, correct?

6   A    They don't pertain to what I'm really doing at work.

7         **THE COURT:**  Listen and just answer the question.

8         **THE WITNESS:**  Okay.

9         **THE COURT:**  Have you retained any of those notes?

10        **THE WITNESS:**  I have those notes, yes.

11        **THE COURT:**  Where are they?

12        **THE WITNESS:**  I have some at my personal locker at

13  work and some in my bag that I take back and forth to work

14  every day.

15  **BY MR. TEMPLE:**

16  Q    Those notes are not required to stay on the unit, are

17  they?

18  A    No.

19  Q    Those are your notes that you take from CITGO and you

20  bring back?

21  A    At shift change, yes.

22  Q    And you've preserved all of your notes?

23  A    I have, yes.

24  Q    How far back --

25        **THE COURT:**  I've noticed that, by the way, that this

```
                    Galvan - Direct / By Mr. Temple              129
 1   Exhibit Number, Plaintiffs' Exhibit Number 1, has pages that
 2   have been torn out besides half the pages torn off.
 3            You were aware of that, Mr. Rosenberg?
 4            MR. ROSENBERG:  I was aware of that.  Well, when I
 5   saw it, yes.
 6   BY MR. TEMPLE:
 7   Q    Sir, do you remember testifying that your notes are
 8   triggers for you and that you use them to help you throughout
 9   your shift?
10   A    As a scratch pad, yes, sir.
11   Q    You use them to do your job, right?
12   A    Not so much to do my job, just to -- for notes to --
13            THE COURT:  Well, are they related to you doing your
14   job?
15            THE WITNESS:  I do use them, I refer to them, yes,
16   ma'am.
17            THE COURT:  Okay.
18   BY MR. TEMPLE:
19   Q    Sir, how far back do your notes that you've retained go?
20   A    I would have to pull up that spiral notebook I have at
21   work that's in my locker.  I don't remember exactly how far
22   back.  I didn't always do that.  I used to take a piece of
23   scratch paper and write on it and throw it away.
24   Q    Have you kept the notes since April of 2011?
25   A    I believe I have, yes, sir.
```

Galvan - Direct / By Mr. Temple                    130

1   Q    But you're not -- you're not sure?

2   A    I don't remember when I started that first spiral

3   notebook, no, sir.

4   Q    Okay.  And remember giving -- well, let me ask the

5   question.  Those notes, you have information in those notes

6   that is completely different than the information that is in

7   the EELs, correct?

8   A    No.  A lot of that same stuff is in the EELs.

9   Q    But there's a lot of stuff in the notes that is not in the

10  EELs, correct?

11  A    Yes, a lot of personal stuff.

12  Q    But that personal stuff still relates to your work,

13  correct, sir?

14  A    While I'm at work, yes.

15  Q    It relates to your work, does it not?

16  A    No.  Some of those do not.

17  Q    But some of the notes that are not --

18          THE COURT:  Sorry, what personal notes are you making

19  on CITGO's time?

20          THE WITNESS:  Oh, just somebody in the back told me

21  what bourbon to buy or suggested a phone number or my ex-wife

22  called me on her number and I took the number down.

23          THE COURT:  Okay.

24          THE WITNESS:  Stuff like that.

25  //

1   **BY MR. TEMPLE:**

2   Q    Okay.  So some of the notes that you take that are not

3   contained in the EELs do pertain to CITGO's work, right?

4   That's what you testified to before?

5   A    Yes.  Yes.

6   Q    And do you remember telling us that those notes are a good

7   way for you to keep a running record of what you do at work?

8   A    That's correct.

9           **MR. TEMPLE:**  No further questions, your Honor.

10                      **CROSS EXAMINATION**

11  **BY MR. ROSENBERG:**

12  Q    Did you retrieve that spiral notebook intact?

13  A    I did, yes.

14  Q    And when did you do that?

15  A    I didn't retrieve it, I keep it on me.

16  Q    Okay.  When did you first tender -- when did you first

17  tender it to me?

18  A    Yesterday.

19  Q    Okay.  And I want to just show you something.  I'm not

20  going to mark it into evidence.  Was it in a blue folder like

21  the one I'm holding before the Court?

