```
 1              IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF TEXAS
 2                  CORPUS CHRISTI DIVISION


 3
    STEVE MOORE, ET AL.,          *    CIVIL ACTION
 4                                *
          PLAINTIFFS,             *    CA-C-11-022
 5                                *
    VS.                           *
 6                                *
    CITGO REFINING AND CHEMICALS  *
 7  COMPANY, LP,                  *    CORPUS CHRISTI, TEXAS
                                  *    NOVEMBER 30, 2011
 8           DEFENDANT.           *    1:30 P.M.
                                  *
 9  * * * * * * * * * * * * * * * *


10

                  TRANSCRIPT OF EVIDENTIARY HEARING
11
            BEFORE THE HONORABLE JANIS GRAHAM JACK
12             SENIOR UNITED STATES DISTRICT JUDGE


13
    APPEARANCES:
14
    FOR THE PLAINTIFFS:      MR. GREGG M. ROSENBERG
15                           ROSENBERG SPROVACH
                             3555 TIMMONS LANE, SUITE 610
16                           HOUSTON, TEXAS 77027

17  FOR THE DEFENDANT:       MR. MARK D. TEMPLE
                             MR. ALEXANDER NICHOLAS PYKE
18                           JONES DAY
                             717 TEXAS STREET, SUITE 3300
19                           HOUSTON, TEXAS 77002

20            (APPEARANCES CONTINUED ON PAGE 2)


21
    COURT RECORDER:          MS. VELMA GANO
22

23        PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
           TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
24              MOLLY CARTER, P. O. BOX 270203
            CORPUS CHRISTI, TEXAS 78427 (361) 945-2525
25
```

```
1    APPEARANCES:  (CONTINUED)

2

     FOR THE DEFENDANT:        MS. JUDITH COLBERT
3                              SENIOR CORPORATE COUNSEL
                               CITGO PETROLEUM CORPORATION
4                              1293 ELDRIDGE PARKWAY, N5020
                               HOUSTON, TEXAS 77077
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          (The proceedings began at 1:30 p.m.)

 2          (Call to Order of the Court.)

 3               THE CLERK:  Court calls Criminal Action C-11-022 --

 4               THE COURT:  It's Civil Action.  I thought you said

 5     "Criminal Action."

 6               THE CLERK:  Oh.  Moore, Et Al., versus Citgo Refining

 7     and Chemical Company.  May I have appearances, please?

 8               MR. ROSENBERG:  Yes, Gregg Rosenberg for all of the

 9     Moore Plaintiffs.

10               THE COURT:  Thank you.

11               MR. TEMPLE:  Mark Temple for Defendant Citgo.

12               MR. PYKE:  Alex Pyke for the Defendant Citgo.

13               MR. TEMPLE:  And with us here today with Defendant

14     Citgo is Judy Colbert as well.

15               THE COURT:  Thank you.  Do you have witnesses to

16     call?

17               MR. TEMPLE:  We do, Your Honor.

18               THE COURT:  Go ahead.

19               MR. TEMPLE:  We call Jaime Requenez to the stand,

20     please.

21               THE COURT:  Where is he?

22               MR. ROSENBERG:  We've got him here ready to go.

23               THE COURT:  Oh, okay.  I think he was under oath last

24     time, but do you want me to put him under oath again?  Let's do

25     it again.
```

Requenez – Direct                    4

```
 1              MR. ROSENBERG:  I don't have any --

 2              MR. TEMPLE:  I don't think he --

 3              THE COURT:  Let's do it --

 4              MR. TEMPLE:  Yeah, I think you swore them all in at

 5    the same time.

 6              THE WITNESS:  I was here.

 7              MR. ROSENBERG:  You were?

 8              THE WITNESS:  Yeah.

 9              MR. ROSENBERG:  Okay.

10              THE COURT:  You're still under oath.

11              THE WITNESS:  Correct.

12              MR. TEMPLE:  Seems like we're all suffering from the

13    same cold this time of year.

14         JAIME REQUENEZ, DEFENDANT'S WITNESS NO. 1, SWORN

15                         DIRECT EXAMINATION

16    BY MR. TEMPLE:

17    Q.   Would you please state your name for the record, sir?

18    A.   Jaime Requenez.

19    Q.   Mr. Requenez, you take notes during work.  Isn't that

20    right?

21    A.   I do, sir.

22    Q.   And your notes are a good record of what happens on your

23    shift.  Isn't that true?

24    A.   It's an indication --

25              THE COURT:  I'm sorry.  Your name again?
```

1          MR. TEMPLE:  Jaime Requenez.

2          THE COURT:  How do you spell the last name?

3          MR. TEMPLE:  R-E-Q-U-E-N-E-Z.

4          THE COURT:  Thank you.  Go ahead, sir.

5     BY MR. TEMPLE:

6     Q.   And, sir, your notes would be the best or a very good

7     reflection of the activities you actually do every day.  Isn't

8     that correct?

9     A.   Pretty close.  I mean, it's an indication of what's going

10    on --

11    Q.   Do you remember telling --

12    A.   -- during my time shift.

13    Q.   Do you remember telling us in your deposition that you

14    thought that your notes would be, and I quote, "the best or a

15    very good reflection of the activities you actually do every

16    day"?

17    A.   That's true.

18    Q.   And you stand by that testimony?

19    A.   Yes, sir.

20    Q.   And you keep your notes in a binder.  Is that correct?

21    A.   I store my notes at the end of the, my four days.  When I

22    leave, my four days, I put them in a little file in the back of

23    the, of the, where we keep, where we keep all of our

24    petrochemical and ISO stuff.

25    Q.   Okay.  Do you remember when we talked about this in your

```
 1   deposition, and you told us that you keep your notes in a

 2   binder?

 3   A.   It's a folder.

 4   Q.   All right.

 5   A.   I don't know if it's -- it's not really a binder.  It's a

 6   folder.

 7   Q.   Okay, well --

 8   A.   You might call it --

 9   Q.   Do you remember telling us that you throw away sections of

10   the binder, or if it's a folder, when it gets too thick?

11   A.   I remember saying that, but I think when I said that --

12   let me reflect, so you can put that on the record.  When we

13   started this appeal, whatever, I'm not too sure what date it

14   was, but I have all the records, all my notes since we started

15   this thing here.

16       What I said that I threw papers when it gets too full is,

17   it might have been like two or three years ago, maybe four or

18   five years ago that I've had, that I've accumulated.  We don't

19   have the filing space to keep, you know, records that don't,

20   that don't, you know, that I guess that are no longer needed.

21       But I do have all the records since we started this case,

22   and I have, they've been provided to Counsel and --

23              THE COURT:  Where are they?  Do you have them?

24              MR. TEMPLE:  I don't have them.

25              THE COURT:  Where are they?
```

1          MR. ROSENBERG:  They were.  They were forwarded to

2    him by e-mail, every single one of them.

3          MR. TEMPLE:  We have some, but I don't think we have

4    all the records that have, from the very beginning.  But we'll

5    pull and see what we have.  I don't have every single record --

6          THE WITNESS:  Well, I offered them to you the last

7    time, and you said, "Don't worry about it.  If they're there,

8    they'll be fine there."

9    BY MR. TEMPLE:

10   Q.   Okay.

11   A.   That's what you told me.

12   Q.   We'll check, but --

13   A.   Yeah.

14   Q.   Okay.  You, in fact, threw away sections of the binder

15   around July of 2011, didn't you?

16   A.   No, sir.  I have all my records every week that I've

17   worked there since, at least that -- maybe January of this

18   year.  Or yeah, I believe -- I think January of this year, I

19   believe.

20   Q.   Okay.  Sir, I'm going to -- do you remember when your

21   deposition was taken in or around August the 24th, 2011?

22   A.   Yes, sir.

23   Q.   And we talked about this issue in your deposition, and at

24   that time you were talking about the binder, and here -- the

25   question was, "How far back does your file go?"  And what was

```
 1    the answer you gave here on Line 21?

 2    A.   I said, "I chunk it out repeatedly, because it gets pretty

 3    thick."

 4    Q.   Okay.

 5    A.   But we weren't specific as to what "repeatedly" was.

 6              THE COURT:  What?

 7              THE WITNESS:  I said we weren't specific as to what

 8    "repeatedly" was.

 9    BY MR. TEMPLE:

10    Q.   Okay.  We'll get there.

11    A.   Okay.  Yeah.

12              THE COURT:  Okay, I didn't hear that.

13              MR. TEMPLE:  He said, "We were not specific as to

14    what 'repeatedly' means."  I'll ask him questions about it,

15    Your Honor.

16              THE COURT:  Okay.

17    BY MR. TEMPLE:

18    Q.   And we went on, sir, do you remember in your deposition,

19    the question was next asked, "So when was the last time you

20    chunked it out?"  Talking about the sections of your binder

21    that you told us at the deposition got too thick.

22    A.   Okay.

23    Q.   What did you say at the time of your deposition on August

24    the 24th, starting at Line 2?

25    A.   It says, "Probably maybe a month ago.  I'm not saying the
```

1  whole thing.  I keep, I try to keep maybe two months, you know,

2  something like that."

3  Q.   Okay.  So as of at least August the 24th, you said that

4  you had thrown away at least a month or so, probably a month

5  ago, and I try to keep at least two months.

6  A.   Yeah, that's what I said then, but I hadn't checked it.  I

7  went back and checked it, and I have all my paperwork there

8  since the beginning, since we started this inquiry.

9  Q.   Okay.  How --

10 A.   So that question there, I said it there because that's

11 what I thought, but it wasn't correct.  You know, I do -- I did

12 have all my papers back then.

13           THE COURT:  So you didn't tell the truth at the

14 deposition?

15           THE WITNESS:  I thought I had said the truth, but

16 when I went back to check on it, everything was there.

17           MR. TEMPLE:  Okay.

18           THE COURT:  Well, when did you give them to the

19 Defendant?

20           THE WITNESS:  When did I give the what, the what to

21 the --

22           THE COURT:  The papers that you went back and found.

23           THE WITNESS:  I've gaven (sic) them to Gregg, and --

24           THE COURT:  When?

25           THE WITNESS:  I think probably right after we had

Requenez – Direct                              10

```
 1    our, my deposition.
 2              MR. TEMPLE:  Okay.
 3              THE COURT:  Right after the deposition?
 4              THE WITNESS:  Yeah, I believe so.  That's when I sent
 5    everything to him.
 6              MR. TEMPLE:  Okay.  Sir, last --
 7              THE WITNESS:  Or to them.
 8    BY MR. TEMPLE:
 9    Q.  We got 300 pages last week and again this past Monday.
10    You produced more than 300 pages of your notes.  Is that right?
11    A.  I've sent --
12              THE COURT:  When did you give those to the Defendant,
13    Mr. Rosenberg?
14              MR. ROSENBERG:  When I received them.  I don't have
15    the e-mail of when we sent them.
16              THE COURT:  Okay.
17              MR. ROSENBERG:  I can represent to the Court --
18              THE COURT:  I want to find out right now.  When, if
19    you, if you sent them when you received them, I want to know
20    when they were received.
21              MR. TEMPLE:  They were received on November 21st and
22    November 29th.
23              THE COURT:  So you can say that's at or about the
24    time you received them, Mr. Rosenberg?
25              MR. ROSENBERG:  Within two or three days, yes.
```

1              THE COURT:  That's just not acceptable.  You know, I

2     just don't understand this.  It's not acceptable.

3     BY MR. TEMPLE:

4     Q.   And, sir, those notes go from February the 8th, 2011, to

5     the present.  Is that right?

6     A.   Those are the last notes that I had, yes, sir.

7     Q.   Okay.  Are you sure that all of those notes, from February

8     8th, 2000 (sic), to the present, were what you produced to your

9     Counsel, that there is nothing missing during that entire

10    period of time?

11    A.   I can't recall.  I do know that, you know, I sent

12    something again probably this past week.

13    Q.   Okay.  So the notes that you provided to your Counsel, you

14    can't testify under oath here today that that, those were

15    complete, all of your notes, from February the 8th, 2011, to

16    the present, can you?

17    A.   They're the notes that I have, and I think they were

18    pretty well complete.

19    Q.   Well, can you say that they are complete, that those were

20    all the notes that you took during that time frame, sir?  Yes

21    or no.

22    A.   Okay.  Repeat the question again.

23    Q.   Can you say under oath here today, sir, that those notes

24    that you've produced were all of the notes that you took while

25    working at Citgo from February the 8th, 2011, to the present?

                        Requenez – Direct

1   A.   I would say, yeah, those are all the notes.

2   Q.   Those are all the notes?

3   A.   Yes, sir.  Uh-huh.

4   Q.   And nothing at Citgo prevented you from removing those

5   notes from the refinery, did it?

6   A.   No, sir.  I had no reason to take anything.

7   Q.   And in July of this year, you threw away notes that would

8   have gone back beyond February of 2011, didn't you?

9   A.   I believe so, uh-huh.

10  Q.   And you remember --

11  A.   But I don't know when I threw them -- I might have thrown

12  them away like February or last year.  I can't remember when I

13  threw them away.

14  Q.   But do you remember telling us in your deposition that it

15  was July?

16  A.   I may have.

17  Q.   And do you remember receiving a Request for Production of

18  Documents from Citgo in April of this year?

19  A.   Yes, sir, uh-huh.

20  Q.   And, sir, you also review typed pass down notes that are

21  left on your work computer on the previous, from the console?

22  Is that right?

23  A.   Yes, sir.

24  Q.   Okay.  And the previous console supervisor's pass down

25  notes do, in fact, assist you in the operation of your board.

1   Is that right?

2   A.   Not as much as my notes.

3   Q.   But they do to some extent?

4   A.   Not really.  Not to me.  My notes are, are pretty well my

5   indication of what's going on.

6   Q.   Well, as a part of your shift, sir, you do review those

7   pass down notes, do you not?

8   A.   Yes, sir, we do, uh-huh.

9   Q.   Okay.  And you review them for a reason, I would guess, if

10  you're going to spend the time to do it.

11  A.   Just for information purposes.

12  Q.   For information to do your job.  Correct?

13  A.   Right.  Correct.

14  Q.   Okay.  And when you're working and you're reviewing those

15  pass down notes, you then write over the prior console

16  supervisor's notes when you're taking your own pass down notes

17  on the computer.  Correct?

18  A.   I write down my notes on my own personal notes, on my four

19  day pass down.

20  Q.   Right.

21  A.   My personal four days.  The one that you're inquiring

22  about, that's what I write down on.  Those are my notes.

23  Q.   Okay.  But you keep those notes on the computer and you

24  write over the previous console supervisor's notes.  Correct?

25  A.   Okay, I keep -- you're saying I keep, I keep my notes that

 1   I write every day that I work there.  Now, the previous

 2   console, he types in that pass down sheet, and that pass down

 3   sheet is stored in, like I said, in the computer, and we

 4   exchange that every day back and forth.

 5   Q.   Right.  And then you write your pass down notes over the

 6   prior console supervisor's pass down notes.  Correct?

 7   A.   No, I don't write them, I type over.  I type over on a new

 8   sheet.

 9   Q.   Yes, sir, thank you.  You type over those?

10   A.   On a new sheet.

11   Q.   Okay.  And that actually replaces the prior console

12   supervisor's text.  Correct?

13   A.   Well, I mean, I don't know if it replaces it.  The copy

14   that he wrote, it's on there, and I type my copy, so we have

15   two different copies.

16   Q.   Right.  And then when you save yours, his are gone?

17   A.   I don't know, sir.

18   Q.   Okay, but we're --

19   A.   I presume they are.  I presume they're stored and they're

20   filed some place, the company has records of that.  I don't

21   know what happens to them.

22   Q.   Okay.  When you save yours, do you save them or store them

23   in a particular place, or you just hit "save"?

24   A.   I just hit "save."

25   Q.   Just like as you understand the prior console supervisor

```
 1   writes --
 2   A.   Right.
 3   Q.   -- they just hit "save."
 4   A.   Yes, sir.
 5   Q.   In the exact same location on the exact same document.
 6   A.   Correct.
 7   Q.   Okay.  So does it -- do you believe that when you're
 8   hitting "save," you are in fact saving over what he wrote?
 9   A.   Yes, sir, I believe so.  I believe that's all, that's what
10   we all believe.
11   Q.   Okay.  And you certainly could have printed out any of
12   those pass down notes that you wrote on the computer before you
13   left your shift.  Correct?
14   A.   I do what again?
15   Q.   You could have printed out any of your pass down notes or
16   any of the pass down notes from the prior console supervisor.
17   Correct?
18   A.   We just, just hit "print."
19   Q.   Yes, it's easy for you to print and retain those.
20   A.   And we print it, and then we review it at the end of the
21   shift.
22   Q.   Okay.
23   A.   That's how --
24   Q.   And you're aware of the Court's August 22nd order
25   requiring the preservation and production of documents.  Is
```

1    that right?

2    A.    Yes, sir.

3    Q.    And you understood that you needed to produce your notes

4    to Citgo by September the 12th.  Correct?

5    A.    I believe so, uh-huh.

6    Q.    And, sir, with regard to your e-mails, do you recall that

7    the Court ordered you to provide information regarding the use

8    of your personal e-mail accounts at work, as well as copies of

9    the e-mails you sent or received while at work?

10   A.    Okay, repeat the question again.

11   Q.    I'm changing gears on you --

12   A.    Yeah.

13   Q.    -- with regard to now e-mails.  Do you remember that you

14   were ordered to provide to Citgo the personal e-mails or

15   e-mails that you accessed while at work?

16          MR. ROSENBERG:  Excuse me, Your Honor, objection,

17   outside the scope --

18          THE COURT:  Sorry?

19          MR. ROSENBERG:  Objection, Your Honor, outside the

20   scope of what's to be covered at this hearing today.

21          MR. TEMPLE:  Your Honor, I --

22          THE COURT:  Outside the scope of what?

23          MR. ROSENBERG:  Of what the purpose, the Court's

24   purpose of the hearing was.  The hearing was to --

25          THE COURT:  Overruled.

1   BY MR. TEMPLE:

2   Q.   And, sir, you were ordered to produce your e-mails by

3   September 5th and to provide the court-ordered information,

4   which included an estimate of the percentage of e-mails that

5   had been deleted and the approximate date the e-mails were

6   deleted, by Monday September the 2nd.  Is that right?

7   A.   I believe so, uh-huh.

8   Q.   And you didn't send your e-mails to -- you didn't produce

9   your e-mails by that September 5th deadline, did you?

10  A.   I don't know when the deadline was.  I know that we sent,

11  I sent information to my Counsel, and then he took over --

12  Q.   Before that September 5th deadline?

13  A.   I don't know what date.  I don't know what day it was.

14  I'm pretty sure it was before that deadline, because they were

15  asking us to be pretty quick.

16  Q.   Did you send the Citgo, the information that was ordered

17  to the, by the Court to Citgo before September 12th?

18  A.   I don't have no idea, sir.  I don't -- like I said, I sent

19  everything that was requested of me before the deadline, to my

20  Counsel.  And what happens there, I don't know after that.

21  Q.   And, sir, on November 3rd, do you remember that the Court

22  ordered you to send Citgo the e-mails or the information

23  necessary to access your e-mail accounts?

24  A.   I don't know what day that was, but I did send that

25  information to my Counsel.

```
 1   Q.    Okay.

 2   A.    Prior to the deadline.

 3   Q.    And on November 8th, you provided Citgo with two e-mail

 4   addresses and passwords that you access from your work

 5   computer.  Is that right?

 6   A.    I don't know what date it was, but I did provide him with

 7   that e-mail.

 8   Q.    Okay.  One was a WildBlue.net account.  Do you remember

 9   that?

10   A.    Yes, sir, uh-huh.

11   Q.    And the other one was a Gmail account.  Do you remember

12   that?

13   A.    Yes, sir.

14   Q.    Okay.  And in early November, you provided an

15   interrogatory response that you said you discontinued the use

16   of your WildBlue.net account.  Do you remember that?

17   A.    Yes, sir.

18   Q.    Okay.  And have you provided any information with regard

19   to your WildBlue.net account to Citgo?

20   A.    I sent the information to Counsel, whatever --

21   Q.    What did you send to Counsel with regard to your

22   WildBlue.net account?

23   A.    They asked for my password and my account, and that was

24   it.

25               THE COURT:  Asked for what?
```

```
 1                THE WITNESS:  Ma'am?

 2                THE COURT:  Asked for what?

 3                THE WITNESS:  He asked me if I had provided any

 4   information on my accounts.

 5                THE COURT:  What did you, what -- how many e-mail

 6   accounts do you have?

 7                THE WITNESS:  How many e-mail accounts do I have?

 8                THE COURT:  Yes.

 9                THE WITNESS:  Right now I just had my --

10                THE COURT:  In the last six months, how many e-mail

11   accounts have you had?

12                THE WITNESS:  Two.

13                THE COURT:  What are they?

14                THE WITNESS:  G -- no, what is it -- JREQUEN.

15                THE COURT:  What?

16                THE WITNESS:  JREQUEN04@Gmail.com.

17                THE COURT:  Do you have that?

18                MR. TEMPLE:  Yes.

19                THE COURT:  What's the other one?

20                THE WITNESS:  And the other one was JREQUEN, I

21   believe 01@WildBlue.net.

22                THE COURT:  Do you have that?

23                MR. TEMPLE:  Yes.

24   BY MR. TEMPLE:

25   Q.  Sir, do you remember at the time of your deposition you
```

Requenez – Direct

1  testified that you only had one account, that WildBlue account?

2  A.   I testified that that's the only account that I think that

3  we had at the time.  After that, that's when I added the other

4  account.

5  Q.   Well, sir, your deposition was taken on August the 24th,

6  2011, and are you saying that that's the only account you had

7  at the time?