22  A    No, sir.

23  Q    Well, then was it a manila envelope like I'm holding for

24  the Court?

25  A    Yes.

1          **MR. ROSENBERG:**  Your Honor, these are not -- I just

2    got these last night.  They haven't been produced.  But I'm

3    going to ask the witness to identify them.

4          **THE COURT:**  Okay.

5          **(Pause)**

6    BY MR. ROSENBERG:

7    Q    You'll see this.  No one else will.  I'm going to show you

8    Exhibit Number -- can you see that exhibit sticker there?

9    A    I do, yes.

10   Q    And you see that --

11         **THE COURT:**  It's on your screen right there.

12         **MR. ROSENBERG:**  Oh, I'm sorry.

13   BY MR. ROSENBERG:

14   Q    Can you identify what this is?

15   A    It's the list of things that I put down when I started --

16   when I broke shift that morning of the 26th.

17   Q    Of?

18   A    Of May.

19   Q    Of May.  And going through this, I'm going through it

20   pretty quickly --

21   A    Yes, sir.

22   Q    -- but can you -- these are your handwritten notes?

23   A    Oh, definitely, yes, sir.

24         **MR. TEMPLE:**  Your Honor, I've never seen these, so….

25         **(Pause)**

Galvan - Cross / By Mr. Rosenberg                    133

1              Your Honor, my only objection is that these were

2     responsive, appear to be responsive to the Court's prior Order

3     and they were never produced and so I --

4              **THE COURT:**  That is clear.

5              **MR. ROSENBERG:**  We offer Plaintiffs' Exhibit

6     Number 2.

7              **THE COURT:**  Any objection?

8              **MR. TEMPLE:**  No, your Honor.

9              **THE COURT:**  Are they fastened together?

10             **MR. ROSENBERG:**  I can fasten them together --

11             **THE COURT:**  Yes.

12          **(Plaintiffs' Exhibit Number 2 was received in evidence)**

13    **BY MR. ROSENBERG:**

14    Q     Just for edification how these notes --

15             **THE COURT:**  Whose edification?

16             **MR. ROSENBERG:**  My edification.

17             **THE COURT:**  Okay.

18    **BY MR. ROSENBERG:**

19    Q     How these notes work, first of all, I take these are in

20    your handwriting?

21    A     It is, yes.

22    Q     And then this is all taken from your spiral notebook?

23    A     From my spiral, yes.

24    Q     Okay.  Explain to the Court what these entries are.

25    A     Well, the top one is of course the date and I'm on A shift

1  and it was my last -- my fourth day of the four day shift.  And

2  as I'm breaking shift the gentleman that I relieve is telling

3  me that the top line four double O two is going -- needs to go

4  to 81.  That's a transfer of diesel from one diesel tank to

5  another diesel tank and it's going to go on a 16-inch line that

6  we call.

7  Q    Okay.

8  A    And --

9  Q    And why is it crossed off?

10  A    Because I completed it for the day.

11  Q    Okay.  Now, do you take that information and input it to

12  EELs or --

13  A    Yes, when I start it and finish it, if it finishes with me

14  I input in the EELs, yes.

15  Q    All right.  The second -- and we're not going through the

16  whole book, I just want to get a clarification for my purposes,

17  what's going on here, the second entry, what's that?

18  A    The second entry is a diesel delivery from 4002 to new

19  start pipeline that was going to start at 0700.

20  Q    Okay.

21  A    And that was just so that I would remember to enter it

22  into our recording -- our own movement system.  Every delivery

23  from one tank to another or one tank to the pipeline we record

24  it.

25  Q    Okay.

1   A    And I just scratch it off after I record it.

2   Q    Third entry?

3   A    804 is a slap tank and it was pumping to five double O

4   five, which is a crude tank and the up arrow indicates that it

5   was moving at the time.

6   Q    Okay.  I'm not going to go through everything here, but I

7   just want to know when you cross something off, when something

8   is recorded on this note, for example on 5/26/11, after it's

9   crossed off what happens to that information?

10  A    It's entered into the EELs.

11  Q    Okay.  There's one here that says "watch 183 coming up"?

12  A    Yes.

13  Q    What's that?

14  A    Well, 183 is a small FDD tank and if it gets too high and

15  it's too hot in the day it will relieve to atmosphere and we

16  don't want that to happen.