8  A.   At the time that I had my deposition, I don't know if I

9  still had that WildBlue account, because my wife is -- it

10  belongs to both me and my wife.  And we have internet, we had

11  internet satellite service, and for about four or five months

12  before that, we had been having trouble with it, and we

13  weren't -- where we live, we live out in the country, and our

14  service was very bad, and we couldn't -- it was up sometimes,

15  it was down.  We never had reliable service, so my wife

16  discontinued it.

17  Q.   Okay.  Sir, do you remember supplying information to Citgo

18  in your interrogatory response Number 16 stating that you had

19  discontinued your WildBlue.net account in March of this year,

20  and that you replaced it with your Gmail account?

21  A.   What I said was that I only had that e-mail account -- I

22  believe the Gmail account was probably, was through my phone

23  account, but I didn't know I had it.  I guess when I got that

24  new phone, they gave me that Gmail account.  But I had never

25  used it before, until --

1   Q.   Okay, sir --

2   A.   -- here recently.

3   Q.   Is it true or not that you discontinued the use of your

4   e-mail, your WildBlue account in March of this year and that

5   you replaced it with your Gmail account?  That's what you told

6   us in your interrogatory responses.

7   A.   I don't know exactly when it was discontinued.  My wife

8   has that information.  I mean, I don't --

9            THE COURT:  Well, did you ask her for it?

10            THE WITNESS:  Sir -- I mean ma'am?

11            THE COURT:  Did you ask her for it?

12            THE WITNESS:  I don't know when exactly we closed it.

13   It might have been --

14            THE COURT:  Did you find out?  It's part of this

15   discovery for your lawsuit.  This is your lawsuit.

16            THE WITNESS:  Right, uh-huh.  Now, the question was

17   did I find out what?

18   BY MR. TEMPLE:

19   Q.   Sir, and maybe it's easier if we just refer to --

20   A.   Yeah.

21   Q.   -- the actual response that you've provided.  You said

22   here -- and this was a supplemental answer on 11/1/2011 --

23   A.   Okay.

24   Q.   -- after your deposition had been taken.  You said,

25   "First, the account I listed above was discontinued in

Requenez – Direct

1   approximately March of this year."  You were talking about this

2   account, this WildBlue account.  Do you see that?

3   A.   Okay.

4   Q.   And then you said, "It was, provided service to our

5   residence in the country but never worked well.  I replaced it

6   with a different account that I use for personal e-mail on an

7   infrequent basis."  And then you referenced the Gmail account.

8   A.   Yeah, I see that, yeah.

9        THE COURT:  Please don't -- please don't hit the

10  microphone.

11  BY MR. TEMPLE:

12  Q.   Do you still stand by that testimony, sir?

13  A.   Yeah, that's the only e-mail account that I have.

14  Q.   Okay.  And, sir, since November the 3rd, have you deleted

15  any e-mails from your WildBlue or your Gmail account?

16  A.   Have I deleted anything from my -- well, I don't have

17  that, what do you call, that WildBlue account.  The Gmail

18  account, I've deleted stuff like Macy's, stuff, you know, just

19  stuff like that, you know, but nothing personal, you know.

20        THE COURT:  Okay.  The question is, have you deleted

21  anything in your e-mail account since when, last December?

22        MR. TEMPLE:  Since November the 3rd, the time of

23  the --

24        THE COURT:  November the 3rd.

25        MR. TEMPLE:  The time of the Court's order.

 1              THE COURT:  Of 2011.

 2              THE WITNESS:  Yeah, I have deleted stuff like that,

 3      you know, junk mail, I guess.

 4      BY MR. TEMPLE:

 5      Q.    You have?

 6      A.    Yes, sir, I have.

 7      Q.    You have deleted information since the time of this

 8      Court's order, November the 3rd, 2011, from your e-mail

 9      account.  Is that what you're telling us?

10      A.    I have deleted junk mail from my personal, my personal

11      e-mail account.

12      Q.    Okay.  And do you remember receiving the Court's order on

13      or about November the 3rd specifically instructing you not to

14      delete any information from your personal accounts?

15      A.    I do remember seeing it, but I think to me that was, I

16      mean, that's junk mail.  I mean, I don't think y'all want to

17      keep that stuff.

18      Q.    It was junk mail, in your mind?

19      A.    Right.

20      Q.    You decided to disregard the Court's order and go ahead

21      and delete personal e-mails.  Isn't that right?

22      A.    No, that's not right.  I don't see it like that.

23      Q.    Well, there's nothing in the Court's order that said you

24      didn't have to or you could go ahead and delete anything that

25      you determined was junk mail, was there?

Requenez – Direct                                    24

```
 1   A.   I guess not.  I apologize if I mistook it wrong.

 2              THE COURT:  You what?

 3              THE WITNESS:  I apologize if I mistook it wrong.

 4              THE COURT:  I don't think that matters.  This is your

 5   case.  I gave you orders, and you never followed them.  And I

 6   said in the last order if you haven't followed them, I'm going

 7   to dismiss the case.

 8   BY MR. TEMPLE:

 9   Q.   And, sir, do you also remember being asked to provide an

10   estimate of how many e-mails you had deleted and when you had

11   deleted those e-mails?

12   A.   I believe I did.

13   Q.   Okay.  And do you remember providing in your interrogatory

14   response the answer that, "It's impossible to estimate how many

15   e-mails have been deleted because the deletion process would

16   have entailed the deletion of e-mails that were either sent or

17   received while I was not at Citgo, as well as perhaps some that

18   were accessed while working at Citgo.  It would be impossible

19   to guess or even estimate when these e-mails were deleted."  Do

20   you remember providing that response?

21   A.   Yes, sir.

22   Q.   So you have not been able to, because in your opinion it's

23   impossible to even estimate how many e-mails you've deleted.

24   Is that your testimony?

25   A.   It's impossible, yes, sir.  Uh-huh.
```

1          MR. TEMPLE:  No further questions, Your Honor.

2          THE COURT:  Thank you.  Mr. Rosenberg?

3          MR. ROSENBERG:  Thank you, Your Honor.

4                        CROSS-EXAMINATION

5    BY MR. ROSENBERG:

6    Q.   Mr. Requenez, explain to us the notes you keep at work,

7    where they would be on a daily basis.  In other words, after

8    you're done with them and you put them in this, we've heard it

9    called a folder, we've heard it called a binder, where would

10   that be?

11   A.   I store them in the file in the back, on the right corner,

12   at the bottom.  We have two files.  One file is, is a paper

13   that we keep for a year, for ISO purposes, petrochemical, and

14   the other file is where we keep all our daily COAs and stuff.

15         And then I just created my own folder, my own little file

16   to put my own personal stuff there, for anybody, if they have

17   any questions.  The reason I keep that is in case something

18   comes up a week later, two weeks later, past or later and

19   something comes up, and I have any questions to ask on it, I

20   review it and I go back for it.

21   Q.   Okay.

22   A.   That's the only reason --

23   Q.   What I want to make sure I understand --

24   A.   Okay.

25   Q.   -- is that, is it fair to say that since this case

1  started, that you have reviewed the notes you've provided, and

2  it's a complete, to the best of your ability, it's -- to the

3  best of your knowledge, it's a complete set from the time this

4  case started until what you've even recently provided?

5  A.   Yes, sir.  It's very complete.

6  Q.   And the note -- is it fair to say that the notes you've

7  recently provided are the notes you're doing in days recent to

8  when you're providing them?

9  A.   Right, it's recent to when -- I guess they wanted to be

10  more specific or something like that.

11  Q.   Okay.  So how have you gone about -- well, is it fair to

12  say that you've produced everything you have and that nothing's

13  been destroyed?

14  A.   That is correct.

15  Q.   Okay.

16  A.   Ever since we started this process --

17  Q.   Okay.

18  A.   -- I saved every note.

19  Q.   I want to get back to --

20        THE COURT:  Why were they just now presented this

21  last few days?

22        MR. ROSENBERG:  Well, it was about two weeks ago.  It

23  was a misunderstanding on our part, because we never, we had

24  them, they weren't labeled, and --

25        THE COURT:  How could there be a misunderstanding?  I

1  have given this order over and over and over again.

2          MR. ROSENBERG:  Judge, I understand the order.  I'm

3  just, I don't have an answer for the Court as to why it

4  happened with this particular witness.  But what I am trying to

5  establish is that the integrity of at least his documents have

6  been preserved and --

7          THE COURT:  I don't think it matters at this point.

8  I think it's too late to go forward with his suit.  I am just

9  astounded at this over and over again, this failure to preserve

10 records, failure to timely present them, with no excuse.

11         MR. ROSENBERG:  May I proceed?

12         THE COURT:  Please.

13 BY MR. ROSENBERG:

14 Q.  I want to talk about the entries made in the, in the

15 computer.  I think they're called, they're referred to as pass

16 down, pass downs?

17 A.  Pass down notes.  Well, we have pass down notes, and we

18 have EELs also, EELs entries.

19 Q.  Okay.  With regard to the pass downs, Mr. Temple had

20 questioned you about what happens when you present, when you

21 make an entry into the computer.  Correct?

22 A.  Correct.

23 Q.  I believe your testimony was that you saved the notes in

24 the computer that you did.

25 A.  Correct.

Requenez – Cross

1   Q.   Do you know for a fact that saving that actually destroys

2   the notes that were there before you went over them?

3   A.   I don't know that, sir.

4           MR. ROSENBERG:  Okay.  Pass the witness.

5           MR. TEMPLE:  Just a few questions, Your Honor.

6                       REDIRECT EXAMINATION

7   BY MR. TEMPLE:

8   Q.   Sir, you said that you saved all the notes that you

9   thought might pertain to this case.  Is that right?

10  A.   I saved all, all the notes, period, that I --

11  Q.   Okay.  And the notes that you've produced, at least that

12  you had saved, start on February the 8th.  Correct?

13  A.   I believe so, uh-huh.

14  Q.   And the lawsuit was filed about February the 1st?

15  A.   I don't know, sir.

16  Q.   Do you know what happened with your notes from the time

17  the lawsuit was filed up until the date that you started saving

18  them?

19  A.   I don't know, sir.  Like I said, I keep my notes there in

20  that file.  I'm not the only one that has access to those

21  files.  You know, anybody, anybody can go in there and chunk

22  stuff from there.  I mean, it's just a file.  The paperwork's

23  there.  You know, somebody can go in there right now and chunk

24  those papers, you know, and I don't know.

25  Q.   Right.  And like you did just this last couple of weeks,

1  at any time you could have copied those notes, so that, so if

2  someone came in and chunked those files, you would have --

3  A.   I have a record of them, yes, sir.

4  Q.   -- the notes that were responsive.  Correct?

5  A.   I have a record of them, yes, sir.

6  Q.   And you understand that you're suing Citgo for work that

7  you performed that had -- that you performed from two years

8  back from the time you filed your lawsuit.  Correct?

9  A.   I believe so, yes, sir, uh-huh.

10 Q.   And, sir, wouldn't it also be true that at least that time

11 going back, the two-year period, you also would have had notes

12 that would be relevant to your job tasks during that period of

13 time?

14 A.   I didn't know that these notes were going to be of any

15 relevance, you know.  I mean, if I would have known that, you

16 know, in my mind, I would have been, it would have been dumb

17 enough for me to, stupid enough to throw them away.

18        MR. TEMPLE:  That's all I have for this witness, Your

19 Honor.

20        THE COURT:  Anything further?

21        MR. ROSENBERG:  Yeah, one question.

22                        RECROSS-EXAMINATION

23 BY MR. ROSENBERG:

24 Q.   Do you recall when it was that you first decided you were

25 going to bring suit against Citgo for overtime?

1    A.    Probably -- that's when we had our little meeting,

2    probably it was maybe February.  It was, I can't remember when

3    it was, but it was early, early -- late fall, or late, maybe

4    February, somewhere in there.  I can't remember when it was.

5    Q.    This year, calendar year?

6    A.    This calendar year, yes, sir.

7              MR. ROSENBERG:  Pass the witness.

8              THE WITNESS:  Maybe late February.  I'm not too sure

9    what date it was, but --

10             MR. ROSENBERG:  Okay.  Thank you, sir.

11             MR. TEMPLE:  Your Honor, we have no further questions

12   for this witness.

13             THE COURT:  Thank you, sir.  You may stand down.

14   Call your next witness.

15             MR. TEMPLE:  Robert Garcia, Your Honor.

16             MR. ROSENBERG:  I'll go get him.  Your Honor, may

17   this witness be excused?

18             THE COURT:  Mr. Temple?

19             MR. TEMPLE:  Yes.

20             MR. ROSENBERG:  Who did you say?

21             MR. TEMPLE:  Robert Garcia.

22             THE COURT:  You're still under oath, sir.  Was he

23   given the oath, Ms. Cayce?  Are you checking?

24             THE CLERK:  Yes.

25             THE COURT:  Thank you.

```
 1              ROBERT GARCIA, DEFENDANT'S WITNESS NO. 2, SWORN
 2                           DIRECT EXAMINATION
 3   BY MR. TEMPLE:
 4   Q.   Sir, could you please state your name for the record?
 5   A.   Robert G. Garcia.
 6   Q.   Mr. Garcia, you take notes during work.  Isn't that true?
 7   A.   Yes, sir.
 8   Q.   And your job involves a pen and a paper all day long?
 9   A.   Yes, sir.
10   Q.   And your notes really reflect what you're doing all day.
11   Correct?
12   A.   Yes, sir.
13   Q.   And isn't it true that only 50 percent of your notes get
14   transferred to the EEL system?
15   A.   Yeah, that would be fine.
16   Q.   Do you remember telling us that in your deposition?
17   A.   Yes, sir.
18   Q.   Okay.  And you stand --
19              THE COURT:  How much?
20              MR. TEMPLE:  50 percent.
21   BY MR. TEMPLE:
22   Q.   Mr. Garcia, and your practice is to throw away your notes
23   at the end of each shift.  Correct?
24   A.   That's what we did prior to the, the deposition, and that
25   was just kind of common practice just to throw away.  But we
```

Garcia – Direct

```
 1   would keep the pass down sheet on the computer, so it was saved

 2   on computer, just --

 3   Q.   And, sir, I'm not talking about the pass down sheet, with

 4   all due respect.

 5   A.   Okay.

 6   Q.   I'm focusing on the notes for right now.

 7   A.   Notes, okay.

 8   Q.   And what you told us at the time of your deposition is

 9   that you throw away your notes at the end of each shift.

10   A.   Okay, yes, sir.

11   Q.   Okay.  And you --

12            THE COURT:  When was that deposition taken?

13            MR. TEMPLE:   The deposition was taken August the 10th

14   of 2011.

15            THE COURT:  Thank you.

16   BY MR. TEMPLE:

17   Q.   And, sir, you stated in your October 11th response to

18   Citgo's document request that you used to throw away your notes

19   at the end of each shift, but since your deposition your notes

20   are in your EELs.  Correct?

21   A.   Yes.

22   Q.   And since what, since that is what we pass down to each

23   other, whatever is in the EELs is what you think is now

24   relevant.  Correct?

25   A.   Yes.
```

Garcia - Direct                                    33

1    Q.    Okay.   So, sir, after your deposition, isn't it true that

2    you changed the way that you do your job and you stopped taking

3    notes relating to your job tasks?

4    A.    No.

5    Q.    You still take your notes?

6    A.    I still take notes.

7    Q.    Same way?

8    A.    Yes, sir.

9    Q.    And what do you do with those notes?

10   A.    I save them.

11   Q.    And where are those notes, as we sit here today?

12   A.    They're, they're here in file, or my lawyer has them.

13   Q.    When did you produce those notes to your Counsel?

14   A.    This morning.

15   Q.    Why did you produce those notes to your Counsel for the

16   first time this morning?

17   A.    I've been, I've been saving them, and on days off, so I'm

18   at home, I just did it from the house.   I took them home so I

19   could fax them from my house to them.

20            THE COURT:   How far back do they go?

21            THE WITNESS:   And -- ma'am?

22            THE COURT:   How far back do they go?

23            THE WITNESS:   A month.

24            THE COURT:   One month?

25            THE WITNESS:   Yeah.

Garcia – Direct

1   BY MR. TEMPLE:

2   Q.   And, sir, so from that one-month period of time, what

3   happened to the notes that were in existence from the time of

4   your deposition up until a month ago?

5   A.   Well, sometimes I don't take -- if I don't need to take

6   notes, I don't take notes.  If I don't need to write anything

7   down on paper, I don't write anything down on paper.

8            THE COURT:  Okay, that's not the question.

9            THE WITNESS:  Okay.

10           THE COURT:  Did you take notes longer than a month

11   ago?

12           THE WITNESS:  Yes.

13           THE COURT:  Where are they?

14           THE WITNESS:  Everything I have is --

15           THE COURT:  Longer than a month ago.  You said you

16   only have the last month's.

17           THE WITNESS:  Yes, everything I have --

18           THE COURT:  Where are the other notes?

19           THE WITNESS:  They're all here.

20           THE COURT:  Listen to me carefully.

21           THE WITNESS:  Okay.

22           THE COURT:  From one month ago, you have the notes.

23   Right?  The last month's notes you have.

24           THE WITNESS:  Yes.

25           THE COURT:  Where are the other notes before a month

1    ago?  It's not difficult.  Where are they?

2              THE WITNESS:  They're at work.

3              THE COURT:  Well, why are they at work and not here?

4              THE WITNESS:  They are here.  I just told you they're

5    here, too.  I made copies of them.

6              THE COURT:  Do you have the last several months'

7    notes?

8              THE WITNESS:  They're, they're right here in my

9    lawyer's hands.

10             THE COURT:  You told me the notes go back one month.

11             THE WITNESS:  My notes are -- from my deposition,

12   whatever notes that I wrote are in possession right there, a

13   month or two or whatever --

14             THE COURT:  You go get them right now and tell me

15   when is the oldest note.

16             THE WITNESS:  I don't know.

17             THE COURT:  Go get them.

18             THE WITNESS:  There's no dates on the notes.

19             THE COURT:  Stand up and go get them.  Now.

20             THE WITNESS:  There is no dates on the notes.

21             THE COURT:  Stand up and go get them.

22             Now, this is not a game, Mr. Garcia.  This is your

23   lawsuit.  I asked you how old those notes were, and you said,

24   "A month old."  Do you remember saying that not five minutes

25   ago?

```
 1              THE WITNESS:  Yes, Your Honor.

 2              THE COURT:  Where are the notes older than a month?

 3              THE WITNESS:  Here.

 4              THE COURT:  So you have the last several months'

 5   notes?

 6              THE WITNESS:  Yes, whatever --

 7              THE COURT:  Why did you tell me you just had a

 8   month's worth of notes?

 9              THE WITNESS:  Well, that was a mistake, ma'am.  I'm

10   sorry.  I'm just --

11              THE COURT:  You're under oath.

12              THE WITNESS:  Yes, ma'am.

13              THE COURT:  This is your lawsuit.

14              THE WITNESS:  Yes, ma'am.

15              THE COURT:  You cannot change your answer --

16              THE WITNESS:  No.

17              THE COURT:  -- fifty times --

18              THE WITNESS:  I understand.

19              THE COURT:  -- in five minutes.

20              THE WITNESS:  I understand.  I'm sorry.

21              THE COURT:  When did you start gathering the notes?

22              THE WITNESS:  From the time that, after the

23   deposition.

24              THE COURT:  So these notes are from August forward?

25              THE WITNESS:  Yes.  Yes, from --
```

```
1              THE COURT:  August, September, October --

2              THE WITNESS:  That's correct.

3              THE COURT:  -- November, December?

4              THE WITNESS:  Yes.

5              THE COURT:  Or November?

6              THE WITNESS:  Yes.

7              THE COURT:  And they have no dates on them?

8              THE WITNESS:  No, I don't need to put dates.  I just,

9      I just scribble on them.  It's just scribble.

10             THE COURT:  When did you, when did you get the notes

11     together?

12             THE WITNESS:  I, every day when I finished taking

13     notes, I just put them in --

14             THE COURT:  Sit down.

15             THE WITNESS:  I put them in my folder and, I mean, my

16     backpack.

17             THE COURT:  Took them home?  Okay.

18             THE WITNESS:  And they just stay with me.  And I just

19     collect them every day.

20             THE COURT:  When did you stop, when did you start

21     throwing them -- when did you stop collecting them and were

22     throwing them away?

23             THE WITNESS:  Stop collecting --

24             THE COURT:  Before your deposition?

25             THE WITNESS:  Yes, yes.  Before my deposition, it was
```

1  just normal for me --

2          THE COURT:  Why did you -- what made you start saving

3  them?

4          THE WITNESS:  Just knowing that the lawyer was asking

5  for them.

6          THE COURT:  When did you know the lawyer was asking

7  for them?

8          THE WITNESS:  I can tell just by the deposition that

9  he was looking for notes.

10          THE COURT:  Well, why did you just give them to your

11  lawyer today?

12          THE WITNESS:  I've been -- I've just been saving

13  them.

14          THE COURT:  Why did you just give them to your lawyer

15  today?

16          THE WITNESS:  That's the way I understood it was okay

17  to do that.

18          THE COURT:  Who did -- how did you understand that?

19          THE WITNESS:  I don't know.  I just assumed that it

20  was okay.  I didn't get an e-mail from anybody telling me to,

21  every time I write a note, to transfer it in.

22          THE COURT:  Okay.

23  BY MR. TEMPLE:

24  Q.  Sir, do you remember getting a Request for Production of

25  Documents --

Garcia - Direct                    39

1   A.   Yes, sir.

2   Q.   -- from Citgo in April of this year?

3   A.   Can you remind me what it is, sir?

4   Q.   Yes, sir.  It's a set of requests from the lawyers asking

5   you to produce documents in this litigation.