17  Q    Okay.  Is that entered into EELs?

18  A    No, that one would not.

19  Q    And explain to us why it would not.

20  A    Because that's just for my reference to remind me -- I

21  keep this sheet in front of me during the day and I look at it

22  and it's a reminder to look at that tank.

23  Q    Okay.  And then down on the bottom there's a -- it looks

24  like "at Yahoo".  What does that mean?

25  A    That is my 15-year-old son's email account and his

1   password and he had called me and at the time told me to write

2   it down so that we wouldn't forget it.

3   Q    Going through the pages at Saturday, 6/18/11, there are a

4   few that are not crossed off and a few that are.  Explain to us

5   what the difference is.

6   A    Well, 201 and 202 are just -- those are tanks that lineup

7   to a truck route and they were pulling down at the time, as I

8   indicate with the arrow.  We just didn't have orders to fill

9   them yet.  That was just to remind me to watch them because

10  they were pulling down.

11  Q    Okay.  Is that entered into EELs?

12  A    No, not that one.

13  Q    Okay. Are those things that aren't entered into EELs, do

14  they -- are those the types of things that assist in the

15  operation of the console?

16  A    Repeat the question?

17  Q    Are the things that aren't entered into EELs, like this

18  1747 and 1748 entry, are those items -- is that information

19  that assists you in the operation of the console?

20  A    No.  Those are just reminders to me.

21  Q    Okay.  And what about this, it looks like almost casa?

22  A    Casa Pipeline.  It's a typical Austin/San Antonio pipeline

23  substantial.

24  Q    Okay.  And is that -- the crossed out information entered

25  into EELs?

1    A    Yes, because I had already done the delivery and started

2    it and just crossed it out that it was done.

3    Q    Okay.  Now, there is one on the page, and I'm leaving it

4    the way it was but it's --

5    A    During the four day shift that I'm working I will take the

6    notes and look at them during the day and then when I leave for

7    the day I leave them on the desk and the gentleman that I

8    relieve pulled it out for me and wrote me a little note.

9    Q    Okay.

10   A    "You're my hero."

11   Q    Is that a personal note?

12   A    Personal note.  Somebody asked me to -- told me to try Dos

13   Equis Amber.  I hadn't tried it yet.

14   Q    Note right down here?

15   A    Liz is a harbor master, sits in the harbor master's office

16   that we deal with every day, and we discovered that she and I

17   are distant relations to each other and she was telling me

18   about Rob's wife, who had passed away, Jean, and he happened to

19   be a cousin of my -- a cousin of my dad's.

20   Q    Okay, so is it fair to say, I don't want to burden the

21   time because it's an opinion but is it fair to say that the

22   information that's scratched out is entered into EELs?

23   A    More or less, yes, sir, it is fair to say that.

24   Q    Is it also fair to say that the information that's not

25   crossed out is information that doesn't assist you in the

1    operation of the console?

2    A    That is correct.

3            **MR. ROSENBERG:**  Pass the witness.

4            **MR. TEMPLE:**  Just a few questions, your Honor.

5                        **REDIRECT EXAMINATION**

6    **BY MR. TEMPLE:**

7    Q    Sir, do you remember getting a request for production

8    asking you for all documents relating to personal interests,

9    activities, or hobbies that you participate in or engage in

10   during your scheduled CITGO work hours and/or the hours that

11   you worked for CITGO since January 1, 2008 and you remember

12   providing a response saying there was none?

13   A    If that's on there, yes, sir, it must have been me that

14   put that in there, yes.

15   Q    And is that accurate or is it now your position that these

16   notes that you just now produced that we haven't seen before

17   today are actually just personal notes?

18   A    Well, some of them are personal notes, yes, sir.

19   Q    Which one is it, they're personal notes that you should

20   have responded to here or what's your position, sir?

21   A    The response is I guess that I have personal notes that

22   are evident, but I did not --

23   Q    Okay.

24   A    -- turn them in.

25   Q    You're not trying to tell us these notes that

Galvan - Redirect / By Mr. Temple                    139

1  Mr. Rosenberg just talked about are all personal notes, are

2  you?