6   A.   Okay.

7   Q.   And that would be the first page that I'm putting on the

8   screen there.  Do you remember seeing that --

9   A.   Okay.

10  Q.   -- in and around April 13th of 2011?

11  A.   Yes, sir.

12  Q.   And, sir, do you remember specifically that question was

13  asked of you with regard to the production of notes, "All

14  documents prepared by you that you use or used or that assist

15  or have assisted you in the operation of your console since

16  January 1st, 2008, including but not limited to trend charts,

17  yield reports, logs, journals, and any other materials you

18  review, prepare or exchange before you begin or end the shift."

19  A.   Okay.

20  Q.   Do you remember receiving that --

21  A.   Yes.

22  Q.   -- in April, sir?

23  A.   I remember seeing this request.

24  Q.   Okay.

25  A.   Looking at this.

Garcia – Direct

```
1   Q.   And, sir, the notes that we're talking about, the notes
2   that you keep while at work --
3   A.   Yes, sir.
4   Q.   -- are responsive to that request.  Correct?
5   A.   Yes, sir.
6   Q.   Okay.  Why didn't you save the notes that we're talking
7   about here, starting at the time you received these document
8   requests in April, when you knew they were responsive?
9   A.   Well, I don't know.  I know that we keep a lot of notes in
10  EELs and our pass down sheet, and I assumed that those were
11  okay to use, you know, since the pass down sheet is recorded on
12  our computer.
13          THE COURT:  Okay.  So what did you do with the notes,
14  instead of putting them in your backpack, what were you doing
15  with them before your deposition in August?
16          THE WITNESS:  As soon as, I'd just throw --
17          THE COURT:  Before your deposition in August, what
18  were you doing with your notes?
19          THE WITNESS:  I'd just throw them away --
20          THE COURT:  All right.
21          THE WITNESS:  -- in the trash can next to me.
22  BY MR. TEMPLE:
23  Q.   And so with regard to those notes that were prior to your
24  deposition, they're completely gone.  Right?
25  A.   Yes, sir.
```

Garcia - Direct

1  Q.    You mentioned the pass down notes, and you also take pass

2  down notes on the computer.  You type them.  Is that right?

3  A.    Yes.

4  Q.    Okay.  And when you type them, are you typing over the

5  prior console supervisor's notes when you do that, sir?

6  A.    Yes.  I delete -- first I save, and then whatever is there

7  is -- first I read, and then if I have to replace that comment,

8  I type over it, and then I save that.

9  Q.    Okay.  And then when you save it, you don't save it in any

10  different place, do you?

11  A.    No, it's just a click button on the pass down sheet.

12  Q.    So you understand that when you're saving, you're writing

13  over or typing over the prior note, the prior pass down note,

14  the prior pass down note entries.  Correct?

15  A.    I believe so.

16  Q.    And at any point in time, sir, before writing over those

17  prior entries, you could have printed out the prior console

18  supervisor's entries before deleting them.  Correct?

19  A.    There is a print button, yes, I could print them out.

20  Q.    And at the end of your shift, you know that your pass down

21  notes that you typed into the computer are also going to be

22  written over by the next person.  Correct?

23  A.    Yes.

24  Q.    And those pass down notes also contain items that relate

25  to your job duties, correct, that you're typing in?

1    A.    Yes.

2    Q.    And at any time you could have printed out those pass down

3    notes before leaving your shift.  Correct?

4    A.    Yes.

5    Q.    The ones that you knew would be --

6    A.    Yes.

7    Q.    -- written over by the next console supervisor?

8    A.    Yes.

9    Q.    Why did you never do that?

10   A.    Because it's saved on the computer.

11   Q.    Okay.  But as you just said, it saved in the same place

12   over and over the other copy.

13   A.    I don't know how it works.  I'm not an IT person.  I

14   assumed that whatever I delete is still there.

15   Q.    Is it your testimony under oath --

16   A.    Or I'm typing over.

17   Q.    -- as we sit here today that you believe all the prior

18   iterations of this document are saved in different places --

19   A.    Yes, sir.

20   Q.    -- when you save it in the same place?

21   A.    That's what I believe.

22   Q.    Have you ever asked anyone about that?

23   A.    No, sir.

24            THE COURT:  Well, have you ever attempted to retrieve

25   them?

1          THE WITNESS:  I haven't tried to do that yet.

2    BY MR. TEMPLE:

3    Q.   In response to the Court's order to produce any records

4    that would be relevant to your job tasks, that would have been

5    included in that search, would it not, those EELs, or those

6    pass down entries.  Correct?

7    A.   I don't know.

8    Q.   Well, you just told us that a part of your job, you keep

9    these pass down notes on the screen --

10   A.   Yes.

11   Q.   -- and that would have pertained to your job.  Correct?

12   A.   Yes.

13   Q.   So why have you not gone back to try to find those notes

14   if in fact you believe they're saved somewhere, if you think

15   they're responsive to the Court's order requiring you to

16   produce them in this case?

17   A.   I don't know.

18   Q.   And, sir, do you remember with regard to your e-mails that

19   the Court ordered you to provide on August 22nd information

20   regarding the use of personal e-mail accounts at work, as well

21   as copies of the e-mails you sent or read from those accounts

22   while working?

23   A.   Yes.

24   Q.   And you were ordered to produce your e-mails by September

25   5th and to provide an estimate of the percentage of e-mails

1  that have been deleted and the approximate date such e-mails

2  were deleted by September the 12th?  Do you remember that?

3  A.   Yes, sir.

4  Q.   Okay.  And you failed to produce any e-mails by September

5  the 8th.  Is that right?

6  A.   No, I don't know that.  I thought I did.  I thought I did

7  produce them.

8  Q.   You did produce all of your e-mails that fall within that

9  category by September the 5th?

10  A.   I don't know the date, but I thought I responded to that.

11  Q.   Who did you produce those to and when?

12  A.   To whoever was asking for it.  It was either you or

13  Mr. Rosenberg.  But I'm pretty sure I responded to that.

14  Q.   And did you produce any -- what, what is it that you

15  produced by that deadline, by September the 5th?

16  A.   I believe it was asked who are my e-mail contacts, and

17  that's all I produced was contacts.

18  Q.   Sir, you were ordered to provide an estimate of the

19  percentages of e-mails that have been deleted and the

20  approximate date the e-mails were deleted by September the

21  12th.  Do you remember that?

22  A.   Vaguely.

23  Q.   Did you provide that information ever?

24  A.   I can't remember.

25  Q.   Do you remember providing that information?

```
 1   A.    I can't remember.
 2   Q.    And if the evidence in this case indicates that you never
 3   provided that information, you wouldn't have any reason to
 4   dispute that, would you?
 5   A.    I don't remember.  I'm sorry.
 6   Q.    And on November the 3rd, the Court ordered you to provide
 7   Citgo the e-mails or the information necessary to access your
 8   e-mail accounts.  Correct?
 9   A.    I don't recall.  What was the, what was the request again?
10   Q.    That you provide information necessary for Citgo to access
11   your e-mail accounts.  Do you remember that?
12   A.    Okay, yes.
13   Q.    And on November the 8th, you provided Citgo with your AOL
14   account and your password?
15   A.    Yes, sir.
16   Q.    Remember that?
17   A.    Uh-huh.  Yes.
18   Q.    And you at that point chose to have, just provide that
19   information versus going back and searching for those e-mails
20   that would be responsive yourself.  Correct?
21   A.    Can you re --
22   Q.    Yes.  You never provided all the e-mails.  Instead of
23   doing that, you simply just provided your e-mail account
24   information and your password.  Correct?
25   A.    I don't recall.  I thought I did provide the e-mails.
```

1   Q.   And, sir, you've never provided how many, any estimate of

2   how many e-mails were deleted and when those e-mails were

3   deleted, have you?

4   A.   It doesn't ring a bell.  I assume that I already did all

5   that.

6   Q.   When did you provide an estimate of how many e-mails you

7   had deleted?

8   A.   I can't remember the date.

9   Q.   Are you telling us under oath you did do that?

10  A.   I want to say yes, that I think I did that.  I'm not real

11  sure at this moment.

12  Q.   And when did you provide when those e-mails were deleted?

13  A.   I don't remember.

14  Q.   Do you remember in your June 3rd response to Citgo's

15  interrogatories that you stated, "I do not recall"?

16  A.   I don't remember that.

17  Q.   And, sir, is it your position today that you cannot even

18  estimate when it was that you last deleted e-mails from your

19  personal e-mail account?

20  A.   No, sir.

21  Q.   Is that --

22  A.   One more -- could you ask the question again?

23  Q.   What is your position with regard to providing the

24  information about the deletions?

25  A.   Deletions?

1    Q.    You're telling us now that you think you have provided

2    that information.

3    A.    I save anything that's -- I don't delete anything any

4    more.  I save it in the folder on the computer.

5    Q.    Okay.  When was the last time you deleted anything from

6    your personal e-mail account?

7    A.    I don't recall the date.  Must have been after the

8    deposition, just not to delete -- or whatever I was told not to

9    delete.  And I don't remember the date that was.

10   Q.    And after that date you were told not to delete, you

11   stopped deleting?

12   A.    Yes, sir.

13   Q.    Do you remember providing an answer to your

14   interrogatories in this case that you can't estimate when you

15   last deleted e-mails from your personal e-mail account or how

16   many?

17   A.    What was the question again?

18   Q.    Sure.  Do you remember providing an answer in this case

19   with regard to the interrogatories requesting information about

20   this issue that you cannot estimate when you last deleted

21   e-mails from your personal e-mail account?

22   A.    That's probably true, sir.

23   Q.    Okay.  So which one is it, sir?  Have you been able to

24   provide the information with regard to when you last deleted,

25   or do you feel like that's impossible?

1   A.   I don't, I don't remember when I stopped deleting.

2           MR. TEMPLE:  Pass the witness, Your Honor.

3           THE COURT:  Thank you.

4           MR. ROSENBERG:  No questions.

5           THE COURT:  You may stand down.  Thank you.  Next

6   case -- next witness?

7           MR. ROSENBERG:  Mark, can he --

8           MR. TEMPLE:  Yes.  He's done.

9           MR. ROSENBERG:  So, Your Honor, Counsel says that

10  this witness can be excused.

11          THE COURT:  Is that right?

12          MR. TEMPLE:  Yes, Your Honor.

13          THE COURT:  Yes.

14          MR. ROSENBERG:  Okay.  Who's next?

15          MR. TEMPLE:  Eddie Martinez.

16      (PAUSE.)

17          THE COURT:  Thank you.  Would you please take the

18  stand up here, please, sir.

19          MR. TEMPLE:  And, Your Honor, I'll represent to the

20  Court that with regard to Mr. Garcia, we have not received that

21  answer that he mentioned on the stand, that he was able to

22  provide an estimate of what e-mails he had deleted and when.

23  We've never received that response.

24          THE COURT:  Okay.  The problem is with this is that

25  under the law, the first answer you give under oath is the one

1   that you go with.  And after the issue has been called to

2   everybody's attention and you bring them in and the answers

3   change even on the stand from one thing to another, it's not

4   going to fly.

5          MR. TEMPLE:  It's -- we share the frustration, Your

6   Honor.  That's why we're unfortunately here.

7          THE COURT:  All right.  Go ahead.

8      EDUARDO MARTINEZ, SR., DEFENDANT'S WITNESS NO. 3, SWORN

9                      DIRECT EXAMINATION

10  BY MR. TEMPLE:

11  Q.   Sir, could you please state your name for the record?

12  A.   Eduardo Martinez, Sr.

13  Q.   And, sir, you review pass down notes while working for

14  Citgo.  Correct?

15  A.   Yes.

16          THE COURT:  Okay.  I have really bad allergies to

17  perfumes.  Would it be possible for you to wash that off?

18          THE WITNESS:  What's that, ma'am?

19          THE COURT:  After shave or perfume or whatever.

20  Thank you.  Call another witness, please, while he does that.

21          MR. TEMPLE:  Ciriaco Villarreal.

22      (Court and ERO conferring off the record.)

23          THE COURT:  Is he under oath?

24          MR. TEMPLE:  Yes, Your Honor.

25          THE COURT:  You're still under oath, Mr. Villarreal,

1    if you could take a seat up here, please.

2              THE WITNESS:  Yes, Your Honor.

3        CIRIACO VILLARREAL, JR., DEFENDANT'S WITNESS NO. 3, SWORN

4                       DIRECT EXAMINATION

5    BY MR. TEMPLE:

6    Q.   Could you please state your name for the record, sir?

7    A.   Ciriaco Villarreal, Jr.

8    Q.   And, Mr. Villarreal, isn't it true that you take notes at

9    work?

10   A.   Only during start up, shut downs and when there's big

11   upsets in the units.

12   Q.   Okay.  Is it true that in the heat of the battle, if

13   something is going on with the unit and you're trying to get it

14   within operating parameters, that's when you jot something

15   down, and then later on transfer it to EELs?

16   A.   That is correct.

17   Q.   Okay.  And you take those notes on a pad of paper on your

18   console.  Do you remember telling us about that?

19   A.   That is correct.

20   Q.   And you know that those notes get thrown away when the pad

21   is full?

22   A.   I don't know that.

23   Q.   Do you remember when we asked you that question in your

24   deposition?

25   A.   I told you that I leave them on the, on the console, and I

Villarreal – Direct

```
 1    don't know what happens to them afterwards.

 2              THE COURT:  And when was this deposition -- what's

 3    your first name, sir?

 4              THE WITNESS:  Ciriaco.

 5              THE COURT:  How do you spell that?

 6              THE WITNESS:  C-I-R-I-A-C-O.

 7              THE COURT:  And when was the deposition taken?

 8              MR. TEMPLE:  The deposition was taken November the

 9    2nd, Your Honor.

10              THE COURT:  And so he, you leave your notes on the

11    console and you don't know what happens to them?

12              THE WITNESS:  Yes, ma'am.

13    BY MR. TEMPLE:

14    Q.  Sir, do you remember I asked you that question in your

15    deposition?  I said, "And what happens when that pad gets

16    full?"

17         And you provided your answer, starting at Line 18.  What

18    did you say at that time, sir?

19    A.  It says on here, "They usually get thrown away," but --

20    Q.  And you stand by what you swore to under oath at the time

21    of your deposition, don't you?

22    A.  Yes.  I'm under oath and --

23              THE COURT:  Well, how come you said, "I don't know

24    what happened to them" just now?

25              THE WITNESS:  Well, because I leave them on the
```

Villarreal - Direct

1    console.

2           THE COURT:  Before you knew they got thrown away, and

3    now you don't know what happened to them.

4           THE WITNESS:  No, ma'am.  Your Honor, when I leave

5    them on the console and when I come back to work --

6           THE COURT:  They're gone.

7           THE WITNESS:  -- and they're not there, I don't know

8    where they went.  So I, I take it that they got thrown away.

9           THE COURT:  Well, have you made any effort to find

10   them?

11          THE WITNESS:  Well, I haven't had any upsets in our

12   unit since June.

13          THE COURT:  Let me just ask you this one more time --

14          THE WITNESS:  Yes, ma'am.

15          THE COURT:  -- have you made any effort to locate

16   them?

17          THE WITNESS:  No, ma'am.

18          THE COURT:  Okay.

19   BY MR. TEMPLE:

20   Q.   Sir, how do you know that those notes usually get thrown

21   away?

22   A.   I don't know that.  I know that they're not there when I

23   come back.

24   Q.   And, sir, you understood that on August the 22nd, you were

25   under a court order to preserve and produce your notes?

Villarreal – Direct

1   A.   I haven't had any notes, because we haven't had any upsets

2   in our units or start up or shut down since before the court

3   order was put into place.  In fact, the last start up was in

4   June.

5   Q.   So it's your testimony that since August the 22nd, you

6   have not taken any notes while at work?

7   A.   No, I don't.

8   Q.   You have not.  Correct?

9   A.   No.  No, sir.

10  Q.   And do you remember receiving a Request for Production of

11  Documents from Citgo in and around April the 13th of 2011

12  seeking these very notes that we're talking about?

13  A.   I'm not sure about that.

14  Q.   Sir, I'm going to call your attention to Request for

15  Production Number 9, and it says, "All documents prepared by

16  you that you use or used or that assist or have assisted you in

17  the operation of your console since January 1, 2008, including

18  but not limited to trend charts, yield reports, logs, journals

19  and any other materials you review, prepare or exchange before

20  you begin or end the shift."  Do you see that?

21  A.   Yes, I do.

22  Q.   Okay, sir.  And do you remember receiving that particular

23  document request in or around April the 13th, 2011?

24  A.   I don't remember when I received it, but I guess I, you

25  know, if I did receive it, I read it.

1            THE COURT:  Do you know if you received it?

2            THE WITNESS:  I'm sure I did, Your Honor.  I'm sure

3    I -- I'm sure I read it.

4            THE COURT:  Do you have any idea if it was this month

5    or six months ago or when you received it?

6            THE WITNESS:  I don't, I don't know when I received

7    it.

8            THE COURT:  Was it before today?

9            THE WITNESS:  I'm sure it was, ma'am.

10   BY MR. TEMPLE:

11   Q.   Sir, upon receipt of that document request, what did you

12   do to start preserving your notes?

13   A.   Everything that, that I use to run my console is on the

14   computer.  Everything.

15   Q.   Okay, sir.  We talked a little while ago that prior to --

16   you said you hadn't taken any of these notes, you said there

17   hadn't been any upsets or anything like that since June.  Do

18   you remember that testimony?

19   A.   Yes, sir, I do.

20   Q.   Okay.  And you received that document request before June.

21   Correct?

22   A.   Yes, I guess I did.

23   Q.   So where are the notes that you would have taken at least

24   at the time of that upset in June that you referenced to, that

25   you referenced earlier?

Villarreal – Direct

1   A.   When I take notes, I leave them there on the pad, on the

2   console.  What happens to them after I leave, I have no idea

3   what happens to them.

4   Q.   At that point in time, sir, you didn't take, you didn't

5   make any efforts, whether it be trying to copy those notes or

6   anything else, to preserve those notes that related to your

7   job, did you?

8   A.   There was no reason to.

9   Q.   Other than the fact that you had received a Request for

10  Production of Documents that specifically requested production

11  of those notes.

12  A.   We don't take those notes as legal documents.  They're

13  just scribble notes.

14          THE COURT:  Do you know what a legal document is?  Is

15  this your job to determine?

16          THE WITNESS:  No, Your Honor, it's not my job.

17          THE COURT:  This is your lawsuit.  You need to save

18  the documents that are required to be saved.  You don't make

19  that determination, whether they're legal documents or whether

20  they're relevant or not relevant.

21          THE WITNESS:  Okay, Your Honor.

22          THE COURT:  It's too, it may be too late.

23  BY MR. TEMPLE:

24  Q.   Sir, do you remember that on August the 22nd, the Court

25  ordered you to provide information regarding your use of

1   personal e-mail accounts at work and copies of the e-mails you

2   sent or read from those accounts while working for Citgo?

3   A.   Yes.

4   Q.   And in addition to producing your e-mails by September

5   5th, you were also ordered to provide information that included

6   an estimate of the percentage of the e-mails that have been

7   deleted, as well as the approximate dates such e-mails were

8   deleted, by Monday, September the 12th.  Do you remember that?

9   A.   I don't remember that quite well.

10  Q.   It was a part of the prior Court's order.  Does that sound

11  familiar?

12  A.   Okay, if it was a court order --

13  Q.   And you failed to produce your e-mails by that September

14  5th deadline, didn't you?

15  A.   Right.

16  Q.   And you failed to produce the information ordered by the

17  Court by September the 12th, didn't you?

18  A.   I produced them to -- it was after my deposition that I

19  produced them, yes.  My deposition was --

20  Q.   Your deposition was taken November the 2nd.  Correct?

21  A.   That's correct.

22  Q.   Now, November the 3rd, the Court ordered you to send Citgo

23  your e-mails or the information necessary to access your e-mail

24  account.  Correct?

25  A.   Yes.

Villarreal – Direct

1  Q.   And on November the 8th, you chose to provide Citgo with

2  46 e-mails from your AOL account.  Correct?

3  A.   Yes.

4  Q.   And you have not provided Citgo with information regarding

5  how many e-mails have been deleted from your account and when

6  those e-mails were deleted, have you, pursuant to the Court's

7  order?

8  A.   Would you repeat the question, please?

9  Q.   As of this day, sir, you still have not provided, in

10  accordance with the Court's order, an estimate of how many

11  e-mails have been deleted from your account and when those

12  e-mails were deleted.

13  A.   I deleted all the information to, to our lawyer.

14           THE COURT:  Pardon?

15           THE WITNESS:  I sent all the information to the

16  lawyer that had requested our lawyer.

17           THE COURT:  When?

18           THE WITNESS:  It was after November the 3rd.

19           THE COURT:  After the 3rd of November?

20           THE WITNESS:  Yes.  Yes, Your Honor.

21  BY MR. TEMPLE:

22  Q.   What information did you provide, sir?

23           THE COURT:  Do you have it yet, Mr. Temple?

24           MR. TEMPLE:  No.  We don't have any estimate of

25  deletions from him.

1           MR. ROSENBERG:  Your Honor --

2           THE COURT:  Mr. Rosenberg?

3           MR. ROSENBERG:  Yeah.  Your Honor, that's -- I hate

4    to say it, it's just not true.  We were required to provide the

5    access information, the passwords, everything to get into these

6    accounts, exactly what the Court order said, and we did it

7    contemporaneously with the Court's order, which is why all this

8    is surprising me at this point.

9           I'm sitting here being quiet, because I wasn't able

10   to -- my objection was overruled before.  But all this was --

11   we complied with that court order of November, whatever day it

12   was, following the telephone conference, within three or four

13   days we supplied them with password information, other

14   information that I have, that I don't have in my recollection,

15   but we provided exactly what they asked for.