3  A    No, they're not all personal notes.

4  Q    Or else you would have answered that in response to

5  Request for Production Number 38, right?

6  A    Right.  Yes, sir.

7  Q    And some of these notes that Mr. Rosenberg talked to you

8  about specifically relate to your work at CITGO and the

9  activities you're performing, correct?

10 A    Yes, sir, and I record most of those in the EELs.

11 Q    But there were some that specifically related to your work

12 and activities at CITGO that you did not record in EELs,

13 correct?

14 A    There may be some, yes.

15 Q    Okay.  There is some, correct?

16 A    Yes.

17 Q    And so why did -- one other question.  You mentioned that

18 you leave them on your console.  That's not what you told us in

19 your deposition.  You told us you put your spiral notebook in

20 your bag and sometimes you take it home.  Remember that?

21 A    I do that at times.  Yeah, I take it home on my four days

22 off, yes, sir.

23 Q    Okay.  So there's no requirement to leave it on your

24 console, because you can take it and you do take it to and from

25 the unit, correct?

Galvan - Redirect / By Mr. Temple                    140

1    A    On my four days off, yes.

2    Q    Okay.  And so why did you not produce any of these notes

3    before today?

4    A    I thought that they were mainly just for my own personal

5    reference and everything that would pertain to my job was on

6    the Eels.

7    Q    You didn't think they were responsive to the Court's

8    Order?

9    A    I didn't think they were, no, sir.

10             MR. TEMPLE:  No further questions for this witness,

11   your Honor.

12             THE COURT:  Thank you.

13             MR. ROSENBERG:  Pass the witness.

14             THE COURT:  Thank you.  You may stand down.

15        (Witness excused)

16             We have time for one more witness I think.

17             THE WITNESS:  Am I allowed to leave?

18             THE COURT:  Any objection to him leaving?

19             MR. TEMPLE:  No, your Honor.

20             Your Honor, we call Michael Weigel.

21        (Pause)

22        (Counsel confer)

23             MR. TEMPLE:  May I approach, your Honor?

24             THE COURT:  Yes.

25             Do you have copies for the Defendant?

EXCEPTIONAL REPORTING SERVICES, INC

1        **MR. ROSENBERG:**  No, your Honor, I just got them and I

2   was going to --

3        **THE COURT:**  Well, this is a copy, so do you have a

4   copy for the Defendant?

5        **MR. ROSENBERG:**  I'm sure I -- I don't want to answer

6   that out of school, I'm sure I do, I don't a copy right this

7   second, but I'll clear that up.

8        **THE COURT:**  So you still haven't produced it to the

9   Defendant.

10        **MR. ROSENBERG:**  I just got it last night, your

11   Honor --

12        **THE COURT:**  You may have a seat.

13        **MICHAEL WEIGEL, DEFENDANT'S WITNESS, PREVIOUSLY SWORN)**

14                        **DIRECT EXAMINATION**

15   **BY MR. TEMPLE:**

16   Q    Would you please state your name for the record, sir?

17   A    Mike Weigel.

18   Q    Mr. Weigel, do you keep notes relate to your -- that

19   relate to your job at CITGO that you actually create during

20   your scheduled work hours, correct?

21   A    Explain notes.

22   Q    I'm sorry?

23   A    Yes, I write down some information on a pad.

24   Q    Okay, you keep notes that you create during your scheduled

25   work hours that relate to your work for CITGO, correct?

Weigel - Direct / By Mr. Temple                    142

1   A    I transfer those into EELs and I don't -- I'm not sure

2   what you are asking.

3   Q    Sir --

4             THE COURT:  He wants to know if you make handwritten

5   notes at work.

6             THE WITNESS:  I make --

7             THE COURT:  Is this difficult?

8             THE WITNESS:  No, ma'am.

9             THE COURT:  Yes or no.

10            THE WITNESS:  No.

11            THE COURT:  You don't keep any -- you don't make any

12  handwritten notes at work?

13            THE WITNESS:  Yes, I do.

14            THE COURT:  Okay.  I don't know why we're

15  equivocating about this.  Where are they?