16          THE COURT:  Okay.

17          MR. ROSENBERG:  And I apologize to the Court, I'm not

18   prepared to get into this, because it wasn't supposed to be

19   part of the hearing.  But I can represent to the Court that

20   what this Court ordered me to do with regard to those e-mail

21   passwords and that part of the Court's order was complied with

22   timely.  And I remember specifically, because I was in a trial

23   in another case while this was going on, and getting that

24   information segregated and out.

25          MR. TEMPLE:  The order I'm referring to is the

1    8/22/2011 order where you were specifically ordered to provide

2    the estimate of the percentage of e-mails --

3            THE COURT:  Yeah, I thought it was really clear when

4    we talked that that was going to be, that was part of the

5    November 3rd order --

6            MR. ROSENBERG:  It was.

7            THE COURT:  -- of failure to supplement, e-mails, and

8    everything else.

9            MR. ROSENBERG:  Right.  Right, and as part of that

10   order, you ordered us to do exactly what it is what we did.

11   And I don't mean to be effervescent, be transvescent (sic),

12   whatever it is I'm doing.  All I'm telling the Court is

13   representing to the Court what the Court ordered me to do with

14   regard to those e-mails, the passwords and the information they

15   needed, we have complied with.

16           MR. TEMPLE:  The issue, Your Honor, was the fact that

17   this was the prior Court's order and he never provided this

18   information.  So if the Court's position, if what you meant to

19   do by the second order was to replace this prior order with

20   regard to the estimate of the percentage of e-mails that were

21   deleted and the approximate date such e-mails were deleted, so

22   be it.  Just getting the account information and their log in

23   information doesn't give us any of this information, which is

24   why we didn't think it replaced the Court's prior order.  We

25   can't determine --

1       THE COURT:  Well, I ordered back in August --

2       MR. TEMPLE:  Right.  That's what this --

3       THE COURT:  -- back in August that, "As for Request

4  for Production 40, 'All text messages you have sent during your

5  scheduled Citgo work hours and during hours you worked for

6  Citgo since January 1st, 2008,' it is ordered that Plaintiffs

7  respond to Request for Production 40 and 41" -- 41 was all

8  e-mails from a non-Citgo e-mail address that you sent during

9  scheduled Citgo work hours and during hours you worked for

10  Citgo since January 1st, 2008 -- that those documents be

11  provided no later than September the 5th, 2011.  But that

12  didn't happen.

13       MR. ROSENBERG:  Well, if you look further down, there

14  was an authorization that the Court allowed us to do, and we

15  did that immediately.  It's either on that page or right a

16  paragraph, a paragraph or two.

17       THE COURT:  "It is further ordered that once

18  Defendant obtains Plaintiff's text message records, Plaintiffs

19  are provided an opportunity to review the records and designate

20  sensitive records that are not to be used in a public

21  proceeding."  That never happened.  So none of that happened.

22       MR. ROSENBERG:  The authorization was done.

23       THE COURT:  Wait a minute.  Then I had to give --

24  because none of that happened, I had to give another order.

25       MR. TEMPLE:  The next order, Your Honor, was November

1    the 3rd.

2            THE COURT:  I'm looking at that one.

3            MR. ROSENBERG:  I found the paragraph I was looking

4    for.

5            THE COURT:  In what order?

6            MR. ROSENBERG:  It's the Court's August 22nd, 2011,

7    order, under C.  I'll wait.

8            THE COURT:  That's Interrogatory Number 7.

9            MR. ROSENBERG:  No.  I'm sorry, Your Honor, it's on

10   Page 8 of 11, C, Request for Production Number 40 and 41.

11       (PAUSE.)

12           THE COURT:  Okay, it doesn't say either/or.

13           MR. ROSENBERG:  No, I agree.  But we're talking about

14   texts.  It says, "It is further ordered that Plaintiffs provide

15   Defendant with authorization to obtain Plaintiffs' text

16   messages, message records, by Monday, September 5th, 2001

17   (sic)."  There isn't any dispute we complied with that.

18           THE COURT:  Okay.

19           MR. ROSENBERG:  The next paragraph is what they

20   haven't complied with.  We're not -- we don't have a motion

21   before the Court, but that next paragraph we never got back,

22   what --

23           THE COURT:  What are you talking about?

24           MR. ROSENBERG:  So the Court goes on to say, "It is

25   further ordered that once Defendant obtains Plaintiffs' text

1    message records, Plaintiffs are provided an opportunity to

2    review the records and designate sensitive records that are not

3    to be used."  That we never, we never had.  But I --

4         THE COURT:  But you never gave them, by September the

5    5th, all e-mails and text messages since January 1st, 2008.

6         MR. ROSENBERG:  We did -- we did the authorization.

7    But text, there's no way to get the authorization.  Then we

8    later figured out we could --

9         THE COURT:  Well, what about the e-mail?  Where was

10   that?

11        MR. ROSENBERG:  That's what we're getting at.  We

12   later figured out that the only way to do that was, was through

13   passwords and all that.  And the Court, we cleared that up in

14   the next hearing.  And the Court, my recollection, it's in the

15   court order, give them the password, give them the log in

16   information, and they have to get it that way.  And we agreed.

17   And quite honestly, Your Honor, I thought that was the end of

18   it.

19        THE COURT:  Well, the problem with that is this.  You

20   never complied with any of my orders.  And the other thing is,

21   these people are testifying they've been deleting e-mails the

22   whole time.

23        MR. ROSENBERG:  To --

24        THE COURT:  So giving your e-mail pass and

25   information is not cutting it, because you have not instructed

1   them, or they have refused to stop deleting their e-mails.  So

2   there's no big picture.  There's no way to get that discovery.

3         And they've not tried to undelete those messages.

4   They have not looked in their trash, they haven't -- nobody's

5   told me that they looked through their trash to see if there

6   were deleted e-mails they could recover.

7         MR. ROSENBERG:  And the problem with that is, Your

8   Honor -- I agree with everything the Court just said.  But the

9   problem with that is that was never intended to be as

10   representative of, as noted by the Court, the subject matter of

11   this hearing today, or else I'd have a response for you.

12         THE COURT:  Yes, it was.

13         MR. ROSENBERG:  Well --

14         THE COURT:  Don't argue with me.

15         MR. ROSENBERG:  I'm not arguing, I just have to make

16   the record.

17         THE COURT:  I put in here that anybody that hadn't

18   responded or hadn't kept their notes, I'm going to dismiss

19   their case.  I gave everybody notice of that.  That's done.

20         Next, I said, "Or those that have failed to

21   supplement responses," which you have failed to do also.  I

22   don't understand why this is so difficult.  What is the issue

23   here that you cannot comprehend?

24         MR. ROSENBERG:  Your Honor, I believe I'm

25   comprehending the issues.  There's been an inordinate amount of

Villarreal – Direct                          64

1   dialogue between Counsel and I trying to resolve these things,

2   and then I get hit with these telephone conferences when we're

3   trying to figure out a way to resolve these disputes.   I

4   understand the Court's --

5              THE COURT:  Well, that's why we're having this

6   hearing, with every one of the Plaintiffs here, to see what's

7   happened.  And it turns out they haven't done anything I've

8   ordered them to do.

9              So go ahead with your questions, sir.

10  BY MR. TEMPLE:

11  Q.   Sir, do you remember providing an answer to Interrogatory

12  Number 16 asking you to "Identify, describe and specify all

13  e-mail addresses you used or accessed during your scheduled

14  Citgo work hours, during hours you worked for Citgo since

15  January 1, 2008"?  Do you remember providing that answer?  The

16  answer that you provided is there at the bottom of the page.

17  A.   Yes.

18  Q.   And the answer you provided was, "There were none."

19  Correct?

20  A.   I wasn't quite sure what you meant by, you know, specify

21  all the e-mail addresses that -- other than what the company

22  already has records of.

23  Q.   Okay.  Sir, you didn't say any of that in response to this

24  question.  You just simply told us that there are none with

25  regard to e-mail addresses used or accessed during your

1    scheduled Citgo work hours.  Correct?

2    A.    That's what I said.

3    Q.    Okay.  And that's not --

4            THE COURT:  Are these all exhibits?

5            MR. TEMPLE:  I can mark them as exhibits, Your Honor.

6            THE COURT:  I need them all marked as exhibits and

7    included.

8            MR. TEMPLE:  Okay.

9            THE COURT:  I need you, for the record, to refer to

10   them as the number of the exhibit.

11           MR. TEMPLE:  I will, Your Honor.  Sir, I'm going

12   to -- or Your Honor, I'm going to ask that we mark the

13   Plaintiff Ciriaco Villarreal's Response to Defendant's First

14   Set of Interrogatories to Plaintiff as Citgo Exhibit 1.

15       (Counsel conferring off the record.)

16           MR. ROSENBERG:  All right.  So with the understanding

17   that there are going to be supplemental interrogatory answers

18   introduced, I don't object to this interrogatory.

19           MR. TEMPLE:  Your Honor --

20           THE COURT:  Defendant's Exhibit --

21           MR. TEMPLE:  Move that it be admitted, that Citgo

22   Exhibit 1 be admitted into evidence.

23           THE COURT:  Admitted.

24   BY MR. TEMPLE:

25   Q.    Sir, do you remember responding to this particular

1  question, in June of 2011, asking you about e-mail addresses or

2  accounts you used while at work, and you simply said, "There

3  are none"?  Do you remember that?

4  A.   Yes.

5  Q.   Okay.  That's not a true statement, is it?

6  A.   Depends on, on what it meant.  I mean, I couldn't get

7  enough information off that question.

8  Q.   I'm sorry?

9       THE COURT:  Well, why didn't you say that instead of

10  answering it then?

11       THE WITNESS:  Your Honor, I —— I wasn't sure what the

12  question meant.  And yes, I didn't put that on there, but I

13  know that Citgo does have all that information, Your Honor.

14       THE COURT:  Well, why didn't you say, "I don't know

15  what you're talking about," instead of answering the question?

16  This is —— once again, this is your case.  You get asked

17  questions, you're supposed to answer them truthfully.

18       THE WITNESS:  And I was, to the best of my ability,

19  ma'am.

20       THE COURT:  And you didn't, you did not, because now

21  you're telling me you didn't understand the question, when

22  you're trying to wiggle around.

23       MR. TEMPLE:  Your Honor, I'd like to introduce, I'm

24  going to mark and introduce the exhibit Ciriaco Villarreal's

25  Fourth Supplemental Response to Defendant's First Set of

1    Interrogatories, mark that as Exhibit 2.

2              MR. ROSENBERG:  Without objection.

3              THE COURT:  Defendant's 2 is admitted.

4    BY MR. TEMPLE:

5    Q.   Sir, do you remember providing a supplemental

6    interrogatory response to that question?  You specifically at

7    that point talked about what you were doing to access and read

8    personal e-mails at work.  Correct?

9    A.   That is correct.

10   Q.   And at that time, when you were asked about the, in

11   compliance with the Court's order, to estimate how many e-mails

12   had been deleted and when, you responded and you said, "It

13   would be impossible to guess or even estimate when e-mails were

14   deleted."  Correct?

15   A.   That is correct.

16   Q.   And that's what you're telling us, that in your opinion

17   there's no way for you to tell us when e-mails were deleted or

18   when those -- what e-mails were deleted and when.

19   A.   I have no idea.  I mean, it's been a long time.  That's

20   from 2008.

21   Q.   Have you done anything to try to make that determination,

22   sir?

23   A.   I've gone back and I have called AOL, and they've told me

24   that, that all that information has been, it's been flushed.

25   It's been, it's gone.

Villarreal - Direct                                        68

```
1              THE COURT:  Well, what about in the last four months?
2    Have you been deleting any personal e-mails?
3              THE WITNESS:  No, Your Honor.
4    BY MR. TEMPLE:
5    Q.   Sir, do you remember in your deposition we talked about
6    this very issue, and you admitted to deleting e-mails from your
7    AOL account on the very morning of your deposition?
8    A.   Not, not anything from work.  You're talking about my
9    personal account?
10   Q.   Yes, sir.  I'm talking about any of your accounts that you
11   accessed at any time while working for Citgo.
12   A.   Yes, I did say I deleted some off of my phone.  I get a
13   lot of, I get a lot of trash e-mail.
14             THE COURT:  Just listen to the question and answer
15   it --
16             THE WITNESS:  Yes.
17             THE COURT:  -- please, sir.
18             THE WITNESS:  Yes, Your Honor.
19   BY MR. TEMPLE:
20   Q.   And, sir, you've deleted e-mails that you think are not
21   anything important or pertinent to this case, haven't you?
22   A.   Yes, I have.
23   Q.   And your position is that you don't do any business as the
24   mayor of Mathis through your e-mail account.  Is that right?
25   A.   I'm trying to remember.
```

1    Q.    Do you remember telling us that in your deposition?

2    A.    I don't do business with the City of Mathis through

3    e-mail.

4    Q.    And, sir, do you remember providing on November the 8th

5    66 pages of e-mails that you both sent and received at work,

6    including e-mails in which you were acting as the city of

7    mayor -- as the City of Mathis mayor?

8    A.    Yes.

9    Q.    When was the last time you deleted any e-mails from your

10   personal e-mail account, sir?

11   A.    I haven't lately.  The last time was that day that I did

12   my deposition.

13            MR. TEMPLE:  No further questions, Your Honor.

14            THE COURT:  Thank you.

15            MR. ROSENBERG:  Pass the witness.

16            THE COURT:  Thank you, sir.  You may -- are you

17   finished?

18            MR. ROSENBERG:  Yeah, I said pass the witness.

19            THE COURT:  You may stand down.  Thank you.

20            THE WITNESS:  Thank you, Your Honor.

21            MR. ROSENBERG:  Your Honor, on the witness with the

22   lotion, if -- I'll go out there and check, because I'm

23   sensitive to it, too.  Would it help if -- you can go.  You may

24   go.  Would it help if we set him here?  If it --

25            THE COURT:  No, because there's no microphone there.

1          MR. ROSENBERG:  Okay.

2          THE COURT:  You can set him at your table, though.

3          MR. ROSENBERG:  All right.  Let me go see what's --

4    is that the next one you want?

5          MR. TEMPLE:  Well, I can do David Bellows next.

6          MR. ROSENBERG:  Well, let me just see what his story

7    is.

8          THE COURT:  See what his condition is at this moment.

9       (PAUSE.)

10         MR. ROSENBERG:  Excuse me, Your Honor.  The witness

11   took his coat off.  That probably helped a great deal.  He did

12   also take care of it in the restroom.

13         THE COURT:  Good, then he --

14         MR. ROSENBERG:  You want him to sit here?

15         THE COURT:  Why don't you just take the stand and see

16   how that goes.

17         Okay, you may proceed.

18      EDUARDO MARTINEZ, SR., DEFENDANT'S WITNESS NO. 4, SWORN

19                       DIRECT EXAMINATION

20   BY MR. TEMPLE:

21   Q.   Sir, could you please state your name for the record?

22   A.   Eduardo Martinez, Sr.

23   Q.   And, Mr. Martinez, you review pass down notes while

24   working for the company Citgo.  Correct?

25   A.   Yes, I have.

Eduardo Martinez, Sr. – Direct

1  Q.   In October, in October the 11th, you responded to Citgo's

2  document request saying that "Important handwritten notes are

3  stored on a terminal clipboard for all to have access to and

4  are unfortunately sometimes misplaced.  Others that are not

5  important go into the recycle bin."  Do you remember that?

6  A.   Yes, sir, I do.

7  Q.   Those are notes that you use during your work at Citgo.

8  Correct?

9  A.   Yes, it is.

10 Q.   You understood that since August the 22nd, you were under

11 a court order to preserve and produce those notes that you used

12 at work.  Correct?

13 A.   Yes.  Yes, sir.

14 Q.   And at this point in time, you've failed to preserve or

15 produce any of those notes.  Correct?

16 A.   Yes.  We were -- I was misunderstood.  I --

17        THE COURT:  I'm sorry, say that again.  I was

18 coughing.

19        THE WITNESS:  I misunderstood that we're supposed to

20 keep all our notes.  I was under the impression that the EELs

21 was sufficient.

22        THE COURT:  Who told you that?

23        THE WITNESS:  Well, that's what we, all our, all our

24 notes are submitted on.

25        MR. ROSENBERG:  You want me to --

1          THE COURT:  Pardon?

2          MR. ROSENBERG:  You want me to move him here?

3          THE COURT:  No.  Go ahead.

4          THE WITNESS:  All our notes are submitted

5   electronically in our EELs, the, it's --

6          THE COURT:  Well, almost everybody has testified that

7   they don't put everything from their notes on the EELs.  Did

8   you know that?

9          THE WITNESS:  No, ma'am, I didn't.

10          THE COURT:  You put all your notes on the EELs?

11   There's nothing you don't put on there?

12          THE WITNESS:  I put everything on the EELs, yes,

13   ma'am.

14          THE COURT:  And you always have?

15          THE WITNESS:  Yes, ma'am.  I have always, since day

16   one.

17          THE COURT:  Is that what he told you?

18          MR. TEMPLE:  Not in the written discovery responses,

19   Your Honor.  I'm going to put, I'm going to mark here as

20   Exhibit 3 Eddie Martinez, Eddie Martinez's -- Eduardo

21   Martinez's Supplemental Response to Defendant's First Set of

22   Requests for Production to Plaintiff.

23          Your Honor, I'm going to move that Defendant's 3 be

24   admitted into evidence.

25          MR. ROSENBERG:  Without objection.

```
 1              THE COURT:  Defendant's 3 is admitted.  Straighten it
 2    out, if we're going to look at it.
 3    BY MR. TEMPLE:
 4    Q.   Sir, do you remember receiving this document request
 5    asking that you produce any documents prepared --
 6              THE COURT:  Could you zoom that out, please?
 7              MR. TEMPLE:  I sure will.
 8              THE COURT:  Ms. Cayce, could you make that window
 9    larger?  There.  Nope -- could you make the window larger?  I
10    don't know what's he's, what's going on.  Thank you.
11    BY MR. TEMPLE:
12    Q.   Sir, do you remember receiving Request for Production
13    Number 9?
14    A.   Yes, sir.
15    Q.   And do you remember seeing that in and around April the
16    13th of 2011?
17    A.   April 13th?
18    Q.   Yes, sir.
19    A.   And what was that question again, sir?
20    Q.   Do you remember receiving this document request in and
21    around that time?
22    A.   Yes.  Yes, I do.
23    Q.   And, sir, do you remember providing a supplemental
24    response to that particular document request in or about
25    October the 11th, 2011?
```

Eduardo Martinez, Sr. – Direct                          74

```
 1    A.   Yes.

 2    Q.   And the response that you provided said, "Important

 3    handwritten notes are stored on terminal clipboard for all to

 4    have access to and are unfortunately sometimes misplaced.

 5    Others that are not important go into the recycle can."

 6    A.   That is correct.

 7    Q.   Okay.  So what notes are you talking about there?

 8    A.   Just notes that are just doodling, like people doodle in

 9    there, nothing --

10              THE COURT:  In where?

11              THE WITNESS:  -- pertaining to -- on our board.

12    Console board.

13    BY MR. TEMPLE:

14    Q.   Sir, you've called them "important handwritten notes."  So

15    are you telling us that you don't take or you've never taken --

16    A.   Well, we have -- we have pass down notes.  Maybe that's

17    what you mean?  Is that what you're -- I'm referring to pass

18    down notes.

19    Q.   Any --

20    A.   We do have a clipboard that has, we do have notes that

21    are, are documented daily.

22    Q.   And you write in those notes daily.

23    A.   Yes, I do.

24    Q.   Correct?

25    A.   Yes, sir.
```

Eduardo Martinez, Sr. - Direct

1    Q.   And you have done nothing to try to preserve those notes

2    for production to --

3    A.   Well, because I was under the understanding that the EELs

4    was sufficient from August 22nd on.  But --

5              THE COURT:  Who told you that?

6              THE WITNESS:  -- I was mistaken.

7              THE COURT:  Who told you that?

8              THE WITNESS:  It was just, that was just my, my

9    interpretation.

10              THE COURT:  Okay.  You told me that all your notes

11   went into EELs.

12              THE WITNESS:  Yes.

13              THE COURT:  Well, what -- why do you have pass down

14   notes then?

15              THE WITNESS:  That's always been like that, ma'am,

16   since day one at the terminal.

17              THE COURT:  Okay.  Are the pass down notes different

18   than what's in the EELs?

19              THE WITNESS:  Yes.  Yes, they are.

20              THE COURT:  All right.  Then where are your pass down

21   notes?

22              THE WITNESS:  I have submitted some.

23              THE COURT:  Where?  Have you been -- when did you

24   start saving them?

25              THE WITNESS:  Oh, about -- well, just -- not on

Eduardo Martinez, Sr. – Direct

1    August 22nd, I admit, I haven't done that.

2             THE COURT:  When did you start saving them?

3             THE WITNESS:  About two, three weeks ago.  I actually

4    thought, like everybody else, the EELs was sufficient.  So we

5    failed to comply.  And I honestly, you know, admit to that.  I

6    didn't do that.

7    BY MR. TEMPLE:

8    Q.   Sir, do you remember that on August the 22nd, the Court

9    ordered you to provide information regarding your use of your

10   personal e-mail accounts at work and copies of the e-mails that

11   you sent or read from those accounts while working for the

12   company?

13   A.   Yes, sir.

14   Q.   And you were also ordered to provide information that

15   included an estimate of the percentage of e-mails that have

16   been deleted and the approximate date such e-mails were

17   deleted, by September the 12th?

18   A.   Yes, sir.

19   Q.   And you failed to produce your -- you failed to produce

20   any e-mails by September the 5th.  Correct?