16            THE WITNESS:  Say again?

17            THE COURT:  Where are the notes?

18            THE WITNESS:  I leave them at the workplace and all

19  my notes get transferred into EELs.

20            THE COURT:  Okay.  I just asked where they were.

21            THE WITNESS:  Okay.

22            THE COURT:  Now, did you get my August 22nd Order to

23  save those notes?

24            THE WITNESS:  I got an email.

25            THE COURT:  Did you save the notes?

1          **THE WITNESS:**  No, I did not, ma'am.

2          **THE COURT:**  Okay.

3   BY MR. TEMPLE:

4   Q    Sir, do you remember in your deposition talking about the

5   fact that there is information that's contained in your notes

6   relating to your work that doesn't eventually make it into

7   EELs, remember that?

8   A    Can you -- can you refresh my memory on that?

9   Q    Well, I'll just ask you the question, sir.  Is it your --

10  isn't it true that there is information on the notes that you

11  take at work relating to your job that doesn't -- that you

12  don't transfer directly into EELs?  Yes or no.

13  A    Yes.

14          **MR. TEMPLE:**  No further questions, your Honor.

15                     **CROSS EXAMINATION**

16  BY MR. ROSENBERG:

17  Q    What was your understanding of your requirements under the

18  Court's Order of August 22nd, 2011?

19  A    As far as regarding notes?

20  Q    Yes.

21  A    Notes pertaining to like how a unit would operate?

22  Q    Yes.

23  A    An 02 reading that I would log into the EELs into our

24  event log that is electronically kept by the company, and so

25  that is like they would call in on the phone, I was busy at the

1   console, I was going ahead and I'd write down an O2 reading of

2   like 312, or whatever, and it would go on a little scratch

3   paper and then I would go later and I'd put it in, or like a

4   time for an output of a valve.

5   Q    Did that information get transferred to EELs?

6   A    Yes.

7   Q    Was -- what was your motivation -- what were you trying to

8   do by putting it into EELs?

9   A    To electronically record the information that I wrote down

10  on a note.

11  Q    Did you believe that was in compliance with the Court's

12  Order?

13  A    From what I understood.

14          MR. ROSENBERG:  Pass the witness.

15                     REDIRECT EXAMINATION

16  BY MR. TEMPLE:

17  Q    Sir, do you remember providing some supplemental

18  interrogatory responses that related to whether or not you

19  could describe all operational upchecks, shutdowns, startups,

20  and turnarounds, or other events that you've worked, remember

21  that?

22  A    Yes.

23  Q    And do you remember saying you didn't -- you did not have

24  independent recall, that the company has the information, and

25  then subsequently you said:

1           "I am currently in the process of reviewing my EELs

2           reports and I will supplement the requested

3           information after I am done."

4           Do you see that?

5  A    Yes, and I have.

6  Q    Okay.

7           **THE COURT:**  What did you do?

8           **THE WITNESS:**  I went through and I recorded -- I

9  highlighted the events and stuff and I sent it back.

10 **BY MR. TEMPLE:**

11 Q    When did you send it back?

12 A    I don't remember which email that was, but it was an

13 attachment I put to an email.

14 Q    Has it been within the last two or three weeks?

15 A    Yes.

16          **MR. TEMPLE:**  No further questions of this witness,

17 your Honor.

18          **THE COURT:**  Anything further?

19          **MR. ROSENBERG:**  Pass the witness.

20          **THE COURT:**  You may stand down.

21     **(Witness excused)**

22          Okay, one more, if you can do it short.

23          **MR. ROSENBERG:**  May this witness be excused?

24          **MR. TEMPLE:**  Yes.

25          **THE COURT:**  Yes.  Who do you want to bring in next?

1          **MR. TEMPLE:**  Donald Hedrick.

2     **(Counsel confer)**

3     **(Pause)**

4          **THE COURT:**  This chair over here.

5          Yes, sir.

6          Your name, sir?

7          **THE WITNESS:**  Donald Hedrick.

8     **DONALD HEDRICK, DEFENDANT'S WITNESS, PREVIOUSLY SWORN**

9                    **DIRECT EXAMINATION**

10    BY MR. TEMPLE:

11    Q    Mr. Hedrick, do you keep notes during your shift at work

12    that relate to your work activities at CITGO, correct?