21   A.   Yes, I did.

22   Q.   And you failed to produce the information ordered by the

23   Court by September the 12th.  Isn't that right?

24   A.   I don't think so.  I do have some that are saved.

25   Q.   Sir, did you provide -- you did not provide an estimate of

1    the percentage of e-mails that have been deleted by you or by

2    anyone and the approximate date such e-mails were deleted by

3    September the 12th, did you?

4    A.   That is correct.

5    Q.   And, sir, you understood that on November the 3rd, the

6    Court ordered you to send Citgo the e-mails or the information

7    necessary to access your e-mail accounts?

8    A.   Yes.

9    Q.   And on November the 8th, you provided Citgo with your

10   Southwestern Bell account and your password.  Is that right?

11   A.   Yes, sir.

12             THE COURT:  What time?  When?

13             MR. TEMPLE:  November the 8th.

14             THE COURT:  November the 8th?

15   BY MR. TEMPLE:

16   Q.   And, sir, you have not provided Citgo with information

17   regarding how many e-mails -- strike that.

18        Sir, do you remember answering some interrogatories in

19   this case on or about June the 3rd?

20   A.   Yes.

21   Q.   And you remember the question was specifically asked of

22   you to "Identify, describe and specify all e-mail addresses you

23   used or accessed during your scheduled Citgo work hours or

24   during hours you worked for Citgo since January 1, 2008"?

25   A.   The question was -- what was the question again, sir?

Eduardo Martinez, Sr. - Direct

```
 1              THE COURT:  Read it right there.

 2   BY MR. TEMPLE:

 3   Q.   It's right here, sir.

 4        (PAUSE.)

 5   A.   Yes.

 6   Q.   What answer did you give at that time, sir?

 7   A.   "I do not recall."

 8              MR. TEMPLE:  Your Honor, I'm going to mark this as

 9   Defendant's Exhibit 3.  I'm sorry --

10              THE COURT:  4.

11              MR. TEMPLE:  4.  Thank you.

12              THE COURT:  Any objection?

13              MR. ROSENBERG:  Let me see what it is.

14        (Counsel conferring off the record.)

15              MR. ROSENBERG:  What number is that?

16              MR. TEMPLE:  4.

17              MR. ROSENBERG:  I don't have an objection to 4.

18              THE COURT:  Defendant's 4 is admitted.

19   BY MR. TEMPLE:

20   Q.   And, sir, do you remember providing a supplemental

21   interrogatory response after answering that one specifically

22   stating, "I do not recall," sometime later providing a

23   supplemental interrogatory response with a different answer?

24   A.   Yes.

25   Q.   And, sir, that was provided on or about September the
```

Eduardo Martinez, Sr. - Direct          79

1    27th.  Is that right?

2    A.    Yes, sir.

3    Q.    And at that point, you said, "To the best of my knowledge,

4    I have not accessed my personal e-mail account during work

5    hours."  Correct?

6    A.    Right.

7          MR. TEMPLE:  I'm going to mark this as Exhibit 5.

8          (Counsel conferring off the record.)

9          MR. ROSENBERG:  No objection.

10         THE COURT:  Defendant's 5 is admitted.

11   BY MR. TEMPLE:

12   Q.    And, sir, isn't it true that on November the 8th, you

13   provided Citgo with your e-mail account information, so at that

14   point Citgo could identify the e-mails you accessed or sent

15   while at work?

16   A.    Yes, sir.

17   Q.    Sir, why was it that you previously took the position that

18   you did not access your personal e-mail at work, and then

19   subsequently took the position that you did?

20   A.    Would you repeat the question?

21   Q.    Yes, sir.  I just would like your explanation with regard

22   to the change in interrogatory responses.  The first

23   interrogatory response, you said, "I do not recall."  The first

24   supplemental, you said, "To the best of my knowledge, I have

25   not accessed my personal e-mail account at work."  And then

Eduardo Martinez, Sr. – Direct                    80

1   later in November, you provided account information, indicating

2   that you had some e-mail account that you had accessed at work.

3            MR. ROSENBERG:  Your Honor, I object to the question

4   as relevant --

5            THE COURT:  Overruled.  I'm sorry, did you finish?

6            MR. ROSENBERG:  I didn't, because he was responding,

7   the Court order said to give the information, and I certainly

8   wasn't going to argue with the Court whether or not it was

9   responsive or not.  The Court wanted it, we were ordered to do

10  it, and we did it.  But I don't see inconsistency.  That's my

11  objection, and we --

12           THE COURT:  That's not a legal objection.  Overruled.

13           MR. ROSENBERG:  My objection was relevance.

14  BY MR. TEMPLE:

15  Q.   Sir, isn't it true that the account information you

16  provided to Citgo, that e-mail account information referenced

17  an account that you accessed while working for the company?

18  A.   Can you rephrase that?  I don't understand what you're

19  saying, sir.

20  Q.   Yes, sir.

21           THE COURT:  Did you use an e-mail account while you

22  were working at Citgo?

23           THE WITNESS:  No, I haven't.

24           THE COURT:  Never?

25           THE WITNESS:  No.  My personal e-mail?  Is that what

 1   you're referring to?

 2   BY MR. TEMPLE:

 3   Q.   Yes, sir.  Any personal web-based e-mail account that

 4   you've used at any time or accessed --

 5           THE COURT:  Or texting on your cell, personal phone,

 6   that sort of thing.

 7           THE WITNESS:  Well, just the Citgo account, e-mails

 8   that I get, those I open.

 9           THE COURT:  Well, do you have a computer at your work

10   console?

11           THE WITNESS:  Yes, I do.  Yes, ma'am.

12           THE COURT:  Could you ever access your personal

13   e-mail through your work?

14           THE WITNESS:  Personal e-mail, no, ma'am, I never

15   have.  It's all Citgo.  I do -- I have my personal e-mail at

16   home.  I do access that.  But not, nothing, nothing at Citgo.

17   BY MR. TEMPLE:

18   Q.   Have you ever accessed your Southwest Bell account while

19   working at the company?

20   A.   No, sir, I never have.

21   Q.   And, sir, in another response to Citgo's interrogatories,

22   you said it's impossible for you to estimate how many e-mails

23   would have been deleted because the deletion process would have

24   entailed the deletion of e-mails that were sent or received

25   while you were not at Citgo, as well as perhaps those that were

Eduardo Martinez, Sr. - Direct

1   accessed while working at Citgo.  Correct?

2   A.   Yes, sir.

3   Q.   And you maintain your position it's impossible for you to

4   determine how many e-mails you may have deleted from your

5   personal account.  Correct?

6   A.   From the Citgo personal account?

7   Q.   From your personal account.

8   A.   I don't have any.

9   Q.   From your Southwestern Bell account.

10  A.   Yes.

11           MR. TEMPLE:  No further questions, Your Honor.

12           MR. ROSENBERG:  No questions, Your Honor.

13           THE COURT:  You may stand down.  Thank you.

14           THE WITNESS:  Thank you.

15           MR. ROSENBERG:  Who's next?

16           THE COURT:  Call your next witness.

17           MR. TEMPLE:  David Bellows.

18       (PAUSE.)

19           MR. ROSENBERG:  Your Honor, he stepped to the

20  restroom.  He's getting out right now.

21           THE COURT:  Thank you.

22           MR. TEMPLE:  Sir, I think -- or Your Honor, I think I

23  can clarify perhaps some of the confusion with regard to that

24  last witness.

25           THE COURT:  Yes, sir?

1          MR. TEMPLE:  There were -- he can go ahead and take

2     the stand.

3               THE COURT:  Pardon?

4          MR. TEMPLE:  He can go ahead and take the stand.  I

5     can clarify -- we had received, Your Honor, the designation of

6     the e-mails into three categories, according to the Plaintiffs.

7     The first category being the produced e-mails, the second

8     category being produced e-mail account information, and the

9     third category being did not have any e-mails sent from a

10    personal account while working at Citgo.  And Mr. Martinez's

11    name was provided in that second category, which is why we went

12    into those issues, Your Honor.

13              THE COURT:  Go ahead.

14         DAVID WAYNE BELLOWS, DEFENDANT'S WITNESS NO. 5, SWORN

15                          DIRECT EXAMINATION

16    BY MR. TEMPLE:

17    Q.   Would you please state your name for the record, sir?

18    A.   Yes, David Wayne Bellows.

19    Q.   Okay.  Mr. Bellows, isn't it true that you take notes

20    related to your work while working for Citgo?

21    A.   I have written down on a note pad, yes, sir.

22    Q.   Okay.  And you remember that on October the --

23              THE COURT:  I'm sorry, his name again?

24              MR. TEMPLE:  David Bellows.

25              THE COURT:  Thank you.

```
 1   BY MR. TEMPLE:
 2   Q.   And, sir, do you remember on October the 6th that you
 3   stated in your supplemental response to the document requests
 4   in this case that you leave notes on a pad at your console when
 5   you leave every day?
 6   A.   Yes.
 7   Q.   And it's your understanding that that pad is not saved?
 8   A.   That it, excuse me, that it's not --
 9   Q.   What do you believe happens to that pad?
10   A.   Well, I just assumed they either got thrown away while --
11   Q.   And that pad contains notes that relate to your job tasks.
12   Correct?
13   A.   Well, I do put, write down numbers and pump numbers and
14   things like that to put down in EELs.
15   Q.   And, sir, you are aware that you were under a court order
16   to preserve and produce your notes from August 22nd onward.
17   Correct?
18   A.   Yes, I do know.
19   Q.   And you knew that the order required you to produce your
20   notes to Citgo by September the 12th, and then on an ongoing
21   basis after that?
22   A.   I'm sorry, repeat the question.
23   Q.   Sure.  You had to produce your notes by September the
24   12th, according to that August 22nd court order?
25   A.   I'm not sure that I had -- well, if I -- maybe I
```

Bellows - Direct

1   misunderstood what I had to have.

2   Q.   Okay.  You didn't produce any notes by September the 12th,

3   did you?

4   A.   No.  No, sir, I sure didn't.

5   Q.   And despite having prior access to your notes, the first

6   time you produced any notes was yesterday in the middle of your

7   deposition.  Correct?

8   A.   That is correct.

9   Q.   And what you produced was two pages of notes?

10  A.   Well, I've been out for the last month-and-a-half, so

11  since I came back, I was out the first week of October, and I

12  came back on the 23rd.  So that was for that four-day set,

13  those were the notes for that.

14          THE COURT:  What happened to all the rest of them?

15          THE WITNESS:  I'm not sure, ma'am.  I'm assuming they

16  got thrown away.

17  BY MR. TEMPLE:

18  Q.   So you don't have all the notes that you've taken since

19  August 22nd.  Correct?

20  A.   Not since August 22nd.

21  Q.   And do you remember around April the 13th receiving a

22  Request for Production of Documents from Citgo?

23  A.   Yes, I believe so.

24  Q.   And at that time one of the document requests was for

25  notes that you may take related to your work?

Bellows - Direct

1  A.   Well, I misunderstood.  I guess I figured it was EELs.  I

2  didn't know that it was the notes that we take.

3  Q.   Okay, sir.  Do you remember reading this particular

4  document request in and around April the 13th, Request for

5  Production Number 9?

6  A.   It looks familiar, yes, sir.

7  Q.   And the notes that we're talking about, those would have

8  been included or encompassed within that request and

9  responsive.  Correct?

10  A.   At the time, I didn't know that that's what it was.  But

11  since we went to this last hearing, I realize the importance

12  and what that, what was requested.  And no, I did not save

13  those.

14  Q.   But at the time, the notes that you were in fact taking on

15  a daily basis were in fact notes that were prepared by you that

16  you use or used or that assist or have assisted you in the

17  operation of your console since January 1, 2008.  Correct?

18  A.   Yes.  It assists me in what I put into EELs.

19  Q.   You don't put everything in your notes into the EELs, do

20  you?

21  A.   No, sir, I sure don't.

22       MR. TEMPLE:  No further questions, Your Honor.

23       THE COURT:  Thank you.

24       MR. ROSENBERG:  No questions, Your Honor.

25       THE COURT:  You may stand down.

1          MR. ROSENBERG:  May he be excused?

2          MR. TEMPLE:  Yes.

3          THE COURT:  Yes.

4          MR. TEMPLE:  Rudy Martinez.

5          MR. ROSENBERG:  You know, Your Honor, I thought that

6   was the -- may I take three minutes to run down?  I apologize.

7          THE COURT:  Yes, sir.

8          MR. ROSENBERG:  Thank you.

9      (PAUSE.)

10         MR. TEMPLE:  Your Honor, I'd like to introduce

11  Exhibit Number 6.

12         MR. ROSENBERG:  Without objection.  He showed it to

13  me.

14         THE COURT:  Defendant's Exhibit Number 6 is admitted.

15     RUDOLFO ROBERT MARTINEZ, DEFENDANT'S WITNESS NO. 6, SWORN

16                    DIRECT EXAMINATION

17  BY MR. TEMPLE:

18  Q.   Sir, could you please state your name for the record?

19  A.   Rudolfo Robert Martinez.

20  Q.   And, Mr. Martinez, isn't it true that you take notes

21  during your work at Citgo?

22  A.   I used to.

23  Q.   What do you mean when you say you used to?

24  A.   Sir?

25  Q.   What do you mean when you say you used to?

1    A.   When they put out that directive to go ahead and save all

2    our notes, I quit doing it, because all my notes are entered

3    into EELs anyway.

4    Q.   So you changed your work practice after you got the

5    Court's order to keep your notes?  You changed the way you do

6    your job?

7    A.   No, sir.  I just quit taking notes.

8    Q.   But why did you stop taking notes?

9              THE COURT:  I'm sorry.  Name?

10             MR. TEMPLE:  This is Rudolfo Martinez.

11             THE COURT:  Thank you.

12             MR. ROSENBERG:  He was the one who was excused from

13   the last one, Your Honor, because of that travel thing, so --

14             THE COURT:  Right.

15   BY MR. TEMPLE:

16   Q.   Sir, my question is why did you change the way you do your

17   job after getting the Court order saying that you had to save

18   your notes?

19   A.   Because a lot of things that I used to write didn't

20   pertain to the job.

21   Q.   But a lot of things that you did write contemporaneously

22   as you were working in your notes did pertain to your job.

23   Correct?

24   A.   Yes, sir, but they were entered into EELs.

25   Q.   But there were things that you took in your notes, notes

1    that you took that did not end up in EELs.  Isn't that right?

2    A.   Yes, sir.

3    Q.   And do you remember stating on October the 11th, in

4    response to some interrogatories or requests for production,

5    rather, in this case that you keep handwritten notes on an

6    8½-by-11 legal pad?

7    A.   Yes, sir.

8    Q.   And that those notes were simply notes that you jot down

9    when we don't have time to type entries into our EELs?

10   A.   That's correct.

11   Q.   And that those note pads are discarded once someone gets

12   to the last page?

13   A.   That's correct.

14   Q.   And you didn't know if anyone keeps those notes?

15   A.   Sir?

16   Q.   And that you didn't know if anyone keeps those notes?

17   A.   No, sir.

18   Q.   Upon receipt of the Court's order on August the 22nd to

19   preserve your notes, what did you do to try to find those notes

20   that you previously kept while working?

21   A.   Well, I looked in a filing cabinet, but I didn't find

22   anything.

23   Q.   What about since the time period that you received the

24   document requests from Citgo on or about April the 13th of

25   2011?  Did you also understand at that point in time you were

Rudolfo Martinez - Direct

1    being, you had been requested to produce notes relating to your

2    job?

3    A.   Could you repeat the question?

4    Q.   Sure.  As of April the 13th, in and around April the 13th,

5    2011, you received a document request from Citgo.  Do you

6    remember that?

7    A.   Yes, sir.

8    Q.   And that document request specifically asked you to

9    produce documents relating to notes or any documents that could

10   reflect the job tasks or your job at Citgo.  Correct?

11   A.   Yes, sir.

12   Q.   And I'm just going to put it on the screen here.  Do you

13   remember receiving that request for production in early April

14   of 2011?

15   A.   Yes, sir.

16   Q.   On or about April the 13th?

17   A.   Yes, sir.

18        MR. TEMPLE:  Your Honor, I'm going to go ahead and

19   mark this as Defendant's Exhibit 6 -- 7.

20        THE COURT:  7.

21        MR. ROSENBERG:  No objection.

22        THE COURT:  Defendant's Exhibit 7 is admitted.

23   BY MR. TEMPLE:

24   Q.   And, sir, what I've marked as Exhibit 7 is the Request for

25   Production of Documents that you received.  Correct?

Rudolfo Martinez – Direct

1   A.   Yes, sir.  Sir, I'd like to clarify that.  I was under the

2   impression they meant procedures that we use.

3   Q.   I'm sorry?

4   A.   I was under the impression that on that particular

5   question they were referring to the procedures that we use.

6   Q.   You didn't understand that this particular document

7   request was seeking any types of notes you took while working

8   at the company?

9   A.   I didn't realize that those notes were -- I mean, if it

10  was in the EELs, you know, I didn't think they were necessary

11  to make another copy.

12  Q.   Nevertheless, after April -- there are, there were notes

13  that you took after April 13th, 2011, up until the time of your

14  deposition that you didn't save.  Correct?

15  A.   Between April and the 22nd of August, they were there.

16  But after the 22nd of August, I quit writing notes.

17  Q.   I'm sorry, sir?

18       THE COURT:  Why?  He said after the 27th (sic) that

19  he stopped, of August, he stopped writing notes.  He was

20  writing them before.

21       THE WITNESS:  22nd.

22       THE COURT:  22nd.  So what happened to the ones

23  before the 22nd?

24       THE WITNESS:  They were discarded.

25       THE COURT:  Okay.  Why did you stop writing notes

1    after the 27th (sic)?

2           THE WITNESS:  Because I just thought it was going to

3    lead to confusion to what everything the Citgo attorneys

4    wanted.

5           THE COURT:  Why?  Well, if you didn't think they

6    wanted the notes, why did you stop taking them?

7           THE WITNESS:  I didn't need them.

8           THE COURT:  Pardon?

9           THE WITNESS:  I didn't need them.

10          THE COURT:  Then why were you taking them before

11   then?

12          THE WITNESS:  It was just a convenience.  If somebody

13   calls you, tells you, "Give me a call three hours from now, see

14   how this works," you know, instead of --

15          THE COURT:  So you stopped writing down phone numbers

16   and things?

17          THE WITNESS:  Ma'am?

18          THE COURT:  So you stopped writing down phone numbers

19   when people called you?

20          THE WITNESS:  No.  I just started looking up their

21   names in the directory.  Their names, everybody that works at

22   Citgo, their names show up in the directory.  And if somebody

23   calls me and wants to say, "Let me know how this procedure

24   works," while I'm talking to them, I would write down the

25   extension number.

Rudolfo Martinez – Direct

1            THE COURT:  So you did write down something.

2            THE WITNESS:  Ma'am?

3            THE COURT:  So you wrote down the extension number.

4            THE WITNESS:  Yes, ma'am, extension number.

5            THE COURT:  On a piece of paper?

6            THE WITNESS:  Yes, ma'am.

7            THE COURT:  Not on the EELs?

8            THE WITNESS:  No, ma'am.

9            THE COURT:  Where are those notes?

10           THE WITNESS:  Which notes?  The ones that I wrote the

11   extension?

12           THE COURT:  Yes.

13           THE WITNESS:  They've been discarded.

14           THE COURT:  Have you taken those since August 22nd?

15           THE WITNESS:  No, ma'am.

16           THE COURT:  Why not?

17           THE WITNESS:  Because I just felt that it was going

18   to lead to confusion on what --

19           THE COURT:  Really?  Okay.

20           MR. TEMPLE:  Your Honor, I'm going to mark

21   Defendant's Exhibit 8, which is his supplemental request for

22   production responses.

23           MR. ROSENBERG:  Without objection.

24           THE COURT:  8?

25           MR. TEMPLE:  Yes, Your Honor.

1          THE COURT:  Defendant's Exhibit 8 is admitted.

2    BY MR. TEMPLE:

3    Q.   Sir, you said that after August the 22nd, you stopped

4    keeping notes.  Is that your testimony?

5    A.   Yes, sir.

6    Q.   Do you remember providing a response to Citgo's Request

7    for Production of Documents on or about October the 11th, 2011,

8    sir?

9    A.   Yes, sir.

10   Q.   And, sir, do you remember at that point in time when you

11   were asked about those notes, the response that you provided

12   was in the present tense, "Handwritten notes are on an 8½-by-11

13   legal pad.  These notes are simply notes that we jot down when

14   we don't have time to type entries into our EELs.  These note

15   pads are discarded once someone gets to the last page.  I don't

16   know if anyone keeps these notes."  Do you remember that, sir?

17   A.   Yes, sir.

18   Q.   And, sir, at that point in time, you don't say anything

19   about, as of August the 22nd, you stopped keeping notes.  This

20   is in November, and you're telling us that there are still

21   notes.  Correct?

22   A.   Well, you asked me what the handwritten notes were.

23   Q.   No, sir --

24   A.   And I told you what they were.

25   Q.   -- the request was the same one we've been talking about,

Rudolfo Martinez – Direct

1   Request for Production Number 9.  It asked that you produce

2   "All documents prepared by you, that you use or used or that

3   assist or have assisted you in the operation of your console

4   since January 1st, 2008, including but not limited -- including

5   but not limited to trend charts, yield reports, logs, journals,

6   any other materials you review, prepare or exchange before you

7   begin or end a shift."  You understood that was the request.

8   Right?

9   A.   Yes.

10  Q.   And as of October the 11th, 2011, you told us that there

11  were some handwritten notes that you kept.  Correct?

12  A.   No, sir.  I was giving you the description of what the

13  8½-by-11 legal pad was used for.