13    A    I don't keep any handwritten notes.

14         **THE COURT:**  Do you make handwritten notes?

15         **THE WITNESS:**  No, ma'am.

16         **THE COURT:**  Since when?

17         **THE WITNESS:**  I don't.  I put them on the computer.

18         **THE COURT:**  Have you ever made a handwritten note at

19    work?

20         **THE WITNESS:**  In 25 years?  Yes, ma'am.

21         **THE COURT:**  Did you take any handwritten notes in the

22    last year?

23         **THE WITNESS:**  No, ma'am, it's on the computer.

24         **THE COURT:**  Okay.

25    //

1  **BY MR. TEMPLE:**

2  Q    The notes that you take on your computer, sir, you are

3  aware that the next person on the next shift is going to write

4  directly over those notes and delete them, correct, that's how

5  it works?  We talked about this in your deposition.

6  A    Well, when they write over them they're probably archived

7  somewhere.

8  Q    Sir, when we talked about this in your deposition I asked

9  you the question are they written over by the next person and

10 then gone and you said yes.  Do you remember that?

11 A    I remember that, yes, sir.

12 Q    And I also asked you whether you could print those out

13 from the computer before they -- at least in your opinion at

14 the time of the deposition they would be gone and you said you

15 could print them out.

16 A    Yes.

17 Q    But you never take any effort to print out those notes

18 before you leave your shift?

19 A    Since you and I talked that night I have, yes.

20 Q    That's not my question.  From August 20 -- well, from

21 April of this year have you made any effort to print out the

22 notes that reflect your daily activities while at work that you

23 keep on the computer before you leave?

24 A    No, they're on the computer.

25 Q    And you haven't done it since August of the year,

1   August 22nd, have you either?

2   A    No.

3   Q    And from April moving forward those notes that you keep,

4   they're no longer on that computer because, as you said in your

5   deposition, the next person writes over them, do you remember

6   you told us that?

7   A    I said that, yes, sir, but electronic -- they're done

8   electronically, they might -- are backed up.  CITGO backs up

9   everything.

10  Q    Do you know for a fact that the notes you keep are somehow

11  kept elsewhere in the system, sir?

12  A    I don't know that, no, sir.

13  Q    And we specifically talked about this in your deposition

14  and you said they are written over during the next shift.

15  A    Yes.

16  Q    And so those notes reflect those daily activities,

17  correct?

18  A    The notes are for information; they don't help me to run

19  my console.

20  Q    Well, but you keep them because they relate to your job

21  and what you're doing in your job, correct?

22  A    They help me communicate to the next guy.

23  Q    Okay, but they also relate to what it is that you're doing

24  throughout the day, right?

25  A    No, that's reflected in EELs.

1          **MR. TEMPLE:**  Okay.  Pass the witness.

2          **THE COURT:**  Did he say in his deposition he kept

3    handwritten notes?

4          **MR. TEMPLE:**  No, he said he kept notes on the

5    computer.

6          **THE COURT:**  Okay.

7          **MR. TEMPLE:**  And that they were written over --

8          **THE COURT:**  But no --

9          **MR. TEMPLE:**  -- and deleted and he took no efforts to

10   try to print them out before leaving.

11         **THE COURT:**  Thank you.

12                          **CROSS EXAMINATION**

13   **BY MR. ROSENBERG:**

14   Q    That was what I was going to ask you, but with regard to

15   the electronic thing, explain to me what you do electronically

16   and how this note process works.

17   A    On the computer we have notes and anything I put on the

18   computer is stored there --

19   Q    Right.

20   A    -- on the screen and when the next guy comes in we go over

21   it.

22   Q    All right.  Is it your understanding that the information

23   that you put on the computer, whether somebody subsequently

24   writes over them, is going to be backed up by the time you

25   leave?

Hedrick - Redirect / By Mr. Temple                    150

1   A    I hit save, when I hit save it should be backed up.

2   Q    Okay.  So you don't -- you hit save?

3   A    Yes, sir.

4   Q    Okay.  And again, just so -- you've already testified that

5   you have not done any handwritten notes?