14              THE COURT:  Well, why did you do that on 10/11/11?

15              THE WITNESS:  Ma'am?

16              THE COURT:  Why did you do it on 10/11/11, say that

17  handwritten notes are on an 8½-by-11 legal pad?  They weren't

18  on 10/11/11?  Or they were?

19              THE WITNESS:  No, the 8½-by-11 legal pad is just

20  where I used to keep my notes.  But the way --

21              THE COURT:  Well, why didn't you say you used to keep

22  them, instead of saying on October the 11th that they're on an

23  8-by-11 legal pad?

24              THE WITNESS:  That's not the way the question was

25  answered -- asked.

1          THE COURT:  No, that's not true.

2          THE WITNESS:  Okay.

3          THE COURT:  You know, this is your lawsuit.  You'd

4    think you'd take a little more care to respond appropriately

5    while under oath.

6    BY MR. TEMPLE:

7    Q.   Sir, at that point in time you said, "We jot down" -- "are

8    simply notes that we jot down when we don't have time to type

9    entries into the EELs," didn't you?

10   A.   Yes, sir.

11         THE COURT:  Not "jotted," but "jot."

12   BY MR. TEMPLE:

13   Q.   Isn't that right?

14   A.   Yes.

15   Q.   And, sir, you could have copied any of those notes, if you

16   wanted to, to save them, correct?

17   A.   Yes, sir.

18   Q.   And you chose not to.  Correct?

19   A.   Yes, sir.

20   Q.   And, sir, do you remember that on August the 22nd, the

21   Court ordered you to provide information about your e-mails

22   with regard to your use of your personal e-mail accounts at

23   work and copies of the e-mails you sent or read from those

24   accounts while at work?

25   A.   The personal accounts?

Rudolfo Martinez – Direct

1   Q.   Yes, sir.

2   A.   Yes, sir.

3   Q.   And do you also recall that you were ordered to produce by

4   September 5th information that included an estimate of the

5   percentage of e-mails that you've been, that have been deleted

6   and the approximate dates such e-mails were deleted by

7   September the 12th?

8   A.   Up until September the 12th?

9   Q.   By September the 12th, sir.  That was the deadline the

10  Court gave you.

11  A.   I don't use my personal e-mail account at work.

12  Q.   Sir, you failed to produce any e-mails by September the

13  5th.  Correct?

14  A.   Excuse me?

15  Q.   You failed to produce any e-mails by September the 5th.

16  Correct?

17  A.   Right.  Yes.

18  Q.   And you completely failed to send any information ordered

19  by the Court by September the 12th.  Correct?

20  A.   Could you repeat that question?

21  Q.   Sure.  You failed to send the information ordered by the

22  Court by September 12th with regard to an estimate of the

23  percentage of e-mails that have been deleted and the

24  approximate date those e-mails were deleted.

25  A.   Yes, sir.  There's no way I can, to determine.

Rudolfo Martinez – Direct

1    Q.    And on November the 3rd, you remember that the Court

2    ordered you to produce the e-mails or the information necessary

3    to access your e-mail accounts?

4    A.    Yes, sir.

5    Q.    And on November the 8th, you subsequently provided that

6    information, the AOL account, as well as the Zebra-Ware

7    account?

8    A.    Yes, sir.

9    Q.    And those were, at that time those were accounts that you

10   accessed from work at some point in time during your shift.

11   Correct?

12   A.    The Zebra-Ware account, yes, sir.

13   Q.    I thought you told us just a minute ago that you never

14   accessed e-mail while at work.

15   A.    Not on the AOL.

16   Q.    But the Zebra-Ware account, you do.  Correct?

17   A.    Once in a while, yes, sir.

18   Q.    Why have you not provided Citgo with the estimate of

19   e-mails that you have deleted or when those e-mails were

20   deleted, pursuant to the Court's order?

21   A.    I just had no way of knowing it.

22   Q.    Do you remember in your June 3rd response to Citgo's

23   interrogatory that you failed to list your AOL account as an

24   e-mail account that you accessed at work?

25   A.    Which one?

Rudolfo Martinez - Direct

1   Q.   Your AOL account.

2   A.   I provided that AOL account.

3   Q.   But do you remember in the June 3rd response, you didn't

4   list that AOL account.  Remember that?  Initially?

5   A.   No, sir.

6   Q.   Do you remember receiving or providing interrogatory

7   responses to Citgo on or about June 3rd of 2011, sir?

8   A.   Yes.

9   Q.   And do you remember at that time the question was asked of

10  you to "Identify, describe and specify all e-mail addresses you

11  use or access during your scheduled Citgo work hours or during

12  hours you worked for Citgo since January 1, 2008."

13  A.   Yes, sir.

14  Q.   And the only answer you provided at that point in time,

15  sir, was your Citgo e-mail account.  Correct?

16  A.   Yes, sir.

17  Q.   Why did you not list any of your other e-mail accounts in

18  response to that interrogatory?

19  A.   Because I don't use Zebra-Ware account that much.  I just

20  forgot about it.  It's seasonal.

21  Q.   I'm sorry?

22  A.   It's seasonal.

23  Q.   Seasonal?  What do you mean by that, seasonal?

24  A.   The only time I look for that account is during basketball

25  season.

1  Q.   Okay.  Sir, nothing in that interrogatory asked for you

2  just to provide information --

3  A.   Yes, sir.

4  Q.   -- relating to seasonal accounts, did it?  But your answer

5  is you didn't provide it because it was only seasonal?

6  A.   No, I forgot about it.

7  Q.   You forgot about it?

8  A.   Yes, sir.

9  Q.   Okay.  Which one is it?  It's seasonal, or you forgot

10  about it?

11  A.   I forgot about it.

12  Q.   Do you remember later testifying on August the 11th that

13  you do not have any personal e-mail address?

14  A.   That I don't have any personal e-mails?

15  Q.   That you don't have any personal e-mail address.

16  A.   At Citgo?

17  Q.   Sir, any personal e-mail addresses.  Do you remember

18  testifying under oath during your deposition, the question was

19  specifically asked of you, "Do you have any e-mail addresses,

20  besides your Citgo e-mail addresses?"  Do you remember that

21  question?

22  A.   Yes, sir.

23  Q.   And what answer did you give?

24  A.   I said, "No."

25  Q.   And you were specifically asked, like a Gmail address or

Rudolfo Martinez – Direct

1    MSN.com address, anything like that.  And what did you say

2    then?

3    A.   "No, sir."

4    Q.   Why did you not provide any of your personal e-mail

5    accounts that you access at work in response to these questions

6    during your deposition?

7    A.   I didn't think the Zebra-Ware account fell into this

8    category.

9    Q.   What -- why did you think that?  What about that question

10   indicated to you it would somehow be limited to -- perhaps

11   seasonal information would be information that wouldn't fall

12   into that category?  What about the question was, perhaps led

13   you to believe that's all that was being asked?

14   A.   Guess I misunderstood the question, sir.

15   Q.   Okay.  And do you remember at the point in your

16   deposition, when we started your deposition, I asked you if at

17   any point during the course of your deposition you don't

18   understand any of my questions, to let me know?

19   A.   Right.

20   Q.   And you never did that, did you?

21   A.   Apparently I didn't do it on this question, no, sir.

22   Q.   Okay, sir, and do you remember receiving this deposition,

23   a copy of this deposition transcript to read and sign after it

24   was taken?

25   A.   Yes, sir.

Rudolfo Martinez – Direct

1   Q.   And did you in fact read and sign, or read the deposition

2   at that time?

3   A.   Yes, sir.

4   Q.   And, sir, at that point in time, why did you not correct

5   your answer here if it was wrong?

6   A.   I still didn't remember about that Zebra-Ware.

7   Q.   I'm sorry?

8   A.   I still didn't remember Zebra-Ware.

9   Q.   When did you first remember this Zebra-Ware account?

10   A.   Started officiating at volleyball games.

11           THE COURT:  Pardon?

12           THE WITNESS:  Started officiating volleyball games.

13           THE COURT:  When was that?

14           THE WITNESS:  Middle of September, I believe.

15           THE COURT:  Is that when you first got it?

16           THE WITNESS:  The what?

17           THE COURT:  The Zebra account.

18           THE WITNESS:  No, ma'am.  No, ma'am.  I've had it for

19   a while, but --

20           THE COURT:  Well, how could you -- how did you forget

21   about it?

22           THE WITNESS:  Well, they don't send us any e-mails

23   until they start calling us for volleyball games.  And they

24   don't call you on a regular basis.  Usually, like the season is

25   over now, they won't call me again until next September, when

1    the season starts again.  So between now and next September, I

2    won't look at that account ever again.

3    BY MR. TEMPLE:

4    Q.   And, sir, do you remember authorizing your lawyer to

5    provide information about both your Zebra-Ware account, as well

6    as your Legend, or your AOL account, in response to the

7    interrogatory about --

8    A.   Yes, sir.

9    Q.   -- accounts that you accessed while at work?

10   A.   Yes, sir.

11   Q.   And you provided both of those accounts finally at that

12   point in time.  Correct?

13   A.   Yes, sir.

14   Q.   Because you actually have accessed both of those accounts

15   while at work, haven't you?

16   A.   I do, but I don't remember using it.

17   Q.   I'm sorry?  You do?  Is that right?

18   A.   I can access it, but I don't remember using it at work.

19   Q.   But you have accessed it at some point in time while

20   working for Citgo, both of those e-mail accounts.  Isn't that

21   right?

22   A.   Yes, sir.

23   Q.   And that's what you said finally on November the 8th,

24   2011.  Correct?

25   A.   That I had access to those accounts?

Rudolfo Martinez - Direct

1   Q.   At that point in time, you finally disclosed for the first

2   time the other accounts which you accessed while at work at

3   Citgo.  Correct?

4   A.   I can access them, yes, but I don't normally do it.

5   Q.   You don't normally, but you do occasionally.  Correct?

6   A.   Zebra-Ware, yes, sir.

7   Q.   Okay.  But at this time, as of November the 8th, you also

8   provided to your lawyer information about this AOL account --

9   A.   Yes, sir.

10  Q.   -- indicating that you accessed that at some point in time

11  while working for Citgo.  Correct?

12  A.   Yes, sir.

13  Q.   And so to be clear, at some point in time while working

14  for the company, you do access that AOL account.  Right?

15  A.   I don't remember.  I don't think so.

16  Q.   I'm not asking you how frequently.  I just want to know if

17  at some point in time, sir, you accessed that AOL account.

18  A.   I could have.

19  Q.   You can't testify under oath here today and say you don't,

20  can you?

21  A.   No, sir.

22  Q.   And, sir, at this point in time you still haven't provided

23  any information with regard to how many e-mails you've deleted

24  from your personal accounts and when you deleted those e-mails,

25  pursuant to the Court's order, have you?

1   A.   From my personal account?

2   Q.   Yes, sir.

3   A.   I haven't deleted any e-mails from my personal account.

4   Q.   Ever?

5   A.   Well, at home, yes.

6   Q.   Well, that's my question, sir.  At this point in time,

7   you've never provided an estimate of how many e-mails that

8   you've deleted from your personal account or when you deleted

9   those e-mails, have you?

10  A.   No, sir.  It's impossible.  I wouldn't know.

11  Q.   Sorry?

12  A.   I wouldn't know how many there are.

13          THE COURT:  Are you still deleting from your personal

14  account?

15          THE WITNESS:  No, ma'am, huh-uh.

16          THE COURT:  Why not?  When did you stop deleting?

17          THE WITNESS:  Wait, are you talking about the --

18          THE COURT:  Both -- either of your personal accounts.

19          THE WITNESS:  My personal e-mail account, yes.

20          THE COURT:  You still delete it.

21          THE WITNESS:  Yes, ma'am.

22          THE COURT:  Okay.

23          MR. TEMPLE:  No further questions, Your Honor.

24                     CROSS-EXAMINATION

25  BY MR. ROSENBERG:

1   Q.   Mr. Martinez, with regard to your, the request for

2   production already in evidence in a different format, Request

3   for Production 9, "All documents prepared by you that you use

4   or used or that assist or assisted you in the operation of your

5   console since January 1st, 2008, including but not limited to

6   trend charts, yield reports, logs, journals, and other, and any

7   other materials you review, prepare or exchange before you

8   begin a shift."  Correct?  Is that what it asked for?

9   A.   Yes.

10  Q.   And then your response on the next page, this is the

11  supplemental response, it's over here, "Handwritten notes on an

12  8½-by-11 legal pad."  Are you referring to notes that you

13  prepared or that other people prepared?  Or both?

14  A.   Both.

15  Q.   Okay.  Is there -- when you, when we supplemented this

16  response on October 11th, 2011, were you intending that

17  response to be in the present tense, as of that day?

18  A.   Yes, sir.

19          MR. ROSENBERG:  Pass the witness.

20          MR. TEMPLE:  No further questions for this witness,

21  Your Honor.

22          THE COURT:  You may stand down.  Thank you.

23          MR. ROSENBERG:  I think there's one more.

24          MR. TEMPLE:  We'd like to call Steve Moore, Your

25  Honor.  This is the last witness.

1              THE COURT:  Okay.

2         (Court and Clerk conferring off the record.)

3          STEVE MOORE, DEFENDANT'S WITNESS NO. 7, SWORN

4                    DIRECT EXAMINATION

5    BY MR. TEMPLE:

6    Q.   Sir, could you please state your name for the record?

7    A.   Steve Moore.

8    Q.   Mr. Moore, you understood that on August the 22nd, you

9    were ordered to preserve your work notes from that date moving

10   forward?

11   A.   That's correct.

12   Q.   And you understood that you needed to produce your notes

13   to Citgo by September the 12th.  Correct?

14   A.   No, I was not aware of that date.  No, I was not aware.

15   Q.   And you testified during your deposition, did you not,

16   that you use a scratch pad to take notes to keep track of

17   everything that's happening on your shift that is not in the

18   daily operating guidelines and not in the EELs reports.

19   Correct?

20   A.   I think -- yes, I'm going to have to take your word for

21   it, yes, sir.

22   Q.   But isn't that a true statement then?

23   A.   That is a true -- well, to a certain degree, yes, sir,

24   that is.

25   Q.   And when you say "to a certain degree," that's what you

Moore - Direct                              108

```
 1   told us in your deposition, but --

 2   A.   Well --

 3   Q.   -- do you disagree now with the statement?

 4   A.   Well, I haven't seen the deposition, and it's been a long

 5   time --

 6            THE COURT:  Whoa, whoa, whoa.  Only one person

 7   talks --

 8            THE WITNESS:  Oh, I'm sorry.

 9            THE COURT:  -- at a time.

10            THE WITNESS:  Okay.

11            THE COURT:  When he's talking, you don't talk, and

12   vice versa.

13            THE WITNESS:  Yes, ma'am.

14   BY MR. TEMPLE:

15   Q.   Let me just ask you the question, sir, and we can go

16   through the testimony if we have to.  But the question is that

17   do you use a scratch pad -- do you use a scratch pad to take

18   notes to keep track of everything that's happening on your

19   shift that is not in the daily operating guidelines and not in

20   the EELs reports?

21   A.   Yes.

22   Q.   And you testified before that you add more detail to your

23   notes than what is in the EELs reports.  Do you remember that?

24   A.   That is correct.

25   Q.   Like why something happened, not just that it happened.
```

1    Correct?

2    A.   That's correct.

3    Q.   And on November the 16th, you produced to Citgo copies of

4    notes from a pad, stating that "I have been able to locate a

5    legal pad that was started at the console on September the 11th

6    and completed on November the 15th, 2011."  Correct?

7    A.   I thought it was, I thought it was September 1st.  I'm not

8    sure though, but I thought it was September 1st, is what it had

9    on the very first page.

10   Q.   Sir, do you remember providing a supplemental request for

11   production response on --

12   A.   Yes, sir, that does say September 11th.  Yes, sir, it

13   does.

14   Q.   Okay.  And you stand by that, your testimony --

15   A.   Well, no, I might have, I might have not wrote it down

16   right.  I thought on the legal pad that I had provided to my

17   attorney that it had, it started on, actually started on

18   September 1st.  That's what I just remember.  If I could see

19   the pad, I -- I don't know how to answer this truthfully.

20        MR. ROSENBERG:  Excuse me, Your Honor.  The pad is in

21   evidence.

22        THE COURT:  What exhibit number is it?

23        MR. ROSENBERG:  It should be R1, from --

24        THE COURT:  Okay.

25        MR. ROSENBERG:  May I?

 1                    THE COURT:  Yes.

 2                    MR. ROSENBERG:  May I put it on the board for the

 3      witness to look at, the first page?

 4                    THE COURT:  Sure.

 5                    MR. ROSENBERG:  Would you do it, please?

 6                    THE WITNESS:  Yes, sir.  That's what I remember,

 7      September 1st.  So I just, somehow I inadvertently put

 8      September 11th down, and I apologize.

 9                    MR. TEMPLE:  Okay.

10                    THE COURT:  What's the right date supposed to be?

11                    MR. TEMPLE:  The date on the document is September

12      the 1st, 2011, Your Honor.

13                    THE COURT:  Okay.

14      BY MR. TEMPLE:

15      Q.   And, sir, this pad that was previously Exhibit,

16      Plaintiff's Exhibit 1 doesn't contain all your notes from

17      August 22nd forward, does it?

18      A.   No, it does not.

19      Q.   It also doesn't contain all your work notes since you

20      received Citgo's document request on or around April the 13th

21      of 2011, does it?

22      A.   I'm sorry, could you repeat that, please?

23      Q.   Well, sir, if you start on September the 1st --

24      A.   Uh-huh.

25      Q.   -- there are other notes that at some point in time you

1    kept from the time that you received Citgo's document request

2    in and around August, or April the 13th, 2011, up until

3    September the 1st.  Correct?

4    A.   Okay, yes, sir.  I'm following you.

5    Q.   Okay.  What happened to those notes?

6    A.   I'm not sure what happened to those notes.

7    Q.   Did you, did you make any effort to try to save those

8    notes?

9    A.   I, when I, when I relieve on the console, I pass those

10   notes on to my relief, and they are in his possession at that

11   point in time.  And I'm no longer in possession of them.

12           THE COURT:  Well, the question is did you make any

13   attempt to preserve them after April the 1st, or April the

14   12th.

15           MR. TEMPLE:  April the 13th.

16           THE COURT:  April 13th.

17           THE WITNESS:  Did I make any attempt to preserve

18   them?

19           THE COURT:  Yes.

20           THE WITNESS:  No, ma'am.  I just left them on Citgo's

21   property.

22           THE COURT:  Okay.

23           MR. TEMPLE:  Okay.

24           THE COURT:  What about all the pages missing in that,

25   or what about that?  Are you going to ask him about that?

1         MR. TEMPLE:  Yes, Your Honor.

2         THE COURT:  Why are all those pages missing and

3   things torn off?

4         THE WITNESS:  This, because -- now like this one

5   right here that I'm looking at right here is very, kind of

6   detailed.  And if you'll flip through it a couple of times,

7   you'll see some of them are just, have hardly any writing on

8   them.  Some of them have just scratch notes on them.  I have --

9         THE COURT:  Did you tear out the pages?

10        THE WITNESS:  No, ma'am.  I have not thrown --

11        THE COURT:  So you don't have any idea if this is the

12  complete and accurate notes for you from September the 1st

13  forward.

14        THE WITNESS:  This is from September 1st.  This is,

15  this is -- unless I -- yes, ma'am, somebody could have torn my

16  notes out, that's very possible.

17        THE COURT:  So you don't know if that's complete even

18  for your notes from September 1st, 2011.

19        THE WITNESS:  I, all I can say is I --

20        THE COURT:  Come on.  Do you know or not?

21        THE WITNESS:  No, ma'am, I do not know.

22        THE COURT:  All right.  And who else were they

23  supposed to be the complete notes of, from September 1st, '11,

24  forward?

25        MR. TEMPLE:  Your Honor, I know there were other

1    people that were referenced in the last hearing.  I'm not sure

2    the whole list.  But there are other people that worked on his

3    console.

4              THE WITNESS:  Yes, there are.  There are five people

5    on my console.

6    BY MR. TEMPLE:

7    Q.   Okay.  Sir, what other notes do you feel, or do you

8    believe that these, this document contains?

9    A.   I'm sorry?

10   Q.   From what other individuals are these scratched pages or

11   notes contained in this pad that you've produced to us?

12   A.   I couldn't say for sure.  I don't -- I only recognize my

13   handwriting.  I would assume, especially because on September

14   1st, I was on vacation till October the 2nd, I believe, so I'm

15   going to have to assume that it was Jimmy Ray, Ron Stubbs, John

16   Holdforth and Terry Oberlander.

17   Q.   But you have no idea that this pad contains all of their

18   notes, do you?

19   A.   I -- of course not, no.  I don't --

20             THE COURT:  Well, when did you get them?

21             THE WITNESS:  I'm sorry?

22             THE COURT:  When did you pick them up?

23             THE WITNESS:  I picked them up the day of -- it was

24   like my second or third to the last day of the day right before

25   I turned them in to my attorney.  So it was like my last day at

```
 1    work.

 2            THE COURT:  What day would that be?

 3            THE WITNESS:  Well, I don't have the -- I'm not sure,

 4    ma'am.  I don't have --

 5            THE COURT:  Any idea?

 6            MR. ROSENBERG:  It would be on -- if you flip, you'll

 7    see it.

 8            THE WITNESS:  Well, yeah --

 9            THE COURT:  But they're not complete.  There are

10    pages torn out.

11            THE WITNESS:  November the -- when did I send them to

12    you, Gregg?  It was --

13            MR. ROSENBERG:  Well, you can't ask me.

14            THE WITNESS:  -- a day or two before that.

15            MR. ROSENBERG:  Hold it.  You can't ask me, but the

16    document --

17            THE WITNESS:  Okay.

18            MR. ROSENBERG:  The document's there.

19            MR. TEMPLE:  Your Honor, can I approach the witness?

20    I don't know what he's talking about.  Maybe --

21            THE COURT:  Just hand it to him.

22            THE WITNESS:  I would have to see my schedule.  If

23    I --

24            THE COURT:  Just look at those notes and see what you

25    can --
```

 1          THE WITNESS:  I can't tell by looking at these notes

 2   exactly when these notes were finished, but I can go back and

 3   see the last time that my handwriting is on here, if you'd like

 4   me to do that.