6   A    No, I don't.

7              **MR. ROSENBERG:**  So I'll pass the witness.

8                      **REDIRECT EXAMINATION**

9   **BY MR. TEMPLE:**

10  Q    Mr. Hedrick, you were asked during your deposition if

11  you've ever tried to save any copies of the blender pass-down

12  notes, do you remember that?

13  A    Yes, sir.

14  Q    And starting at Line 5, what was your answer?

15  A         "It didn't, were not relevant, whatever happened that

16            day is what I want to know about."

17  Q    Okay, so that's different from what you just now told us.

18  We were specifically talking about that issue in your

19  deposition and the question was "What have you not ever tried

20  to save any copies of the blender console notes?" and you said

21  they weren't relevant, correct?

22  A    Because I have EELs.  EELs is the relevant part.

23  Q    Okay.

24             **THE COURT:**  That's your decision?  You get to decide

25  what's relevant?

1          **THE WITNESS:**  No, ma'am.

2          **THE COURT:**  Well, you just did.

3          **THE WITNESS:**  No, well EELs is reflection of what we

4    do during the day.  It's all a required log book.

5    **BY MR. TEMPLE:**

6    Q    And sir, you were also asked with regard to these notes,

7    the question starts at the bottom:

8          "But as you said before, the information that you're

9          performing, that's the best picture of what you do

10         every day."

11         And what was your answer?

12   A        "Yes."

13   Q    And the question was:

14          "And if you wanted to, it would be very easy to just

15         print out before you leave, it sounds like."

16         Your answer?

17   A        "Yes."

18         **MR. TEMPLE:**  No further questions, your Honor.

19                    **RECROSS EXAMINATION**

20   **BY MR. ROSENBERG:**

21   Q    What's the purpose of printing something that's already

22   saved electronically?

23         **THE COURT:**  He said it was written over.  That's the

24   purpose.

25         **MR. ROSENBERG:**  But he said he hit save.  That's what

1    I was getting at.

2    **BY MR. ROSENBERG:**

3    Q    Did you or did you not say that you hit save at the end of

4    your thing?

5    A    I hit save every time I put something on that.

6    Q    Okay.  Now, if somebody writes over it is your information

7    already saved and somebody's just writing over the screen?

8    A    It's written over.  I hit save, it should be there.

9    Q    Okay.  Why do you hit save?  What --

10            **THE COURT:**  Well, why do you say it was written over

11   then?

12           **MR. ROSENBERG:**  Well, because the file is saved, it's

13   almost like a Word document, a file is saved but then it

14   becomes a new document, but that information is there.

15           **THE COURT:**  Well, wouldn't he know that if just

16   pulled it up and printed it out?  Why are we talking about

17   this?

18           **MR. ROSENBERG:**  Because --

19           **THE COURT:**  He was ordered to preserve it.  Where is

20   it?

21           **MR. ROSENBERG:**  And he did.  It's -- he hit save.

22   What more --

23           **THE COURT:**  Well, we don't have any way of knowing

24   that because he hasn't printed it out and shown us.

25           **MR. ROSENBERG:**  We do have a way of knowing it if

1   CITGO would produce what he saved.  They have it.  They have --

2   he's -- it would be different --

3            **THE COURT:**  Okay, we'll just move on.

4         **MR. ROSENBERG:**  Pass the witness.

5         **MR. TEMPLE:**  Just one question, your Honor.

6                    **FURTHER REDIRECT EXAMINATION**

7   **BY MR. TEMPLE:**

8   Q    Sir, we talked about this in your deposition and I asked

9   you specifically if at the end of that shift do those notes

10  that you take on that shift get written over on the next shift

11  and the information you input and what did you tell us?

12  A    It gets written over.

13  Q    Okay.  And by "gets written over," you meant that your

14  information is being replaced with their information, correct?

15  A    Yes.

16  Q    And we talked about the issue about where it might be and

17  you didn't -- and to this day you can't say under oath that you

18  saved those -- that information in any place at CITGO where it

19  can subsequently be retrieved, can you?

20  A    I can honestly say I hit save on that document.

21  Q    And it's your understanding that the next person, the

22  document they pulls up -- pull up is like a template and they

23  write right over and then they hit save and when they hit save

24  it saves it right over what you wrote, correct?