 5          THE COURT:  That would be nice.

 6          THE WITNESS:  Okay.  Here's my handwriting right

 7   here.  This page doesn't have a -- this page doesn't have a

 8   date on it.

 9          THE COURT:  Well, did you come back to work the end

10   of October, first of November?

11          THE WITNESS:  I came back to work October 2nd, I

12   believe.  And then I produced these to Gregg on the -- I took

13   them the last day of my shift before they were presented --

14   before we came the last time.  So I'd have to look at my shift

15   schedule.

16          THE COURT:  Like a day or -- do you know when you got

17   them, Mr. Rosenberg?

18          MR. ROSENBERG:  Yeah.  Whatever date the hearing was,

19   it was the night before.

20          THE COURT:  November 2nd?

21          MR. TEMPLE:  I think they were produced to us --

22          THE COURT:  What was the hearing?

23          MR. TEMPLE:  I think they were produced to us on

24   November the 16th.

25          THE COURT:  18th?

```
 1              MR. TEMPLE:  16th is when we got them.

 2              THE COURT:  The 16th?  18th -- okay, the hearing was

 3  on the 18th.

 4              MR. ROSENBERG:  Then they would have been two days

 5  before, the 16th.

 6              MR. TEMPLE:  We got them on the 16th, Your Honor.

 7              THE COURT:  So November 16th, you got these.  You

 8  picked these up.

 9              THE WITNESS:  15th or the 16th, yes, ma'am.

10              THE COURT:  Where did you find them?

11              THE WITNESS:  They're on the console where we, where

12  we leave them.

13              THE COURT:  So that's -- how many -- who all works at

14  your Console 5?

15              THE WITNESS:  John Holdforth.

16              THE COURT:  John who?

17              THE WITNESS:  Holdforth.

18              THE COURT:  He's not part of this suit?

19              THE WITNESS:  No, ma'am.

20              THE COURT:  Who else?

21              THE WITNESS:  Terry Oberlander.

22              THE COURT:  Is he a part of the suit?

23              THE WITNESS:  No, ma'am.

24              THE COURT:  Okay.

25              THE WITNESS:  Ron Stubbs.
```

1        THE COURT:  Is he part of the suit?

2        THE WITNESS:  Yes, ma'am.  Myself, and Jimmy Ray.

3        THE COURT:  Is he part of the suit?

4        THE WITNESS:  No, ma'am.

5        THE COURT:  So those were kept by the console for

6   September, October and November.

7        THE WITNESS:  Yes, ma'am.

8        MR. TEMPLE:  Your Honor, I'm going to mark his third

9   supplemental responses as Exhibit 9.

10       MR. ROSENBERG:  What's the date of that, just out of

11  curiosity?

12      (Counsel conferring off the record.)

13       MR. TEMPLE:  Your Honor, I'm going to move that

14  Exhibit 9, Defendant's Exhibit 9 be admitted into evidence.

15       MR. ROSENBERG:  Without objection.

16       THE COURT:  Defendant's 9?

17       MR. TEMPLE:  Yes, Your Honor.

18  BY MR. TEMPLE:

19  Q.   And, sir, do you remember as of October the 11th, 2011,

20  providing a response to the Request for Production of Documents

21  seeking your notes, Request for Production Number 9, on Exhibit

22  9?  Do you see that?

23  A.   Yes, uh-huh.

24  Q.   And the response that you provided as of October the 11th

25  was what?

1    A.   "To clarify my most recent response, the notes are left

2    for my relief.  The notes are insignificant, as anything is

3    as" --

4    Q.   I'm sorry, sir.  Let me interrupt you.

5    A.   Okay.

6    Q.   I'm referring to the one, the first answer you provided to

7    us on October the 11th.  What did you say --

8    A.   Oh, oh, oh.

9    Q.   -- at that point in time?

10   A.   "All my notes are left at work and thrown away in a timely

11   fashion.  I have no records of these."

12   Q.   Okay.  And then you later supplemented and you said, "To

13   clarify my most recent response, the notes are left for my

14   relief, and those are insignificant, as anything significant is

15   left in EELs.  I'm not the one who throws them away," and then

16   it goes on.  Correct?

17   A.   That's correct.

18             THE COURT:  So then you suddenly found three months

19   worth?

20             THE WITNESS:  I'm sorry, ma'am?

21             THE COURT:  Then you suddenly found three months

22   worth?

23             THE WITNESS:  Well, yes, ma'am, I did.  They were,

24   they were on the console.  Yes, ma'am.

25             THE COURT:  They were there all the time, even when

1    you supplemented that response?

2          THE WITNESS:  I'm -- well, I -- when I supplemented

3    that response, I was on -- what day was that that I

4    supplemented?

5    BY MR. TEMPLE:

6    Q.   Sir, it's on October the 11th, 2011.  The question is, at

7    that point in time, sir, you could have gone to your console

8    and you could have made copies of the notes that you

9    subsequently produced.  Isn't that right?

10   A.   On what date?

11   Q.   On October the 11th, 2011.  At that point in time, these

12   same notes that you've produced --

13   A.   Uh-huh.

14   Q.   -- you could have produced at that point, whether it be

15   the originals or copies.  Right?

16   A.   That's -- sure.  Yes, uh-huh.

17   Q.   And you didn't do that.  Not only did you not do that, you

18   said that you had no records of those.

19   A.   It says here, it says all my notes are left at work and

20   thrown away in a timely fashion, not by me, that --

21          THE COURT:  Well, it turned out they weren't, as of

22   October the 11th.  You brought in some from --

23          THE WITNESS:  Yes, ma'am, I happened -- yes, ma'am,

24   when I -- these were there at work, and I saw them there at

25   work, and it was the end of the, it was the end of the page,

```
 1   and so I took them to --

 2              THE COURT:  Okay.  Anything else?

 3              MR. TEMPLE:  Just the e-mails, Your Honor.  It's the

 4   same, same issue with e-mails.  Would you like for me to just

 5   skip it or go through it?

 6              THE COURT:  Anything you want to do.

 7   BY MR. TEMPLE:

 8   Q.   Okay.  Do you remember on August the 22nd the Court

 9   ordered you to provide information regarding your use of your

10   personal e-mails at work and copies of the e-mails you sent or

11   read from those accounts?

12   A.   Yes.

13   Q.   And you were also ordered to produce by September 5th

14   information that included an estimate of the percentage of

15   e-mails that had been deleted and the approximate date such

16   e-mails were deleted by September the 12th.  Do you remember

17   that?

18   A.   Not really, but yes, okay.

19   Q.   Okay.

20   A.   I mean, I --

21   Q.   And you didn't provide any of your e-mails by the

22   September 5th deadline, did you?

23   A.   I don't recall if I did or not.

24   Q.   You can't under oath, as you're sitting here today,

25   testify that you did meet that deadline, can you?
```

1    A.    No, I cannot.

2    Q.    And you failed to provide the information ordered by the

3    Court by the September 12th deadline as well.  Correct?

4    A.    Yes, sir, I -- yes, uh-huh.

5    Q.    And on November the 3rd, the Court ordered you to send

6    Citgo your e-mails or the information necessary to access your

7    e-mail accounts.  Do you remember that?

8    A.    Yes.

9    Q.    And do you remember on November the 8th, you provided

10   Citgo with ten e-mails from your Hotmail account, the --

11   A.    That's correct.

12   Q.    Is that right?

13   A.    That's correct.

14   Q.    And were there other e-mails that were from that account

15   that are no longer in existence that have been deleted?

16   A.    No.

17   Q.    And do you remember at your deposition, you produced

18   e-mails from your Citgo account that you picked and chose

19   because you thought, as you said at your deposition, they would

20   be helpful to your case?

21   A.    That's correct.

22   Q.    What happened to the other e-mails that were in your

23   personal e-mail account?

24   A.    They're still there.

25   Q.    At that point in time, sir, you hadn't searched for any

1    other e-mails that in any way could relate to your work before

2    your deposition, had you?

3    A.   I'm sorry.  Say that again, please.

4    Q.   At the time of your deposition, other than the ones that

5    you thought might be helpful, you had not gone to your personal

6    e-mail account and tried to locate any e-mails that you

7    accessed while at work, had you?

8    A.   No, sir, I have not.  I just, I just kept them.

9    Q.   And you decided, with even the few ones that you produced,

10   that you were going to wait till your deposition and then pick

11   and choose those e-mails that you thought would be helpful to

12   your case, as you told us about in your deposition.  Do you

13   remember that?

14   A.   Yes.  Absolutely, that's correct, uh-huh.

15            MR. TEMPLE:  No further questions, Your Honor.

16            THE COURT:  Thank you.

17            MR. ROSENBERG:  May I approach to get that pad?

18            THE COURT:  Yes, sir.

19                          CROSS-EXAMINATION

20   BY MR. ROSENBERG:

21   Q.   Just so I'm clear, are you able -- first of all, I'm

22   looking at this 9/1/2011 page right here.  That's not your --

23   well, I want to ask you, is it your handwriting?

24   A.   No, sir.  I'm on vacation right now.

25   Q.   All right.  I'm going to flip till we get to yours.  It

Moore – Cross

1    may take a second, but bear with me.  Okay?

2    A.   Okay.

3    Q.   This page here?

4    A.   No.

5    Q.   This page here?

6    A.   No.

7    Q.   And let me -- if you can identify as I'm going through, if

8    you can identify the handwriting, let me know.  If not, we'll

9    just move right by it.

10   A.   Okay.

11   Q.   All right?

12   A.   Yes.

13   Q.   This page here?

14   A.   No.

15   Q.   This page here?

16   A.   No.

17   Q.   This page here?

18   A.   No.

19   Q.   This page here?

20   A.   No.

21   Q.   Anything down here, 600 or (indiscernible).

22   A.   No, huh-uh.

23   Q.   This page here?

24   A.   No.

25   Q.   This page here?

Moore - Cross

```
 1   A.    That's me.

 2   Q.    Well, I --

 3   A.    "Pass 7 vacuum heater," that's me.  Right here on the

 4   side, on the corner here.

 5   Q.    Right -- were you --

 6   A.    Right there, that's it.

 7   Q.    Where I am?

 8   A.    That's my handwriting, yes.

 9   Q.    Okay.

10   A.    And that one below that, too.  Yes.

11   Q.    All right, so --

12   A.    And the one below that.  And the one -- yeah, all that,

13   all that whole little group of notes is mine.

14   Q.    All right.  So the "39S, 18S"?

15   A.    Correct.

16   Q.    Just out of curiosity, what does that mean?

17   A.    I have -- I don't know.

18   Q.    Okay.  This number here, this 210 number?

19   A.    Uh-huh.  That's not my handwriting.

20   Q.    Okay.  This, this information right here, S over D?

21   A.    That's "Shut down oil side bad PV."

22   Q.    Question mark, question mark, question mark?

23   A.    Right.

24   Q.    Now, explain this, just so we know what that is.

25   A.    I don't -- I don't know.
```

```
 1   Q.   Okay.

 2   A.   I'm sorry.  I -- at that point in time on, if you would

 3   have taken me back to that day at that particular point in

 4   time, absolutely, I could have answered this question, but --

 5   Q.   Fair enough.  I just wanted to get --

 6            THE COURT:  Do you know about what day it was?

 7            THE WITNESS:  No, ma'am, I do not.

 8            THE COURT:  All right.

 9            MR. ROSENBERG:  Is it customary to date --

10            THE COURT:  Is it -- what month?

11            THE WITNESS:  It's going to have to be in October --

12            THE COURT:  Okay.

13            THE WITNESS:  -- because I'm on vacation the whole

14   month of September.

15            THE COURT:  When did you go back to work?

16            THE WITNESS:  October 2nd.

17            THE COURT:  Okay.  So around that time, you think?

18            THE WITNESS:  Well, truthfully, I don't know.  I

19   can't answer that question.  I just can't.  I'm sorry.  If you

20   could -- I don't even, even if it's at the top of the page,

21   this is just kind of --

22            MR. ROSENBERG:  It's not --

23            THE WITNESS:  That's not normally -- the notes that I

24   was referring to in my deposition are like this one right here,

25   "Coker at 28.5," "Shock at 2:00 a.m."  That's the type of notes
```

1   that I was referring.  This stuff here, that's just scratch,

2   chicken scratch.

3   BY MR. ROSENBERG:

4   Q.  All right.  But to be fair, the "Coker at 28.5M," that's

5   not your handwriting.  Right?

6   A.  That is not my handwriting, no.

7   Q.  Okay.  Let's just, I just want to go what you did.

8   A.  Okay.

9   Q.  And get through this as quickly as we can.  "Pass

10  Number 7," what is this here where I am?

11  A.  That's vacuum heater, Pass Number 7 vacuum heater, there

12  was something with Pass Number 7 on the vacuum heater that day.

13  I don't --

14  Q.  Okay.  Is that something that's recorded in EELs, or do

15  you know?

16  A.  It's very possible.  I mean, it could be that they were --

17  I don't know.

18  Q.  Okay.  "11" whatever this is here, Mr. Moore?

19  A.  That looks like a level indication on the bottom of my

20  vacuum tower.

21  Q.  Okay.  And I'm going to the next page.  Your handwriting?

22  A.  No.

23  Q.  Next page?

24  A.  That's my handwriting there, "Coker 02," "Number 2DE."

25  Q.  Okay.  Let me go here.

```
 1   A.    Uh-huh.

 2   Q.    Before we do that.

 3   A.    Okay.

 4   Q.    Let me go, is -- in the bracket where my thumb and my

 5   forefinger is --

 6   A.    No, it's where your --

 7   Q.    Okay.

 8   A.    That.  Yes, that's me.

 9   Q.    So here on this page?

10   A.    Uh-huh.

11   Q.    "Coker 02," and then "Number 2DE along"?

12   A.    That's correct.

13   Q.    So tell me what that means, that exchange.

14   A.    That probably means that the Coker's 02 limited.

15   Q.    Okay.

16   A.    And that would not be in EELs.

17   Q.    What does that mean, in laymen's terms, for someone who

18   knows nothing about --

19   A.    Well, it's just like, it's just like saying if me and you

20   were in a car race, and we were both drivers in the car, and it

21   was your turn to drive, I'd say, "Hey, you need to get gas as

22   soon as you can."  It's just a, I'm letting you know what's

23   going on with work.

24         It's not -- it's something that you can look and find

25   yourself, but it's just, I'm just helping you find it.  Instead
```

1   of having to look down at the fuel gauge and go, "Oh wow, I

2   need gas.  I wonder how come he didn't tell me I needed gas."

3   Q.   Okay.

4   A.   That's basically all it is.

5   Q.   "23 Apple, 23 AM service," what does that mean?  If you

6   know.

7   A.   That looks like maybe we cascaded something to the top of

8   the tower.

9   Q.   Okay.  This IL whatever that is?

10  A.   "11LA in service."

11  Q.   What does that mean?

12  A.   That's a -- I think that's a level transmitter on the

13  bottom of the vacuum tower, and it's in service.

14  Q.   Okay.  "B overhead," is that still your handwriting,

15  Mr. Moore?

16  A.   That is my handwriting.  "B overhead in tower," that's --

17  I think that's something that comes in -- that's something that

18  was from another unit that's now into our tower, and that

19  would, that is definitely in EELs.

20           THE COURT:  Did you rip off the bottom of that page?

21           THE WITNESS:  No, ma'am, I did not.

22           THE COURT:  It's still on your time frame, isn't it?

23           THE WITNESS:  Well, yes, but there would be, I mean,

24  you can see every other line is -- so there would be something

25  right there, but somebody else wrote something.  I mean, I --

Moore – Cross

1    so I'm going to have to assume, no, that that's where it ended

2    right there, just on the fact that I've got every other line,

3    and then there's nothing below.  There's not one anywhere below

4    the "B overhead."  I skipped a space, and then there's nothing

5    there.  There's --

6    BY MR. ROSENBERG:

7    Q.   Is this yours?

8    A.   No.

9    Q.   Okay.  And when I say "this," I'm looking at, it says

10   "Fill ram level switches."  Is that --

11   A.   I -- no, that's not mine.

12   Q.   Okay.  Next page?

13   A.   Okay, yeah, that's -- oops, push it down a little bit from

14   the top.

15   Q.   Hold it.  Let me fix it this way.

16   A.   "Holding at 135 and stabilized," that's me.

17   Q.   All right.  What about this, where my thumb and forefinger

18   is, crude --

19   A.   Yeah, this thing over here where it says "AGO" and I got a

20   couple of lines going back like that.

21   Q.   Yeah.

22   A.   That's me.  That's mine.

23   Q.   What about all the -- like "Blocked steam on die

24   stripper."

25   A.   No, that's not me.

1    Q.   Okay.  How about the middle "Coker," and then there's a

2    scratch out?

3    A.   That's not my handwriting.  My handwriting is underneath.

4    And there we are, Coker, Coker -- Coker 02 limited again is

5    what that means.

6    Q.   So this is your handwriting, 02 arrow?

7    A.   That's my handwriting.  That's correct.

8    Q.   Okay.  Slow down just for a second.  I want to make sure,

9    we may need this at some point.

10   A.   Okay.

11   Q.   So "02" and an upward arrow "for MarkWest" is your

12   handwriting?

13   A.   Yes.

14   Q.   What does that mean?

15   A.   I'm going to have to -- truthfully, I'm just, I'm going

16   to -- I think it's 02 limited again, and it's because of

17   MarkWest.  MarkWest is who, if they're not pulling our residual

18   gas, then it causes us to have problems not getting rid -- we

19   make too much gas at the West Plant.

20   Q.   Who's MarkWest?

21   A.   MarkWest is one of the refineries that takes our off-gas

22   that we make.

23   Q.   It's not a person?

24   A.   No, no, no, it's a refinery.

25   Q.   Okay.  So down here, "Util," is that your handwriting?

1   A.   No, that's not me either.

2   Q.   "November 6 weekend."  Is that your handwriting?

3   A.   No.  That looks like my handwriting -- no, that's not

4   my -- no, no, it's not.  No, I don't do my Ns like that.

5   Q.   Okay.  Go to the next page.

6   A.   Go -- yeah, that's me.

7   Q.   Yeah.  Hold on a second.  "Crude 155," that's you?

8   A.   That's me, uh-huh.

9   Q.   What does that whole exchange mean?

10  A.   That just, that's just -- now, this is more, this is a

11  relief that I give like from a -- this would be probably if I

12  had to go back and find all this information, this would

13  probably be my last night, and the person who just came on

14  after being gone for four days, and all I'm doing is

15  summarizing for him what happened while he was gone and just

16  giving him a quick rundown on the units, both units status and

17  where we're at on the units.

18  Q.   Okay.  And "Crude," is that the name of a --

19  A.   That's the Crude Unit, that's correct.

20  Q.   Okay.  Now, there's another one for Coker.

21  A.   That's correct.  I run the --

22  Q.   Is this also --

23  A.   -- Coker unit also.

24  Q.   -- also your --

25  A.   That's right.

Moore - Cross

1   Q.   It's also your handwriting.  Correct?

2   A.   Oh, I'm sorry.  Yes, uh-huh.

3   Q.   Okay.  And tell us what you're, in this four-line

4   exchange, with a line in the middle, what you're conveying

5   there?

6   A.   Coker's at 30,000 because of MarkWest.  At 40,000 you're

7   going to start hitting the wet gas compressor amp limit of 630.

8   Q.   Okay.

9   A.   So be careful when you go to 40,000.

10  Q.   "Feed exchangers open"?

11  A.   Feed exchanger bypasses are open because MarkWest, we're

12  trying to consume as much fuel gas as possible, and so we open

13  the fuel gas -- the feed exchangers to cool down the feed into

14  the heater.

15  Q.   Okay.

16  A.   And the heaters all, the "heater damper 100 percent" means

17  that we've got as much air going into it to run it as

18  inefficiently as possible.

19  Q.   Okay.  And then "start pay supervisor," that -- is that

20  your writing?

21  A.   That's not me, no.

22  Q.   Okay.  Going back to the top of this page --

23  A.   Okay.

24  Q.   -- would this Coker information here, would that be in

25  EELs?

Moore - Cross

1   A.   It would not be in EELs, no.

2   Q.   Okay.  And then crude information, would that be in EELs?

3   A.   Scroll down a little bit.  "023A in service" probably

4   would.  The rest of it is just in our databases.  It's in our

5   pie systems and our databases and stuff like that.

6   Q.   I think that's the first time I've heard that pie system

7   database.

8   A.   It's a, what it does is you have to -- when you're running

9   a refinery, or we, what we have is we have, we have hundreds of

10  thousands of points, okay, and we have to, we have to keep --

11  we have to be able to track those points, for history.  If I'm

12  trying to troubleshoot something, what I do is I go look at a

13  trend of, say, you know, how flat is this desk over the course

14  of time.  So I can, I can see what's -- I can trend all this

15  stuff.  And that's what we call our pie system.  It's a, it's

16  every single point that is used in the refinery is captured in

17  this pie system.

18  Q.   And saved somewhere in Citgo?

19  A.   Oh, it's -- yeah, that's the most secure -- that's, oh,

20  yes, absolutely, that thing is very secure.