25  A    Correct.

1          **THE COURT:**  Anything else?

2          **MR. ROSENBERG:**  Yes.

3                    **FURTHER RECROSS EXAMINATION**

4    BY MR. ROSENBERG:

5    Q    But is it your understanding your stuff is still there?

6    A    I hit save.

7          **THE COURT:**  Oh, come on.  He just said no.

8          **MR. ROSENBERG:**  He said -- he didn't say no,

9    your Honor.

10         **THE COURT:**  Okay, enough.  Enough.

11         Thank you.  You're excused.

12     **(Witness excused)**

13         All right, that's all the time we have today.  I'm

14   trying to think of a time to pick up on this.

15         I'm just unsure what kind of sanctions to do

16   actually.

17         **MR. TEMPLE:**  Your Honor, I think some of these people

18   were aware, and the testimony I think speaks for itself, they

19   were aware of their obligation, they were aware of the Court's

20   Order, they sought no clarification.  Some of them are talking

21   about putting them on the console.  We -- after getting the

22   deposition testimony we raised a concern immediately with

23   opposing counsel via correspondence --

24         **THE COURT:**  We've been through this and been through

25   this and been.  I put in my Order that if I found that they

1  violated my order to preserve their notes and all documents

2  they'd have their claims dismissed.  Right now all I've heard

3  from are eligible for that except Mr. Harrison, Mr. Chester

4  Harrison, because he said he didn't have notes.

5            So let's get a time to come back and do this.

6            When is this set for trial?

7            **MR. TEMPLE:**  We're set in March, your Honor.

8            **THE COURT:**  Okay.  Let's set a time to finish up this

9  and -- make in January.  Or is that too late?  I don't know if

10  that's beyond dispositive motions deadline.

11            **MR. TEMPLE:**  I think it's before the deadline, but if

12  we could have it earlier we sure would like to, because we plan

13  on filing a dispositive motion sooner than that.  But whenever

14  the Court has time, whatever works.

15            **THE COURT:**  We're pretty much out of time the rest of

16  this month.

17            **MR. TEMPLE:**  Okay.  We'll make ourselves available.

18            **THE COURT:**  Do we have time the week after

19  Thanksgiving?

20            **THE CLERK:**  Your Honor, the 28th, which is the Monday

21  after Thanksgiving, is filled up with criminal settings but the

22  Wednesday, November 30th, we do have the afternoon starting at

23  1:15.

24            **THE COURT:**  Okay, the whole afternoon?  Okay.

25            Look on your calendars and see.

1        **MR. TEMPLE:**  I think we'll be here the 29th for a

2   deposition anyway, so that works.

3        **(Pause)**

4        **MR. ROSENBERG:**  I'm clear.

5        **THE COURT:**  Okay, the 30th starting at 1:15.

6        Thank you very much, you're excused.

7        **MR. TEMPLE:**  Your Honor, I have one question.  How do

8   we deal with the issue of between now and then and the

9   Plaintiffs talking about what happened in the courtroom today

10  amongst themselves?

11       **THE COURT:**  That's done.  Let's just see what answers

12  we get when we bring them back the next time.

13       **MR. TEMPLE:**  Thank you, your Honor.

14       **THE COURT:**  And --

15       **MR. ROSENBERG:**  I just want to get a clear

16  understanding as to, because I've been checking them off, who I

17  need to bring back here.

18       **THE COURT:**  Everybody but who you brought this time.

19       **MR. ROSENBERG:**  Well --

20       **MR. TEMPLE:**  We'll provide you a list.

21       **MR. ROSENBERG:**  Well, I want to tell -- I'll be able

22  to tell --

23       **THE COURT:**  Okay.

24       **MR. ROSENBERG:**  -- whoever wasn't here.

25       **THE COURT:**  Ms. Cayce --

157

1                You're excused.  Thank you.

2           **MR. TEMPLE:**  Thank you, your Honor.

3      **(This proceeding was adjourned at 12:30 p.m.)**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

February 3, 2012

_____                    _____

Signed                                                    Dated

*TONI HUDSON, TRANSCRIBER*