21  Q.   Okay.  Now, this one page here, I'm going to do it as fast

22  as I can, "56.7"?

23  A.   No, that's not me.

24  Q.   "74E36A"?

25  A.   No, that's not me.  That's me.  Switch -- oops.

1   Q.   "Switch at midnight"?

2   A.   "Switch at midnight, then go to 30-hour cycle."  That's

3   me.

4   Q.   What does that mean?

5   A.   That we're going to be switching at midnight.  Probably

6   what happened is we changed a cycle in the middle of the day.

7   We had something happen that changed our normal cycle.  The

8   Coker is on a normal 11-hour cycle.  So if I switched at

9   midnight, that means we changed the cycle, and then we're going

10  to a 30-hour cycle for the next cycle.

11  Q.   Okay.  "Andre Chivit"?

12  A.   No, that's not me.

13  Q.   Okay.  Anything else in this page yours?

14  A.   Not that I can -- no, huh-uh, that's it.

15  Q.   Is that you?

16  A.   No.

17  Q.   Is that you?

18  A.   No.

19  Q.   Is that you?

20  A.   No.

21  Q.   Is this you?

22  A.   Yes, that's me right there, "Watchdog timer not running on

23  frac RNPCT mix valves at 9 and 11."

24  Q.   What does that mean?

25  A.   Which one?

Moore - Cross

135

1   Q.   Watchdog timer?

2   A.   It's a, it's a part of our advanced control systems that

3   when it's not running, it allows us not to be able to use it.

4   And I don't understand exactly how it works, I just know that

5   when it's not running --

6   Q.   Okay.

7   A.   -- that we can't use it.

8   Q.   "Mix valves, 911"?

9   A.   That's on desalters, our desalters have mix valves.

10  That's what they're set at.

11  Q.   The rest?

12  A.   No, that's -- none of the rest of that is mine.

13  Q.   This graph that's here with 34.3, that's not yours?

14  A.   No, that's not mine either.

15  Q.   This page here?

16  A.   2, E2 -- um, that very well could be my "2 E2s on."  That

17  kind of looks like my handwriting.

18  Q.   What does that mean?

19  A.   Two end fans (phonetic) on the Crude Unit are on.

20  Q.   Okay.  This next page here?

21  A.   That "555 naphtha rerun," that probably means that at 5:55

22  I sent in a naphtha rerun.

23  Q.   Which is what?

24  A.   One of our samples.

25  Q.   Anything else on this page yours?

Moore - Cross
136

1    A.    No.  No.

2    Q.    Next page?

3    A.    I don't see anything on that page.

4    Q.    No?

5    A.    No.  That "105 naphtha in box" is mine.

6    Q.    Okay.  What does that mean?

7    A.    That means that at 1:05 the naphtha sample was in the box

8    so you can go back and reference.

9    Q.    Anything else?

10   A.    That 1:51 charge minimum, raise 1,000 -- raise 1,000 in

11   crude Coker, that looks like mine.  And the 1:30 naphtha

12   sample, that looks like my handwriting too maybe.

13   Q.    Okay.  Just a few more.  This doesn't look like your

14   handwriting.

15   A.    No.

16   Q.    (Flipping page.)

17   A.    No, I don't see any there either.

18   Q.    (Flipping page.)

19   A.    No.

20   Q.    (Flipping page.)  Is that your handwriting?

21   A.    No.

22   Q.    What about this red stuff down here?

23   A.    No.

24   Q.    Is this yours here?

25   A.    I don't see any there, no.

1   Q.   Two or three more pages left, sir.

2   A.   Okay.  No.

3   Q.   And then the last?

4   A.   No.

5   Q.   Okay.  Is that number a telephone number JR?

6   A.   No.

7   Q.   633783?

8   A.   No.

9   Q.   Okay.  Okay.

10          MR. ROSENBERG:  We'll pass the witness.

11          THE COURT:  Thank you.

12                    REDIRECT EXAMINATION

13  BY MR. TEMPLE:

14  Q.   Sir, all the things that you were just talking about,

15  those references that were in your notes, you were taking those

16  notes for a reason, were you not?

17  A.   Yes.

18  Q.   You were writing down when something was important to you.

19  Correct?

20  A.   Something that I wanted to remember, that's correct.

21  Q.   Right.  A decision you had somehow made during your shift?

22  A.   Not a decision, no, sir.

23  Q.   Oh, none of the -- none of your notes pertained to any

24  decisions during your shift?  That's what you're telling me?

25  A.   You asked me a decision, and I said, I'm answering no.

Moore – Redirect

1  They're not all decisions.  They're just, sometimes they're

2  just somebody calls on the radio, "Hey, we just fixed this," I

3  write it down.  I'd have to go back through them and -- if you

4  want me to go back through them --

5           THE COURT:  Okay.  The bottom line is it's

6  information you need to know to operate your console.

7           THE WITNESS:  No, ma'am, it's not.

8           THE COURT:  None of it?

9           THE WITNESS:  Some --

10          THE COURT:  Then why do you write it down?

11          THE WITNESS:  Some of it is, yes, ma'am.

12          THE COURT:  Okay.  That's all I needed to know.

13          THE WITNESS:  Okay, yes, ma'am.  Some of it is, yes,

14  ma'am.

15  BY MR. TEMPLE:

16  Q.   And some of it referenced things that you have to consider

17  in operating your console.  Right?  What the naphtha level was,

18  when you take a sample, all these things are things that you

19  have to consider when operating a sample, or operating your

20  console.

21  A.   Okay.

22  Q.   Is that right?

23  A.   Uh-huh.

24  Q.   Is that a yes?

25          THE COURT:  I'm sorry, answer in words.

1      THE WITNESS:  Yes.

2  BY MR. TEMPLE:

3  Q.   And that's why you write it down, because it helps you

4  remember what it is that you're doing.

5  A.   In some cases, that's correct.

6  Q.   Okay.  And that's what we spent seven hours during your

7  deposition talking about your job tasks.  Right?

8  A.   About my notes?

9  Q.   About your job tasks, what it is that you do at work.  Do

10  you remember that?

11  A.   I remember a lot of things from the deposition, yes.

12  Q.   And it would have been very helpful, would it not, at

13  least for us to have had this information to talk to that, talk

14  to you about the job tasks in your notes during your

15  deposition.  Right?

16  A.   Yes, sir.

17  Q.   And, sir, some of these pages were ripped, so there were,

18  or there could have been information about your job tasks even

19  during the period of time that your referenced Plaintiff's

20  Exhibit 1 covers that in fact relate to your job that are no

21  longer here.

22  A.   Yes, sir.

23      THE COURT:  Several pages missing, not just ripped.

24  There's some ripped pages, and then there are whole pages

25  missing.

Moore – Redirect

140

```
1   BY MR. TEMPLE:
2   Q.   And, sir, can you say, as you sit here today under oath,
3   that those whole pages that are missing are not your pages?
4   A.   I can say here under oath that I did not remove those
5   pages.  I cannot say if they were or were not my pages.
6   Q.   Very well could have been.  Right?
7   A.   They very well could not have been.
8            THE COURT:  Just answer the question.  Could they
9   very well have been some of your notes?
10           THE WITNESS:  Yes, ma'am, they could have.
11           THE COURT:  Okay.  This is not a game.  This is your
12  suit.
13           THE WITNESS:  Yes, ma'am.
14           MR. TEMPLE:  No further questions, Your Honor.
15           MR. ROSENBERG:  No further questions.
16           THE COURT:  You may stand down.
17           MR. ROSENBERG:  I'm sure -- can he be excused?
18           MR. TEMPLE:  I don't have any other need for him.
19           MR. ROSENBERG:  Yeah, all right.
20           THE COURT:  Okay.  Arguments?
21           MR. TEMPLE:  Yes, Your Honor.  There are a few other
22  discovery items that we'd like to raise with the Court.  We can
23  either do it now as a part of this hearing or at a later point
24  in time.
25           THE COURT:  Tell me about them.
```

1          MR. TEMPLE:  One relates to Greg Smith and Mike

2    Wedgel --

3          THE COURT:  Wait a minute.

4          MR. TEMPLE:  -- and their answers to Interrogatory

5    Number 8.  They both need to be supplemented and have not been

6    supplemented.

7          THE COURT:  Greg Smith and Mike Wedgel?

8          MR. TEMPLE:  Gregg Smith and Michael Wedgel.

9          THE COURT:  Okay.

10         MR. TEMPLE:  Need to supplement Interrogatory

11   Number 8.

12         THE COURT:  What else?

13         MR. TEMPLE:  And then the other thing that we'd just

14   like to raise to the Court's attention is this personal e-mail

15   issue.  We have accessed and gone through some of the e-mails

16   that they've provided, and it appears to us by looking at the

17   screen shots at different points in time, e-mails are in fact

18   being deleted, since this Court's order.  And we can walk the

19   Court through it, because we've got a lot of screen shots

20   that --

21         THE COURT:  Well, that's clear.

22         MR. TEMPLE:  I'm sorry?

23         THE COURT:  It's clear they are.  They just said they

24   were.

25         MR. TEMPLE:  Okay.  There are more, separate and

```
 1    aside from the individuals we've heard from here today, and the

 2    prior hearing.

 3              THE COURT:  Okay.  Then I need to know about those.

 4              MR. TEMPLE:  Okay.

 5              THE COURT:  But first I'm going to dismiss Rudy

 6    Ramirez, William Waggoner, Greg Smith, Diana Reddell, Ronald

 7    Ganer, Ronald Stubbs, Rick Salinas, Luis Galvan, Michael

 8    Wedgel, Don Hedrick, Jaime Requenez, Robert Garcia, Eduardo

 9    Martinez, Mr. Villarreal, Mr. Bellows, Mr. Martinez, and

10    Mr. Moore.

11              Now, let's take up what's left on discovery matters.

12              MR. ROSENBERG:  Your Honor, can I -- I'm sure it will

13    be in the order coming out, I just would like to -- I didn't

14    get a chance to write down every single one of those.  And I --

15              THE COURT:  I'll give you an order -- Rudy Ramirez,

16    Waggoner, Smith, Reddell, Ganer, Stubbs, Salinas, Galvan,

17    Michael -- is it Wedgel?

18              MR. ROSENBERG:  Wedgel.

19              THE COURT:  Wedgel, Hedrick, Requenez, Robert Garcia,

20    Eduardo Martinez, Sr., Mr. Villarreal, Mr. Bellows, Rudolfo

21    Martinez, and Steve Moore.

22              And some out of those who testified, Chester Harris

23    is the only one, Harrison, that's going to be saved.  And

24    that's, I'll give you a, if you require it, I'll give you a

25    long order on that.  But it's for failure to participate in
```

1    discovery, properly supplement, and preserve documents.

2              MR. ROSENBERG:  I mean, the Court's ruled, there's no

3    sense in argument.  I'm certainly not going to do that, if the

4    Court -- if the Court's ruled, there's nothing for me to argue.

5              THE COURT:  Okay.

6              MR. ROSENBERG:  I think I respect the Court's ruling,

7    and I think I do need a, an order explaining this from the

8    Court.

9              THE COURT:  You didn't get it as we were going along?

10             MR. ROSENBERG:  No, Your Honor, that's not the point.

11             THE COURT:  I got it.  No, no problem.  So tell me,

12   other than the people I dismissed, what discovery issues do you

13   have?

14             MR. TEMPLE:  Your Honor, we've got e-mail issues with

15   Jerry Davila.

16             THE COURT:  Wait a minute.  What are those?

17             MR. TEMPLE:  The e-mail issues go to the, go to the

18   point of deletions, what appear to be deletions from the e-mail

19   account.  He's given us his password, and as we look at the

20   screen shots from different dates, it appears -- and I could

21   walk the Court through it and introduce them -- but it appears

22   that e-mails are being deleted.

23             MR. ROSENBERG:  May I be heard on this one?  All

24   right.  This is something that we're seeing brought up to me

25   for the first time without even seeing what it is he's talking

1   about.  There's been no communication on this issue from

2   Counsel.  We've provided the passwords.  We were supposed to

3   get the information.  I haven't seen it.  And to bring it up at

4   this point --

5          THE COURT:  Would you all like to take some time and

6   exchange this information, discuss it, and see if you can come

7   up with a solution?  And if you can't, obviously I can.

8          MR. TEMPLE:  That's fine, Your Honor.  The only -- we

9   just recently found out about it.  The only reason I was

10  raising it now is because it's, the Court order --

11         THE COURT:  You're just giving me a heads up.

12         MR. TEMPLE:  Yeah.

13         THE COURT:  And anything else you want to put on the

14  record?

15         MR. TEMPLE:  No, Your Honor.

16         THE COURT:  Mr. Rosenberg?

17         MR. ROSENBERG:  Well, I would like to put on the

18  record and argue to the Court.  And as I'm arguing to the

19  Court, I certainly want to make it clear that I realize the

20  roles here.  I have an obligation to my clients to, to assert

21  argument, and I'm going to make it, and I'm happy to make it in

22  a motion for reconsideration, if that's better.

23         THE COURT:  Would it be better for you to do that?

24         MR. ROSENBERG:  I would prefer it, Your Honor,

25  because it gives me a --

1    THE COURT:  Because I want you to be able to see my

2 written order, so you'll know what to address.

3    MR. ROSENBERG:  Fair enough.

4    THE COURT:  Is that fair enough?

5    MR. ROSENBERG:  Fair enough.  I -- fair enough.

6    THE COURT:  And I mean, I just want you to be able to

7 be complete.

8    MR. ROSENBERG:  Right.  And I want --

9    THE COURT:  I know you object to my dismissing this.

10    MR. ROSENBERG:  Well, but Your Honor, I don't argue

11 with District Judges.  If you made a ruling, you made a ruling.

12    THE COURT:  You can argue all you want.  It doesn't

13 bother me.  The only thing that annoys me, I guess, is when

14 somebody stands up and asks me a question.  Well, what do you

15 mean by that?  I get a little testy about that.

16    MR. ROSENBERG:  Well, I hope I haven't done that.

17    THE COURT:  You have never done that, Mr. Rosenberg.

18    MR. ROSENBERG:  Okay.

19    THE COURT:  But what I'd like to do is go ahead and

20 issue my order, let you file a motion to reconsider, addressing

21 the certain points, and then I'll give the Defendants a week to

22 respond to that.  How does that sound?

23    MR. ROSENBERG:  And would we be able to address it

24 back in court by hearing?  It's obviously --

25    THE COURT:  I would be glad to.

1          MR. ROSENBERG:  It's obvious, I know the Court's

2   schedule is, is --

3          THE COURT:  Your time is -- my time is your time, so

4   don't even worry about it.

5          MR. ROSENBERG:  Okay.

6          THE COURT:  Just check with Ms. Cayce.  Y'all do a

7   joint call to Ms. Cayce, and if you want to do this orally,

8   I'll do that.  But I want everybody to be able to respond

9   first.

10         MR. ROSENBERG:  Yeah, that would be, that would

11  certainly be my preference.  And then we've got to figure out

12  what we do with the rest.  And if we do certain --

13         THE COURT:  You want two weeks to respond to my order

14  whenever I get it out?

15         MR. ROSENBERG:  Yes.

16         THE COURT:  And then a week for the Defendants?

17         MR. TEMPLE:  Thank you, Your Honor.

18         MR. ROSENBERG:  And that would -- but what does that

19  do -- yes, he can answer for himself, but the question I have

20  is we have remaining people in the case.  Obviously, if the

21  Court, if the dismissal is going to stand, and we go forward,

22  I've got to, I've got to then request 54B, I've got to do

23  something legally, procedurally, and I don't know exactly what

24  it's going to be yet, because I haven't thought it all the way

25  out.  But we have a trial setting in March.

1           THE COURT:  We don't really have the certification

2      either.  Do we require that?

3           MR. ROSENBERG:  For what?

4           THE COURT:  For the --

5           MR. ROSENBERG:  It's not a class.

6           THE COURT:  I'm sorry, okay.

7           MR. ROSENBERG:  Yeah.

8           THE COURT:  Not a wage and overtime claim.

9           MR. ROSENBERG:  I mean, it is, but it's not a class

10     action.

11          THE COURT:  But don't you have to do some kind of

12     notice?

13          MR. TEMPLE:  Your Honor, this is now --

14          THE COURT:  No?

15          MR. TEMPLE:  It's a multi-plaintiff case at this

16     point.  It's no longer a 216B.

17          THE COURT:  Never mind.  Got it.

18          MR. ROSENBERG:  Right.

19          THE COURT:  I'm just tired.

20          MR. ROSENBERG:  And I just want to know, we have a,

21     you know, pretrial.  I had sent out some requests for

22     discovery.  Obviously, a lot of what I sent out, if the Court's

23     order stands, it doesn't go.  I mean, because I have requested

24     depositions for supervisors who you just dismissed from the

25     case.  So I've got to re --

```
1              THE COURT:  Let me just tell you this right now.  If

2    I don't keep the dismissals that I've got right now, I will

3    change the trial time.  Okay?

4              MR. ROSENBERG:  Okay.

5              THE COURT:  So you can -- no use going back and forth

6    with a lot of discovery now.  I've made a ruling, and I will be

7    glad to revisit it, after I look at your response, your motion

8    to reconsider it, and the Defendant's response.  Is that fair

9    enough?

10             MR. ROSENBERG:  Very fair.

11             THE COURT:  Okay.

12             MR. ROSENBERG:  So we don't have to worry about

13   discovery right now.  We'll get this addressed, then go from

14   there.

15             THE COURT:  I think, go ahead and do discovery on the

16   people that you know are left.

17             MR. ROSENBERG:  The problem is some of them, like for

18   example, if there's a supervisor, the supervisor might be the

19   supervisor of --

20             THE COURT:  I understand.

21             MR. ROSENBERG:  -- six people.

22             THE COURT:  I understand, and you don't want to do

23   them piecemeal.

24             MR. ROSENBERG:  Right.

25             THE COURT:  If you can do discovery, go ahead and do
```

1    it.  If these people are going to be -- if I add some people

2    back in, if I made a mistake, which is not unusual, then I'll

3    let you take the depositions.  Just wait and take those

4    depositions that may apply to multiple people.  If you can

5    take, do any discovery that applies to the remaining people, do

6    it.

7            MR. ROSENBERG:  I don't know, we'll have to talk

8    about that.

9            THE COURT:  Why don't y'all talk about that.

10           MR. TEMPLE:  And just one issue, Your Honor, as I'm

11   kind of thinking through this.  With regard to the remaining

12   Plaintiffs, we intend to file and are about to file motions for

13   summary judgment, so --

14           THE COURT:  I expect that.

15           MR. TEMPLE:  -- I don't want that to stop that

16   process.

17           THE COURT:  But I need to get this order out first --

18           MR. TEMPLE:  Yeah.

19           THE COURT:  -- to see.  And are we ready to go off

20   the record for a minute?

21           MR. ROSENBERG:  The only question I would have on the

22   record, and then we could go off, is would the Court consider,

23   in light of what's happened today, moving everything forward

24   until this can be reconciled, because the summary judgment

25   motion he's going to file, it's really going to be the same

1    motion for summary judgment for everybody in or out of the

2    case.

3              THE COURT:  I will.  I will.  Let's go off the record

4    for a minute.  I want to talk to you about that.

5        (Proceedings concluded at 4:15 p.m.)

6

7

8

9

10   I, court approved transcriber, certify that the foregoing is a
     correct transcript from the official electronic sound recording
11   of the proceedings in the above-entitled matter.

12

13

14
     /s/ Molly Carter              February 3, 2012
15   Molly Carter                  Date

16

17

18

19

20

21

22

23

24

25

```
1                              INDEX

2

3   DEFENDANT'S WITNESSES:      DIRECT   CROSS   REDIRECT   RECROSS

4   JAIME REQUENEZ                4       25       28         29

5   ROBERT GARCIA                31

6   CIRIACO VILLARREAL, JR.      50

7   EDUARDO MARTINEZ, SR.        70

8   DAVID WAYNE BELLOWS          83

9   RUDOLFO ROBERT MARTINEZ      87      105

10  STEVEN MOORE                107      122      137

11

12  COURT'S RULING ON DISMISSALS ........................... 142

13

14

15  EXHIBITS:                                          RECEIVED

16  DX-1:  CIRIACO VILLARREAL JR.'S RESPONSE TO DEFENDANT'S
           INTERROGATORIES .............................   65
17  DX-2:  CIRIACO VILLARREAL JR.'S FOURTH SUPPLEMENTAL
           RESPONSE TO DEFENDANT'S INTERROGATORIES ........   67
18  DX-3:  EDUARDO MARTINEZ, SR.'S SUPPLEMENTAL RESPONSE TO
           DEFENDANT'S REQUESTS FOR PRODUCTION ............   73
19  DX-4:  EDUARDO MARTINEZ, SR.'S RESPONSE TO DEFENDANT'S
           INTERROGATORIES .............................   78
20  DX-5:  EDUARDO MARTINEZ, SR.'S THIRD SUPPLEMENTAL
           RESPONSE TO DEFENDANT'S INTERROGATORIES ........   79
21  DX-6:  DAVID BELLOWS' SUPPLEMENTAL RESPONSE TO
           DEFENDANT'S REQUESTS FOR PRODUCTION ............   87
22  DX-7:  CITGO'S REQUESTS FOR PRODUCTION TO RUDOLFO R.
           MARTINEZ ....................................   90
23  DX-8:  RUDOLFO R. MARTINEZ'S SUPPLEMENTAL RESPONSE TO
           DEFENDANT'S REQUESTS FOR PRODUCTION ............   94
24  DX-9:  STEVE MOORE'S THIRD SUPPLEMENTAL RESPONSE TO
           DEFENDANT'S REQUESTS FOR PRODUCTION ...........  117
25
```